# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LEONARD S. EMBODY,     )
                           )
       Plaintiff,    )
                           )
vs.                 )  CASE NO.
                           )  310 0126
STEVE WARD,         )
individually,      )
                           )  ORIGINAL
       Defendant.    )
_____)

VIDEOTAPE DEPOSITION OF:

LEONARD STANNIE EMBODY

Taken on behalf of the Plaintiff

October 14, 2010

VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
(615) 256-1935

1

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 1 of 177 PageID #: 51

```
 1   APPEARANCES:

 2
     For the Plaintiff:
 3
      PHILLIP L. DAVIDSON, ESQUIRE
 4    Law Offices of Phillip L. Davidson
      2400 Crestmoor Road, Suite 107
 5    Nashville, Tennessee 37215
      615.386.7115
 6

 7   For the Defendant:

 8    MARY M. BERS, ESQUIRE
      Attorney General's Office
 9    425 5th Avenue North, 2nd Floor
      Nashville, Tennessee 37202
10    615.741.1845
      Mary.Bers@ag.tn.gov
11

12    KIM L. KIRK, ESQUIRE
      Environment and Conservation Office
13    401 Church Street, 20th Floor
      Nashville, Tennessee 37243
14    615.532.0131
      Kim.kirk@tn.gov
15

16

17   Also Present:   Katerine Embody
                      Steve Ward
18                    Joshua Walsh

19

20   Videographer:   Rudy Smith

21

22

23

24

25
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 2 of 177 PageID #: 52

```
 1                    I N D E X

 2   WITNESS:  LEONARD STANNIE EMBODY

 3                INDEX OF EXAMINATIONS

 4                                          Page

 5   By Mr. Davidson .......................  5

 6

 7

 8

 9                 INDEX OF EXHIBITS

10

     Exhibits          Description        Page

11
     No. 1    The Highroad Forum emails     50

12
     No. 2    Opencarry Forum email         51

13
     No. 3    Glock Talk email              52

14
     No. 4    Opencarry Forum email         53

15
     No. 5    CD                            58

16
     No. 6    Interrogatories to Plaintiff  84

17
     No. 7    Color photograph              85

18

19

20

21

22

23

24

25
```

Case 3:10-cv-00126  Document 16-1   Filed 11/30/10  Page 3 of 177 PageID #: 53

```
1              The videotape deposition of LEONARD

2    STANNIE EMBODY was taken by counsel for the

3    Plaintiff at the offices of Attorney General's

4    Office, 425 5th Avenue North, Nashville,

5    Tennessee, on October 14, 2010, commencing at

6    9:41 a.m., for all purposes under the Tennessee

7    Rules of Civil Procedure.

8              The formalities as to notice,

9    caption, certificate, et cetera, are waived.

10   All objections, except as to the form of the

11   questions, are reserved to the hearing.

12             It is agreed that Sandra Andrys,

13   RMR, LCR, being a Notary Public and Court

14   Reporter, may swear the witness, and that the

15   reading and signing of the completed deposition

16   by the witness are reserved.

17

18

19                      *    *    *

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  On the record.
 3    Reading of the introduction has been waived.
 4    The time on the video monitor is 9:41 a.m.
 5              Court reporter, would you please
 6    swear in the witness.
 7              LEONARD STANNIE EMBODY,
 8    having been first duly sworn, was examined and
 9    testified as follows:
10              E X A M I N A T I O N
11    BY MS. BERS:
12    Q.    Good morning.  Are you Leonard Embody?
13    A.    Yes, I am.
14    Q.    Mr. Embody, we're here today on a case
15    that you have filed in federal court.  Before I
16    start asking you questions, there's some -- some
17    things I'd like to go over with you.
18              If I ask you any question that is
19    unclear or confusing or you simply don't
20    understand, will you let me know that?
21    A.    Yes.
22    Q.    If at anytime you need to add to, correct
23    or change anything that you have told me, will
24    you let me know that, please?
25    A.    Yes.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 5 of 177 PageID #: 55

```
 1    Q.      Do you understand that what you tell me
 2    today, I'll have the right to rely on in future
 3    proceedings in your case?
 4    A.      Yes.
 5    Q.      Are you taking any medications or any
 6    type of substance that would in any way limit
 7    your ability to understand and answer questions
 8    today?
 9    A.      No.
10    Q.      Are you carrying any type of recording
11    device with you today?
12    A.      Yes.
13    Q.      What type of device are you carrying?
14                MR. DAVIDSON:   Let me enter an
15    objection.   Mr. Embody is not recording anything
16    today.
17    BY MS. BERS:
18    Q.      You have a device, but you are not using
19    it, is that -- is that what I understand to be
20    the case?
21    A.      Yes.
22    Q.      Now, what is your date of birth and your
23    age?
24    A.      April 27, 1972; I'm 38 years old.
25    Q.      Who -- where -- where are you presently
```

```
 1   living?
 2   A.      I live at my house.
 3   Q.      All right.  What is your address?
 4   A.      6620 Valley Drive, Brentwood, Tennessee.
 5   Q.      And who's in -- who's in your household
 6   with you?
 7   A.      My children and my wife.
 8   Q.      Okay.  And your wife's name is?
 9   A.      Katerine Embody.
10   Q.      And she's here today; is that right?
11   A.      That's correct.
12   Q.      And your children are?
13   A.      They're not here today.
14   Q.      They're not here today.
15           What are their ages?
16   A.      Seven and 10.
17   Q.      Okay.  Now, I'm looking in large part for
18   a lot of information about you from responses
19   that you made to interrogatories --
20   A.      Okay.
21   Q.      -- that -- that we had.  And so that
22   we're all talking off of the same page, I'm
23   going to give you -- I'm going to give you a set
24   of -- of your responses.  Thank you.
25           Mr. Embody, you indicated in
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 7 of 177 PageID #: 57

1  response to interrogatory Number 2 that you have

2  -- you've gone by a number of different names or

3  variations of your names; would that be fair to

4  say?

5  A.     I've been known by a few, yes.

6  Q.     All right.  It looks as though till 1990,

7  when I bet you had just turned 18, you went by

8  Lenny or Lenny Stannie Embody and then after --

9  after 1990, it appears that you preferred to be

10  called Leonard Embody or Leonard Stanard --

11  Stannie Embody; is that right?

12  A.     That's correct, that's my given name.

13  Q.     All right.  It also appears that you have

14  used some names that would -- would these be

15  names -- well, you tell me what those names are,

16  Kwikrnu, Kwikru, Easterisland, et cetera.

17  A.     Yes.

18  Q.     What are -- what are those names?

19  A.     Well, I was asked to -- to give names

20  that I've used on Internet websites or news

21  forums, Internet discussion forums, and those

22  are names that I've -- I've used.

23  Q.     Okay.  And so Kwikrnu, K-W-I-K-R-N-U,

24  would, for example, be one of those -- one of

25  those names that you've used for discussion

Case 3:10-cv-00126  Document 16-1  Filed 11/30/10  Page 8 of 177 PageID #: 58

1  forums and things of that nature; is that right?

2  A.    Yes, it's just a user name.

3  Q.    All right.  Now, you have -- you were

4  born in -- in California, I believe; is that

5  right?

6  A.    That's correct.

7  Q.    Okay.  And it looks as though you -- you

8  went through high school when you were still

9  living in California?

10  A.    That's correct.

11  Q.    Then it also looks as though you went to

12  a community college in California, Cilantro

13  Community College; is that right?

14  A.    Cilantro Community College.

15  Q.    Cilantro.  All right.  Did you -- did you

16  get a degree there?

17  A.    No.

18  Q.    Okay.  What did -- what did you study?

19  A.    General studies.

20  Q.    Okay.  It also looks as though you moved

21  to Tennessee at some time in the early 1990s; is

22  that correct?

23  A.    Near mid 1990s.

24  Q.    Mid 1990s, okay.  Because I've been

25  looking at -- I believe it was interrogatory

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 9 of 177 PageID #: 59

1   Number 8 -- 28, and it indicated that you lived

2   with Bill and Narise Embody.

3   A.      Yes, they're my parents.

4   Q.      Okay.  And that was from 1990 to 1991; is

5   that right?

6   A.      Actually, I've lived with them while I

7   was growing up --

8   Q.      All right.

9   A.      -- for most of my life.

10  Q.      Okay.

11  A.      But, yes, I -- I lived with them from

12  1990 to 1991.

13  Q.      In Cottontown, Tennessee?

14  A.      No.

15  Q.      I beg your pardon?

16  A.      No, I've -- I've never lived in

17  Cottontown, Tennessee.

18  Q.      All right.  So when you were asked to

19  list the -- I see.

20          So their present address is -- is

21  Cottontown; is that right?

22  A.      Yes.

23  Q.      Okay.  Did you move with your parents to

24  Tennessee?

25  A.      No, I did not move with my parents to

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 10 of 177 PageID #: 60

```
 1   Tennessee.
 2   Q.      You came on your own to Tennessee.
 3   A.      Yes.
 4   Q.      Okay.  What were your reasonings for
 5   moving from California ultimately to Tennessee?
 6   A.      I didn't move from California to
 7   Tennessee.  I moved from --
 8   Q.      I understand.
 9   A.      -- I moved from San Antonio, Texas to
10   Tennessee.
11   Q.      All right.  You -- you went to a
12   community college in California in 1990, 1991,
13   in that time?
14   A.      That's correct.
15   Q.      Okay.  And then at some point you -- you
16   joined the -- the Reserves, the Army Reserves;
17   is that right?
18   A.      That's correct.
19   Q.      All right.  Would that have been directly
20   out of your time at the community college, or
21   how does that relate?
22   A.      No.  The -- when I -- I went to the --
23   it's such a long time ago.
24           MR. DAVIDSON:  Are you referring to
25   a civic question, that might help out?
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 11 of 177 PageID #: 61

```
 1              MS. BERS:  Yeah.
 2   BY MS. BERS:
 3   Q.      If you look -- Mr. Embody, look at either
 4   interrogatory Number 28 or interrogatory Number
 5   5, those will probably help you the best.
 6   A.      No.  I think I went to -- I went to
 7   community college from -- in 1991 --
 8   Q.      Okay.
 9   A.      -- in the spring of 1991.  And from there
10   the -- I -- I moved -- I'm sorry, what -- repeat
11   your question again, because I'm confused.
12   Q.      I'm not sure if I can remember my
13   question, but let me -- let me start again with
14   you; okay?
15   A.      Okay.
16   Q.      And let's see where we can go from there.
17   Okay.
18              You -- you -- you went to the
19   community college, Cilantro Community College.
20              What did you do after Cilantro?
21   A.      I went on a mission for my church.
22   Q.      All right.  Where in -- where was that?
23   A.      It was in Ogden, Utah, I believe, or
24   in -- maybe in Provo, Utah, for two months, and
25   then I was in Santiago, Chile.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 12 of 177 PageID #: 62

```
1   Q.      And what brought you to Santiago, Chile?

2   A.      The mission trip with the church.

3   Q.      And you were there for a couple of years,

4   weren't you?

5   A.      I was there until 1993, the summer of

6   1993.

7   Q.      Then what did you do after that?

8   A.      Then I worked, and then I went to -- then

9   I joined the Army Reserves.

10  Q.      Then you did what?

11  A.      Then I joined the Army Reserves.

12  Q.      Okay.  What did you do?  What kind of

13  work did you do between returning from Chile and

14  going into the Reserves?

15  A.      I believe I worked for Century

16  Insulation.

17  Q.      When you were in the Reserves, do you

18  remember what the -- what years you were in

19  active duty?

20  A.      I was -- oh, I was on the active duty for

21  a few months between 19 -- from January, 1994

22  until about October, 1994.

23  Q.      Look, if you would, at interrogatory

24  Number 5.

25          And do you see -- it has the dates
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 13 of 177 PageID #: 63

```
 1   1994 to 2002 your being in the Army Reserves; do
 2   you see that?
 3   A.      Yes.
 4   Q.      Okay.  And it says that you were training
 5   for war.
 6                What -- what war were you training
 7   for?
 8   A.      That's what soldiers do, they train for
 9   war.
10   Q.      Did you ever see combat?
11   A.      No, I didn't.
12   Q.      Okay.  What -- did you have any training
13   in the use of AK-47s during your -- your
14   training?
15   A.      No, I didn't.
16   Q.      What type of -- or what types of job
17   assignments did you have both in active duty and
18   then during your Reserve time?
19   A.      We had -- we had any -- any typical job
20   assignment that you would have in basic
21   training, cleaning the -- cleaning the toilets,
22   making beds, shining the floor, mopping the
23   floor, sweeping.
24   Q.      Were you -- I'm sorry.
25   A.      I mean, there's -- there's a million and
```

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 14 of 177 PageID #: 64

```
 1    one assignments.
 2    Q.      Sure.  Okay.  Were you -- were you
 3    assigned any particular specialty?
 4    A.      Yes, my specialty, I was assigned or that
 5    I chose was a pharmacy technician specialty.
 6    Q.      And how long did you -- did you -- were
 7    you assigned to jobs in that specialty?
 8    A.      From 1994 until 2002, when I was
 9    honorably discharged.
10    Q.      Okay.  During your time of active duty,
11    which you said was just a few months; am I
12    correct, is that what you said?
13    A.      That's right, from January, 1994, until
14    about October of 1994, active duty training.
15    Q.      Okay.  And where did you have your active
16    duty training?
17    A.      Fort Sill, Oklahoma.
18    Q.      Okay.
19    A.      And Fort Sam, Houston, Texas.
20    Q.      After you completed your active duty,
21    where did you go to live?
22    A.      Tennessee.
23    Q.      In Tennessee.  And I apologize to you
24    that my chronology is not totally correct, or if
25    it is.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 15 of 177 PageID #: 65

```
 1              Had you already considered Tennessee
 2    to be your home address at -- at that point?
 3    A.      Yes.  Well, the -- during -- while I was
 4    in active duty for training?
 5    Q.      Yes.
 6    A.      Then I changed my home -- home duty to
 7    Tennessee.
 8    Q.      Okay.  What did you -- and -- and again,
 9    pardon me if my chronology is wrong.
10              Had your parents already moved to
11    Tennessee?
12    A.      Yes.
13    Q.      All right.  So -- so they were already
14    here, and when you finished your active duty, it
15    is to Tennessee that you came also; is that
16    right?
17    A.      That's correct.
18    Q.      Where in Tennessee did you move?
19    A.      Nashville.
20    Q.      To Nashville, all right.
21              What brought you to Nashville?
22    A.      Well, my parents live here, so it was
23    free room and board.
24    Q.      Okay.  So you came and you stayed with
25    your parents; is that right?
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 16 of 177 PageID #: 66

```
1   A.      That's correct.
2   Q.      Okay.  You gave also, in interrogatory
3   Number 5, a listing of some of the jobs that
4   you've had.  And I notice that there was a
5   period of time between 1991 and 1994 that you
6   don't have any listings.
7           What was going on during that time?
8   A.      Well, as I stated previously, I was in
9   South America.
10  Q.      All right.  So -- so that accounts for
11  part of that time.
12  A.      And then I was active duty training for
13  the military.
14  Q.      All right.  Okay.  Then of the jobs that
15  you have listed, apart -- let's -- apart from
16  the Army Reserves, Mr. Embody -- apart from the
17  Army Reserves, tell me what other jobs that you
18  have listed that would have been full-time jobs.
19  A.      Matco Tools was a full-time job.  The
20  Staffmark Temporary Agency was a full-time job.
21  The Truck Tops, Et Cetera, was a full-time job.
22  The ASIG was a full-time job.
23          Gap was a full-time job.  Master
24  Staff was a full-time job.  Yellow Freight was a
25  full-time job if you can -- if -- if you're
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 17 of 177 PageID #: 67

```
 1   considering eight hours a day a full-time job.
 2                 And the Williamson County Board of
 3   Education, I considered that a full-time job
 4   because I was -- it was about seven and a half
 5   hours a day.
 6   Q.     All right.  Were the Williamson County
 7   Board of Education you were a bus driver; is
 8   that right?
 9   A.     That's right.
10   Q.     School bus?
11   A.     Yes.
12   Q.     School bus driver?  And you worked there
13   from 2008 to 2010?
14   A.     That's correct.
15   Q.     Are you still working there?
16   A.     No.
17   Q.     Okay.  When -- when did you -- when did
18   you stop?
19   A.     I quit in January of this year.
20   Q.     Okay.  And the reason for your leaving
21   your job?
22   A.     I had two surgeries in 2009 on my wrist,
23   and -- and I quit for two reasons:  One, because
24   my wrist was hurt when I -- when I drove the bus
25   it just hurt; and the second reason, I'm in
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 18 of 177 PageID #: 68

```
 1   nursing school, and I don't have time to drive
 2   the bus.
 3   Q.      Which wrist did you have your surgery on?
 4   A.      My left wrist.
 5   Q.      Okay.  Are you left or right-handed?
 6   A.      I'm right-handed.
 7   Q.      Okay.  You had two jobs, two full-time
 8   jobs in 2007, ASIG and Gap.
 9           Were they at the same time or were
10   they at separate times?
11   A.      No, I started ASIG, and then I quit that
12   probably within two weeks.  I don't -- I don't
13   recall the exact, but then I -- then I began
14   working at Gap.
15   Q.      And then how long did you stay at the
16   Gap?
17   A.      I worked there, I think, until April of
18   -- of 2007.
19   Q.      Okay.  So between January and April of
20   2007, you had worked at ASIG and you had also
21   worked at Gap?
22   A.      Yes.
23   Q.      Then your next job was not until 2008; is
24   that right?
25   A.      No, I -- I worked at -- I worked at
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 19 of 177 PageID #: 69

```
 1   Yellow -- I was employed with Yellow Freight
 2   during that time period as well.
 3   Q.     And -- and that was a full-time job as
 4   well?
 5   A.     Yes, that's -- that's casual, as it
 6   states on the paper.  It was a casual on-call
 7   job, so it depends on if they needed me, they
 8   called me in, but I'd usually work eight hours
 9   when they did call me.  And the economy was good
10   at that time, so I was called often.
11   Q.     Do you -- in -- in -- in your past work
12   life do you consider that you have a -- a set of
13   specialized job skills?
14   A.     Yes.
15   Q.     What -- what would those be?
16   A.     I'm able to drive a forklift.  I'm able
17   to -- as a pharmacy technician dispense
18   medicines.  I can hang insulation, install
19   insulation.  I was a sorter for UPS for four or
20   five years.
21               Pick-N-Pack tools; install
22   components for trucks; as a bus driver, drive
23   buses.  So, yeah, I mean, I have a lot of
24   specialized skills.
25   Q.     Okay.  You -- you mentioned before that
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 20 of 177 PageID #: 70

1    you're -- you're studying for a nursing degree;

2    is that right?

3    A.      That's correct.

4    Q.      Let me go back a bit and let's -- let's

5    work up to that; okay?  We've talked a little

6    bit about Cilantro Community College, and I

7    think you said that you were doing general --

8    general studies there; is that right?

9    A.      That's correct.

10   Q.      Then the next school that you've listed,

11   if I'm correct, is Volunteer State Community

12   College --

13   A.      That's correct.

14   Q.      -- up at Gallatin; is that right?

15   A.      Yes.

16   Q.      Did you get a degree there?

17   A.      Yes, I did.

18   Q.      What was -- what, associate's degree?

19   A.      Yes.

20   Q.      And what was -- what were you studying?

21   A.      I've changed my -- my degree several

22   times, at least twice.  So what time frame are

23   you talking about?

24   Q.      Okay.  Well, I guess what I was trying to

25   find out from you, when you said you had your

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 21 of 177 PageID #: 71

```
 1   associate's degree from Volunteer State --

 2   A.      Okay.

 3   Q.      -- was what your major was at the time.

 4   A.      At what time?

 5   Q.      That you were at Volunteer State.

 6   A.      I --

 7   Q.      Or if you had several majors, that's

 8   fine.

 9   A.      I've had two different majors.

10   Q.      Okay.  What were they?

11   A.      Okay.  First, my major was pre-pharmacy,

12   and second, my major was sociology.

13   Q.      Did you change from pre-pharmacy to

14   sociology or was it -- or was it the other way

15   around?

16   A.      Pre-pharmacy first.

17   Q.      And then sociology?

18   A.      Yes.

19   Q.      You then -- you then went to Columbia

20   State Community College starting in 2009; is

21   that right?

22   A.      That's correct.

23   Q.      Okay.  And are you presently enrolled at

24   Columbia State Community College?

25   A.      Yes, I am.
```

```
 1   Q.      Okay.  And are you working toward a

 2   degree there?

 3   A.      Yes, I am.

 4   Q.      What degree are you working towards?

 5   A.      Nursing degree.

 6   Q.      Is that a B.S.?

 7   A.      A.S.

 8   Q.      Okay.  And is it in any particular branch

 9   of nursing or a general nursing degree?

10   A.      It's a general Registered Nurse degree.

11   Q.      Okay.  As an RN.  How far along are you

12   in your studies?

13   A.      As far as, like, how many credit hours?

14   Q.      Yes, sir.

15   A.      I don't know.

16   Q.      Did you receive credit for your -- your

17   past studies?

18   A.      Yes.

19   Q.      What are you taking this semester?

20   A.      I'm taking basic medical surgical.  I'm

21   taking a clinical.  I'm taking a pharmacy class,

22   and I'm taking an OB/GYN class.

23   Q.      Where are you taking your clinical?

24   A.      Williamson Medical Center.

25   Q.      And how -- how many hours a week is your
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 23 of 177 PageID #: 73

1  clinical?

2  A.    It's approximately six hours a week.

3  Q.    Okay.  And that's for -- that's the this

4  semester; is that right?

5  A.    That's correct, so far.

6  Q.    Okay.  How many semesters have you gone?

7  A.    To Columbia State?

8  Q.    Yes, sir.

9  A.    This is my third semester.

10  Q.    Okay.  Did you go during the summer?

11  A.    I went through the -- the summer of 2009.

12  Q.    We are here today to talk about the --

13  the incident at Radnor Lake Natural Area on

14  December the 20th, 2009.

15         And if I refer to it as Radnor or

16  Radnor Lake, will we both understand that I'm

17  talking about Radnor Lake Natural Area?

18  A.    I -- I thought it was considered a state

19  park.

20  Q.    Well, it's considered a natural area.

21  The technical name is natural area, but I've

22  often thought of it as a state park myself.

23         But just so that we understand, when

24  we talk about Radnor or Radnor Lake, we're

25  talking about Radnor Lake Natural Area or state

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 24 of 177 PageID #: 74

```
 1   park; okay?
 2   A.      Okay.
 3   Q.      Okay.  Now, I want to talk, first of all,
 4   about the firearm that you brought with you on
 5   that day.
 6   A.      Okay.
 7   Q.      And in your complaint, in paragraph 3 of
 8   the complaint, and I can hand it to you in just
 9   a moment, you said that you had with you an
10   AK-47 handgun; is that right?
11   A.      That's correct.
12   Q.      Okay.  Let's talk about -- let's talk
13   about that firearm, first of all.
14   A.      Okay.
15   Q.      Now, that's a -- is that a semi-automatic
16   weapon?
17   A.      Yes.
18   Q.      It is.  About what range would -- would
19   -- would that cover?
20   A.      I don't know.
21   Q.      If you were to fire?
22   A.      I have no idea.
23   Q.      You don't -- you don't know how far the
24   bullet would go?
25   A.      No, I've never measured that.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 25 of 177 PageID #: 75

```
 1   Q.      Okay.  Have you ever been interested in
 2   knowing generally what the range is of a -- of
 3   that weapon?
 4   A.      Sure, can you tell me?
 5              MR. DAVIDSON:  Don't ask her
 6   questions.  She'll ask you.
 7   BY MS. BERS:
 8   Q.      I'm asking you if you've ever --
 9   A.      No.
10   Q.      -- inquired?
11   A.      No, I don't think I've ever inquired.  I
12   don't recall that.
13   Q.      Okay.  Now, how long is the barrel length
14   of that weapon?
15   A.      I believe it's 11 and a half inches.
16   Q.      Okay.  In response again to
17   interrogatories, you sent along some documents,
18   and it's really under the -- under the group of
19   papers entitled, "First Request for Production
20   of Documents," if you want to get that --
21   A.      Okay.
22   Q.      -- under you.  And if you'll look, you
23   will see that some of the documents that you
24   included were papers and manuals that came with
25   -- with your -- with your weapon.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 26 of 177 PageID #: 76

1           And I'm going to show you, it says
2     "owner's manual, Draco pistol."
3           Can you get to that part of your --
4     of your stack there.
5     A.     Okay.
6     Q.     I'd like you to flip back, let's see,
7     one, two, three pages, until you come to a
8     diagram.
9           Do you see that of -- of the weapon?
10    A.     Yes.
11    Q.     Okay.  Underneath the diagram of that
12    weapon, it has some information about the
13    background of the -- of the Draco; do you see
14    that there?
15    A.     Yes.
16    Q.     And would you agree that one of the
17    attributes that they -- that they mention is
18    that it has the attributes of an assault rifle;
19    is that right, if you look at the bottom of the
20    second paragraph there -- the third paragraph?
21    A.     I think you're asking me if I agree that
22    -- what again?
23    Q.     Well, in -- in the information that was
24    provided to you when -- when you purchased this
25    weapon, it indicated that it -- that the AK-47

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 27 of 177 PageID #: 77

1    can be seen as a fusion of the best that the MI

2    (sic) Garand offered, combined with some of the

3    positive attributes of the German -- it looks

4    like StG .44 assault rifle; do you see that

5    there?

6    A.      Okay, yes.

7    Q.      Okay.  So when you purchased that weapon,

8    that information was provided to you; is that

9    right?

10   A.      After I purchased the weapon and after it

11   was delivered to me.

12   Q.      All right.  Did it come with the weapon?

13   A.      Yes.

14   Q.      Are you aware that an AK-47 started out

15   as a military weapon?

16   A.      Yes.

17   Q.      Okay.  And probably is still used by --

18   by our armed forces, as well as armed forces of

19   other countries; do you agree with that?

20   A.      I don't know if it's used by the United

21   States Armed Forces.

22   Q.      You don't know.

23   A.      I don't know.

24   Q.      Okay.  But it had its inspiration and was

25   designed by a Russian by the name of Mikhail

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 28 of 177 PageID #: 78

1    Kalashnikov.  I'm going to ruin that,

2    Kalashnikov?

3    A.      Yes.

4    Q.      So all of that information was provided

5    to you when your weapon arrived to you; is that

6    right?

7    A.      That's correct.

8    Q.      Now, you -- you bought this weapon in

9    December -- it looks like December 14 of 2009;

10   is that correct?

11   A.      That sound about the right time frame,

12   yes.

13   Q.      Okay.  And it was transferred to you a

14   couple of days later, December 16, 2009; is that

15   right?

16   A.      Yes, I was invoiced on the 14th, on

17   December 14th.

18   Q.      If you look at interrogatory Number 8,

19   that might assist you.

20   A.      Well, I was -- I was looking at the

21   receipts, but, yeah, I was invoiced on the 14th

22   and -- on December 14th.  Then it was

23   transferred to me on the 16th.

24   Q.      And so on December 16th of 2009, that's

25   when this weapon came into your possession; is

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 29 of 177 PageID #: 79

```
 1   that correct?

 2   A.      That's correct.

 3   Q.      Okay.  And that would have been about

 4   four days before this episode at Radnor; is that

 5   right?

 6   A.      That's correct.

 7   Q.      Now, from whom did you -- did you buy

 8   this weapon?

 9   A.      I bought it from Classic Arms.

10   Q.      Was that by mail order that you -- that

11   you purchased it?

12   A.      Yes.

13   Q.      How many times before -- you went to

14   Radnor on December the 20th.

15           How many times had you fired that

16   weapon before you went to Radnor?

17   A.      I probably fired maybe five or six

18   rounds.

19   Q.      Before you went to Radnor on December the

20   20th of 2009, how many other public places did

21   you take that weapon?

22   A.      I've taken it to the airport --

23   Q.      Okay.

24   A.      -- and when I was driving around in my

25   car, when I went to get gas in my car.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 30 of 177 PageID #: 80

```
1   Q.      You took it to the Nashville Airport?

2   A.      That's correct.

3   Q.      Okay.  Where at the Nashville Airport did

4   you -- did you take this?

5   A.      Passenger drop-off.

6   Q.      Okay.  Did you keep it in your car with

7   you or did you leave the car with it?

8   A.      Yeah, I left the car with it.

9   Q.      Okay.  And where did you walk with it?

10  A.      I walked to the curb to leave off bags.

11  Q.      All right.  And did you have it in its

12  sling?

13  A.      Yes, that's correct.

14  Q.      Okay.  Was it in -- was it -- was this

15  weapon -- was the sling of this weapon, was it

16  positioned so that the weapon was at your back

17  or at your front?

18  A.      At my front.

19  Q.      At your front.  And so -- and what day

20  was that that you did that?

21  A.      I don't -- I don't recall the exact date.

22  Q.      Is it possible it might have been the

23  morning of December 20th, 2009?

24  A.      I don't -- I don't think it was the

25  morning, but it could have been.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 31 of 177 PageID #: 81

1    Q.    All right.  But it was sometime between

2    December 16th and December 20th of 2009?

3    A.    That's correct.

4    Q.    When you brought it to the airport and

5    you were standing at the passenger drop-off, was

6    that weapon loaded?

7    A.    Yes.

8    Q.    Okay.  Did you have two magazines with

9    you?

10   A.    No, I just had one magazine.

11   Q.    One magazine.  Was there a round in the

12   chamber of the weapon?

13   A.    Yes.

14   Q.    Did you bring a recording device with you

15   and have it playing?  Let's -- let's start with

16   the first question.

17             Did you bring a recording device

18   with you to the airport that time?

19   A.    Probably.  I -- I always carry a

20   recording -- I usually carry a recording device

21   with me.

22   Q.    Did you have the recording device

23   operational and playing at the time?

24   A.    No.

25   Q.    Now, have you ever brought any other

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 32 of 177 PageID #: 82

1  firearms to the Nashville Airport?

2  A.     I'm sure I have.  I always carry a

3  handgun with me, but -- but I don't -- I don't

4  recall any particular event or anything.

5  Q.     Okay.

6  A.     I've been to the Nashville Airport

7  several times.

8  Q.     All right.  Other than the airport, any

9  other public places where you had taken the

10  AK-47 before the episode at Radnor?

11  A.     Yeah, I said I took it to a gas station.

12  Q.     To a gas station.

13  A.     Uh-huh.

14  Q.     All right.  Was that the same trip as to

15  the airport or a different trip?

16  A.     I think it was the same trip, but I -- I

17  don't remember exactly.

18  Q.     Before the episode at Radnor, had you

19  disassembled that weapon at any time?

20  A.     Yes.

21  Q.     Okay.  And re-assembled it?

22  A.     Yes.

23  Q.     My understanding is that on December 20th

24  of 2009 when you took this weapon to -- to

25  Radnor, the weapon had an orange-colored barrel

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 33 of 177 PageID #: 83

1   nut; is that right?

2   A.      That's correct.

3   Q.      Did it come with an orange-colored barrel

4   nut?

5   A.      No.

6   Q.      How did it get the orange-colored barrel

7   nut?

8   A.      I painted it.

9   Q.      When did you do that?

10  A.      I don't know.  I don't recall the exact

11  date.

12  Q.      It would have still had to have been

13  between December 16th and December 20th of 2009,

14  though; is that correct?

15  A.      That's correct.

16  Q.      So the -- the gun that Ranger Ward over

17  here saw on December the 20th looked different

18  from the gun that you received on December 16th,

19  2009; isn't that true?

20  A.      Yeah.

21  Q.      What kind of ammunition did you have with

22  you on your person on December the 20th of 2009

23  at Radnor Lake?

24  A.      I had the basic 762 by 39 millimeter

25  cartridge.

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 34 of 177 PageID #: 84

```
 1  Q.      And I understand that you've had two
 2  30-round magazines with you?
 3  A.      No.
 4  Q.      You did not?
 5  A.      That's correct, I didn't -- I didn't.  I
 6  only had one magazine.
 7  Q.      Your testimony is that you had one
 8  magazine with you; is that right?
 9  A.      That's correct.
10  Q.      Okay.  And there are 30 rounds in a
11  magazine?
12  A.      Yes.  Each magazine -- well, that type of
13  magazine that I have holds 30 rounds.
14  Q.      And you, in fact, had it filled?
15  A.      That's correct.
16  Q.      And would one of those rounds have been
17  in the chamber?
18  A.      No, an extra round was in the chamber.
19  Q.      I see.  So you had a total of 31?
20  A.      That's correct.
21  Q.      So I take it that at the time that you
22  were actually walking through Radnor, that
23  weapon was loaded and was ready to be fired if
24  you -- if you so wished; is that right?
25  A.      Well, it was on safety.  The safety was
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 35 of 177 PageID #: 85

1  on.

2  Q.    But it was ready to be fired if you so

3  wished; is that correct?

4  A.    Yeah, that's correct.

5  Q.    And that would have been true at the time

6  that you met Ranger Josh Walsh over here?

7  A.    Yes.

8  Q.    And it would have been true at the same

9  time that you encountered Ranger Steve Ward, who

10  is sitting next to me; is that right?

11  A.    Yes.

12  Q.    Before you went to Radnor on December the

13  20th of 2009, did you ever make any inquiries

14  about obtaining armor-piercing ammunition for

15  that weapon?

16  A.    I don't recall, but -- I don't recall,

17  but, I mean, I may have at some point in the

18  past.

19  Q.    So there's a possibility you had?

20  A.    Yes.

21  Q.    Now, you had with you on December the

22  20th of '09 at Radnor -- you had this weapon in

23  a sling; is that right?

24  A.    That's correct.

25  Q.    Okay.  And it is -- what -- describe what

```
 1  that sling would look like.
 2  A.      It's a -- it's a piece of canvas with --
 3  that attaches to the front end of the weapon
 4  where the barrel is and to the back end of the
 5  weapon where -- basically where the handle is.
 6  Q.      All right.  Are you able to position the
 7  weapon -- using that sling, are you able to
 8  position the weapon so that the weapon is at
 9  your back?
10  A.      Yes.
11  Q.      Okay.  Parallel to your back?
12  A.      Yes, uh-huh.
13  Q.      Are you able to reposition the sling so
14  that the weapon can be positioned across --
15  across your chest?
16  A.      Yes.
17  Q.      When it is positioned across your chest,
18  in which direction is the barrel pointing?
19  A.      It could -- it could point up; it could
20  point down.
21  Q.      It would be at an angle to your chest,
22  the weapon; is that right?
23  A.      Well, it depends on how you -- how you
24  put the -- put the sling on.
25  Q.      All right.  When -- when you wore the
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 37 of 177 PageID #: 87

1    sling at Radnor that day, at one point you had

2    -- or at one time you had the weapon positioned

3    so that it was at your back; is that right?

4    A.      That's correct.

5    Q.      Okay.  How was the weapon positioned on

6    your back?

7    A.      It was diagonally on my back with the --

8    with the hand grip to the left, and the -- and

9    the barrel to the -- my upper right shoulder.

10   Q.      Was the barrel pointing up or pointing

11   down?

12   A.      It was pointing down.

13   Q.      At another time you repositioned the

14   weapon so that the weapon was positioned across

15   your chest; is that right?

16   A.      That's correct.

17   Q.      Tell -- describe how you had it

18   positioned at that time.

19   A.      With the barrel to my lower left, and the

20   -- the hand grip to my -- my upper right

21   shoulder.

22   Q.      Which way was the barrel pointing then?

23   A.      Down.

24   Q.      Okay.  When -- when the weapon is

25   positioned across your chest as you just

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 38 of 177 PageID #: 88

```
 1   described, first of all, can you demonstrate to
 2   us how you would then be able to fire that
 3   weapon?
 4   A.      Well, you'd have to release the sling to
 5   be able to push the weapon out to shoot it.
 6   Q.      You'd have to release the sling in order
 7   to be able to fire the weapon?
 8   A.      That's correct, because it's -- it's tied
 9   against your chest, and the -- the manufacturer
10   of the sling makes it so it's tight against your
11   chest so it doesn't -- it's not flopping all
12   over the place in a dangerous type of situation,
13   so it's tied up to your chest.
14          So to release it, you pull the quick
15   release, and then you can push the weapon out to
16   defend yourself.
17   Q.      Okay.  Show -- show us again, and I would
18   -- I would like to be able to have the
19   videographer be able to -- to capture that.  I'm
20   not sure that your hands were -- were --
21   A.      I don't know, it's difficult to do it
22   without a sling.
23   Q.      All right.
24   A.      But how -- I mean, okay.  So are you
25   talking about how would I get it from my back to
```

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 39 of 177 PageID #: 89

1   my chest?

2   Q.    First of all, demonstrate how you'd get

3   it from back to chest.

4   A.    Well, you'd grab the sling, the canvas

5   portion of the sling right here, and then you'd

6   just pull it up.  It takes two seconds.  So then

7   it goes from your back where the hand grip is at

8   the bottom, and you just pull it up.

9         And then so now the hand grip is at

10  the top and the barrel is down, sitting tight

11  against your chest.  To release it there's a

12  quick release tab.  You pull the quick release

13  tab, and then the weapon is either free or -- or

14  you can pull -- there's two quick release tabs.

15        One you pull so the weapon is free

16  so it's not attached to any type of a sling.

17  The other one you pull the quick release tab,

18  and it gives slack to the sling so you're able

19  to hold it --

20  Q.    All right.

21  A.    -- while it's still slung on your body.

22  Q.    When -- when you demonstrated -- you can

23  sit down now.

24        When -- when you demonstrated moving

25  the -- the weapon from back to front, the weapon

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 40 of 177 PageID #: 90

1  was going under your arm; is that right?

2  A.     Yeah, the weapon -- you would pull --

3  Q.     Sorry.

4  A.     You pull the hand grip.  When -- when the

5  weapon is on the back, I have the barrel up

6  here, my upper right shoulder.  The hand grip is

7  to my left kidney.

8  Q.     All right.

9  A.     Okay.  You grab -- you don't touch the

10  weapon.  You grab the sling.  You pull the sling

11  up.  The weapon follows the sling so -- so that

12  if the hand grip was there, you grab onto the

13  sling.  You pull the sling up.

14         The hand grip is now up here, and

15  the barrel is now pointing down, but it's still

16  tight to your chest.  Now, and it takes about

17  two seconds to do that.  Now, if you want to

18  release it, just pull the quick release tab and

19  your weapon is free.  You can -- to defend

20  yourself.

21  Q.     And so when you pull the quick release

22  down, at that point all you need to do is to --

23  is to swing the barrel forward; is that correct?

24  A.     That's correct.

25  Q.     Okay.  When you encountered -- and if I

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 41 of 177 PageID #: 91

1     asked you this, I apologize, but I'll ask you

2     again.

3            When you encountered Josh Walsh, the

4     very first ranger that you met at Radnor, the

5     weapon at that point was positioned, as you

6     described, it would be on the front of your

7     chest; is that right?

8     A.      That's correct.

9     Q.      And the barrel was down?

10    A.      Yeah.

11    Q.      And to -- to fire at that point all you

12    needed to do was to press the quick release and

13    you would be operational to fire; is that right?

14    A.      No, well, you'd have to -- you'd have to

15    point and then you'd have to remove the safety

16    as well.

17    Q.      All right. With those other two steps?

18    A.      Yes.

19    Q.      Quick release, release the safety, and --

20    and aim; is that right?

21    A.      That's correct.

22    Q.      You had been -- I want to talk to you

23    about Radnor.

24            You had indicated in your

25    interrogatory responses that you had --

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 42 of 177 PageID #: 92

```
 1              MR. DAVIDSON:  What question,
 2   please?
 3              MS. BERS:  Interrogatory Number 6.
 4              MR. DAVIDSON:  Six?
 5              MS. BERS:  Yes, sir.
 6              MR. DAVIDSON:  Thank you.
 7   BY MS. BERS:
 8   Q.      You had indicated that you had been to
 9   Radnor Lake two times in the fall of 2009; is
10   that right?
11   A.      That's correct.
12   Q.      And each of those two visits to Radnor
13   Lake you had carried a -- well, you describe to
14   me what you had carried.
15   A.      The two occasions in the fall of 2009, I
16   carried a Smith & Wesson revolver.
17   Q.      Was that -- did you carry that in a
18   holster?
19   A.      Yes.
20   Q.      With either of those two occasions, at
21   any time did any ranger stop and question you?
22   A.      Yes.
23   Q.      Do you remember which ranger it was who
24   stopped and questioned --
25   A.      Ranger Ward.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 43 of 177 PageID #: 93

```
 1   Q.      It was Ranger Ward.  Okay.
 2               And that was during a time when you
 3   were carrying the Smith & Wesson revolver in
 4   your holster; is that right?
 5   A.      That's correct.
 6   Q.      Did you have anyone with you?
 7   A.      Yes, my children were with me.
 8   Q.      Your two children.  When Ranger Ward
 9   stopped you, did he ask to see your handgun
10   permit?
11   A.      Yes, he did.
12   Q.      And did you have it with you?
13   A.      Yes, I did.
14   Q.      And did you show it to him?
15   A.      Yes, I did.
16   Q.      And then he reviewed it?
17   A.      Yes, he did.
18   Q.      And after he reviewed the handgun permit,
19   what else happened?
20   A.      I don't recall, because I was paying more
21   attention to my children, but I think he took it
22   and he called someone about it, but he may not
23   have.  I'm not a hundred percent sure on that.
24   Q.      All right.  And then what happened?
25   A.      And then he gave it back to me.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 44 of 177 PageID #: 94

```
 1   Q.      And then what happened?

 2   A.      We talked for maybe a minute or two

 3   about --

 4   Q.      About -- I'm sorry?

 5   A.      About guns and about guns at the park.

 6   Q.      Okay.  And then what happened?

 7   A.      Then he walked away.

 8   Q.      Now, that's one -- one of the two

 9   occasions that you had your -- your revolver

10   with you.

11           On the other occasion that you had

12   your revolver with you, did you encounter any

13   ranger?

14   A.      I didn't encounter -- I encountered

15   someone behind the desk, but I'm not sure if she

16   was a volunteer or if she was a ranger.

17   Q.      At the visitor's center?

18   A.      Yes.

19   Q.      Okay.  But -- but did that individual ask

20   to see your handgun permit?

21   A.      No.

22   Q.      So -- so in the fall of 2009, you had

23   those two occasions when you went to Radnor

24   Lake, and you've just described what happened in

25   each of those; is that right?
```

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 45 of 177 PageID #: 95

1  A.     Yes.

2  Q.     Okay.  Then the third occasion that you

3  brought a weapon, a firearm to Radnor Lake,

4  would have been on December the 20th of 2009; is

5  that right?

6  A.     That's correct.

7  Q.     Okay.  Let's talk about that day.  What

8  -- what time did you get to -- to Radnor?

9  A.     It was approximately 3:30, 3:45.

10 Q.     Okay.  Did you have anyone with you that

11 day, Mr. Embody?

12 A.     No.

13 Q.     You were by yourself?

14 A.     Yes.

15 Q.     When you got out of your car, I assume

16 the first thing you did was to -- to place the

17 sling and to position the weapon; is that right?

18 A.     Yeah.  Well, I'm not -- I don't recall if

19 I had it already on me, but I -- I'm almost -- I

20 think I had it on me as I -- as I pulled up in

21 there.

22 Q.     All right.  So you already had the sling

23 and the weapon?

24 A.     Yes, and what I -- what I think I did was

25 -- usually when I drive, I usually have it

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 46 of 177 PageID #: 96

1  positioned on my chest, so I probably flipped it

2  over to my back.

3  Q.     Now, when -- when you -- when you got

4  there, where did you go in Radnor?

5  A.     I parked at the west parking lot, and I

6  walked into the visitor's center.

7  Q.     All right.  And what did you do there?

8  A.     I think I went to get a drink of water.

9  Q.     And then what?

10  A.     Then I walked and I -- I walked around

11  the trail.

12  Q.     Do you remember which trail you went on?

13  A.     I don't recall right offhand, but it was

14  -- it's the -- there's only -- there's only one

15  trail that I believe goes from that west parking

16  lot, and it's a little dirt trail, and it runs

17  along the north side of the lake.

18  Q.     So you were following along the lake?

19  A.     I was following the trail.

20  Q.     All right.  What were you wearing that

21  day?

22  A.     I was wearing boots, blue jeans,

23  camouflage jacket and a black polypropylene hat.

24  Q.     The -- the camouflage jacket, was that a

25  military-issued type camouflage jacket?

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 47 of 177 PageID #: 97

```
 1   A.       Yeah, I bought the jacket at the military
 2   post exchange while I was in military service,
 3   but I was never issued the jacket.
 4   Q.       But it was a military type of camouflage
 5   jacket?
 6   A.       Yes.
 7   Q.       Now, you had a recording device with you?
 8   A.       Yes.
 9   Q.       Okay.  And that recording device was --
10   was actually working at that time; is that
11   right?
12   A.       That's correct, I had inadvertently
13   turned the -- turned the recording device on, so
14   it was recording during my walk.
15   Q.       Okay.  We've already discussed the fact
16   that you had painted the barrel nut of the
17   weapon orange sometime between December 16th and
18   December 20th of 2009; is that right?
19   A.       That's correct.
20   Q.       Now, would you agree that as Kwikrnu, you
21   stated on the -- the Highroad.org on December
22   18th, 2009, "I painted the muzzle nut/thread
23   protector blaze orange because I have safety in
24   mind.  It means no one can and will shoot me."
25   A.       Uh-huh.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 48 of 177 PageID #: 98

1   forums that you -- you disclosed to us on

2   December 18, 2009, "I painted the muzzle

3   nut/thread protector blaze orange because I have

4   safety in mind" -- "in mind.  It means no one

5   can and will shoot me"; is that correct?

6   A.      Yes.

7            MS. BERS:  All right.  Let's make

8   that Exhibit Number 1 then, please, to

9   Mr. Embody's deposition.

10           (Document marked as Exhibit 1.)

11  BY MS. BERS:

12  Q.      Again, in response to interrogatory

13  Number 2 and interrogatory Number 4, it is --

14  you've indicated that you engaged in discussions

15  in the -- I believe it's the -- the

16  Opencarry.org discussion forums; is that right?

17  A.      That's right.

18  Q.      Okay.  And isn't it true then that on the

19  day after this incident at Radnor Lake on

20  December 21, 2009, you were asked by another

21  member of this discussion forum why you have an

22  orange tip.

23           And you replied, "Safety, cops don't

24  shoot people with orange-tipped handguns.  When

25  they do, they think twice about it.  Since most

1   Q.    Did you say that?

2   A.    I think I did.  The -- but a lot of those

3  -- a lot of those Internet forums, they will

4  edit your comments, but I did paint it orange.

5             MR. DAVIDSON:  I'll state for the

6  record, this is the first time I've seen this

7  document.

8  BY MS. BERS:

9   Q.    Mr. Embody, in response -- thank you very

10  much.

11            In response to interrogatory

12  Number 2 -- no, excuse me -- yes, in response to

13  interrogatory Number 2, you indicated that one

14  of the names that you use for discussion forums

15  is the name Kwikrnu, K-W-I-K-R-N-U; is that

16  right?

17  A.    Yes.

18   Q.    And you've also indicated in response to

19  interrogatory Number 4, you advised us of the

20  various discussion forums in which you have

21  placed comments; isn't that correct?

22  A.    Yes.

23   Q.    Then with that I'll show you this

24  comment, and you've already looked at it, the

25  comment that you made in one of those discussion

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 50 of 177 PageID #: 100

```
 1   people assume it is an airsoft toy, I will
 2   probably generate fewer MWAG calls."
 3              I'm going to show that to your
 4   attorney and ask him to pass that one to you.
 5              Do you agree that you said that or
 6   stated that in that discussion forum,
 7   Mr. Embody?
 8   A.    Right, that's posted under my username,
 9   so --
10   Q.    Yes?
11   A.    I mean, I -- you know, that was, what, 10
12   months ago, and I can't guarantee that that post
13   hasn't been edited by someone other than me.  I
14   probably have thousands of Internet posts, but
15   it seems reasonable.
16              MS. BERS:  All right.  Let's make
17   that Exhibit Number 2 to Mr. Embody's
18   deposition, please.
19              (Document marked as Exhibit 2.)
20   BY MS. BERS:
21   Q.    In your -- in your responses to our
22   interrogatories, again interrogatory Number 2
23   and interrogatory Number 4, you indicated that
24   another discussion group that you participated
25   in was Glocktalk.com; is that right?
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 51 of 177 PageID #: 101

1    A.      That's correct.

2    Q.      Okay.  And isn't it true that on August

3    the 23rd of 2009 you stated on Glocktalk.com, "I

4    can't wait for a cop to arrest me because I

5    open-carried a handgun and someone called 9-1-1.

6    It almost happened twice, but no cigar yet.

7    Maybe carrying a PLR-16 or AK pistol will change

8    that."

9                I'm going to show that to your

10   attorney -- excuse me -- and ask him to pass

11   that on to you.

12               That's what you stated, didn't you?

13   A.      Like I said, you know, I don't recall,

14   but that -- that forum has edited a lot of my

15   posts.  So, I mean, those could be my words, it

16   might not, but I don't recall making that post.

17   Q.      You don't recall?

18   A.      That's right.

19               MS. BERS:  Let's make that Exhibit

20   Number 3.

21               (Document marked as Exhibit 3.)

22   BY MS. BERS:

23   Q.      Again, in response to interrogatory

24   Number 2 and interrogatory Number 4, you

25   disclose that you engaged in discussion in the

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 52 of 177 PageID #: 102

1    Opencarry.org forum.

2              And I'm going to show you an entry

3    made by Kwikrnu on December 20th, 2009

4    describing the episode at Radnor Lake that day.

5    And I'm going to let your attorney see it.

6              And my question to you will be

7    whether or not you agree with that description.

8    A.      Yeah, I think I remember posting that.

9    Q.      You remember posting this?

10   A.      Uh-huh.

11   Q.      Yes?

12   A.      I can't say that it's those exact words,

13   because those forums often edit your comments.

14   But, I mean, it seemed reasonable to me and I

15   don't -- I don't disagree with anything that's

16   said there.

17              MS. BERS:  Let's make this the next

18   numbered exhibit to Mr. Embody's deposition,

19   please.

20              (Document marked as Exhibit 4.)

21   BY MS. BERS:

22   Q.      At -- at one point during your -- your

23   hike at Radnor on December the 20th, 2009, you

24   encountered Ranger Josh Walsh; isn't that right?

25   A.      Yes.

```
 1   Q.      Okay.  Where did you encounter him?

 2   A.      On the road that runs from the east side

 3   of the park to the west side.

 4   Q.      Is that Otter Creek Road?

 5   A.      I don't know the name of the road.

 6   Q.      Was it a paved road?

 7   A.      Yes.

 8   Q.      You were no longer on the dirt path that

 9   you described before?

10   A.      That's correct.  I was probably about 100

11   yards, maybe 150 yards off of that dirt trail.

12   Q.      When you encountered Ranger Walsh, what

13   was he doing at the time?

14   A.      I think he was talking to someone.

15   Q.      All right.  And when you encountered him,

16   of course, you were still dressed in your --

17   your -- your camouflage jacket and black cap; is

18   that right?

19   A.      Yeah, that's correct.

20   Q.      And at that time you had the AK-47 slung

21   so it was positioned across the front of your

22   chest; is that right?

23   A.      That's correct.

24   Q.      And Ranger Walsh questioned you about

25   whether that was a handgun; is that right?
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 54 of 177 PageID #: 104

```
 1    A.    Yes.

 2    Q.    And he also -- you may have commented to

 3    him that you -- you knew you would run into a

 4    ranger one of these times; isn't that true?

 5    A.    Yes.

 6    Q.    Okay.  I have a CD that your attorney

 7    provided to us that we understand was a

 8    recording that you made that day while you were

 9    at Radnor Lake.

10          Does that sound familiar to you?

11    A.    Yes, I made recordings.

12    Q.    All right.  And you made a recording that

13    day; do you remember doing that?

14    A.    Yes.

15    Q.    Okay.  And that recording would have

16    included Ranger Walsh's discussion with you; is

17    that right?

18    A.    Yes.

19    Q.    Okay.  I'm going to try and see if we can

20    play that at this moment.

21          THE WITNESS:  Okay.

22          MR. DAVIDSON:  Just for point of

23    clarification, are you going to play the whole

24    recording?

25          MS. BERS:  No, and I -- I don't plan
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 55 of 177 PageID #: 105

```
 1   to do that, Mr. Davidson.
 2              MR. DAVIDSON:  All right.
 3              MS. BERS:  What I would propose that
 4   we do is this, because it's a fairly long
 5   recording --
 6              MR. DAVIDSON:  Just make it an
 7   exhibit to his deposition.
 8              MS. BERS:  Yes, but I would like to
 9   play it also so that we can all hear it.  I
10   don't think it needs to be transcribed, but I
11   would like for Mr. Embody to hear portions,
12   because I would like to talk to him about that;
13   okay?
14              THE WITNESS:  Okay.
15   BY MS. BERS:
16   Q.    So what I'm going to do is to play the
17   very first portion of it, and then there's a
18   long period of time there appears that you were
19   just walking or hiking along, and we certainly
20   don't need to -- to listen to that.
21              But then I'm going to fast forward
22   it, if you agree, to the portion where you and
23   Ranger Walsh are talking.  Is that all right?
24   Okay.
25              (Audio recording was played.)
```

Case 3:10-cv-00126  Document 16-1   Filed 11/30/10  Page 56 of 177 PageID #: 106

1            MS. BERS:  I'm stopping at that

2     point.  I'm going to stop it at that point.

3     First of all, I've asked the court reporter not

4     to transcribe that, all right, because we will

5     certainly -- we'll simply use the audio of that,

6     and we're going to be making this an exhibit to

7     your deposition anyway.

8     BY MS. BERS:

9     Q.      I want to ask you about that particular

10    portion.

11            When did you make that part of this

12    recording?

13    A.      Probably as soon as I got out of my

14    vehicle.

15    Q.      Okay.  So the first thing you did was to

16    -- was to flip on your tape recorder or your

17    recording device; is that right?

18    A.      Usually I turn on the recording device,

19    if I remember to do it.

20    Q.      Okay.  And you wanted to make sure that

21    it -- it documented this as Radnor Lake on

22    December 20th, 2009; right?

23    A.      That's correct.

24    Q.      Okay.  I'm going to turn that on and then

25    I'm going to fast forward it, because there's a

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 57 of 177 PageID #: 107

```
 1    long period of time where it's simply nothing
 2    but -- but noise of your walking.  And if you
 3    want to listen to any of that, let me know;
 4    okay?
 5                    (Audio recording was played).
 6                    MS. BERS:  Okay.  I'm going to fast
 7    forward this up a bit.
 8                    (Audio recording was played).
 9    BY MS. BERS:
10    Q.      Were you able to hear?
11    A.      Yes.
12    Q.      All right.  And you have -- you have
13    certainly listened to that recording before,
14    haven't you?
15    A.      Yes.
16    Q.      And the recording that -- that you just
17    heard now is the same recording that you've
18    heard before; is that correct?
19    A.      Yes.
20    Q.      And it is in fact the recording that you
21    made on December 20th, 2009, is that right?
22    A.      Yes.
23                    MS. BERS:  All right.  Then what I'm
24    going to do is to make that the next exhibit to
25    your deposition, Mr. Embody.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 58 of 177 PageID #: 108

```
 1              (Document marked as Exhibit 5.)
 2              MS. BERS:  Ms. Court Reporter, I've
 3   got the jacket for this, and so I'll provide
 4   that to you, but we'll make that the next
 5   exhibit to Mr. Embody's deposition.
 6   BY MS. BERS:
 7   Q.     You commented during -- during that
 8   discussion with Mr. -- with Ranger Walsh that
 9   you knew that you had -- that you would run into
10   a ranger one of these times; isn't that right?
11   A.     Yes.
12   Q.     You anticipated that a ranger would stop
13   and ask you about your weapon, didn't you?
14   A.     Yes, yes.
15   Q.     At any time did Ranger Walsh say anything
16   to you that indicated to you that you were not
17   able to leave Radnor?
18   A.     No.
19   Q.     Okay.  But when Ranger Walsh had that
20   discussion with you, he questioned you about
21   whether or not that was in fact a handgun,
22   didn't he?
23   A.     Actually, I think he admitted that it was
24   a handgun.
25   Q.     Well, let's listen to that part again,
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 59 of 177 PageID #: 109

```
 1  and perhaps you might not -- the audio is not
 2  that good.
 3              What else did he do besides admit
 4  that it was a handgun?
 5  A.      He said, "Technically that is a handgun,
 6  but I don't see why you need it in the park."
 7  Q.      Well, he -- let's listen to that again.
 8              (Audio recording was played.)
 9              MS. BERS:  Can you hear?
10              THE WITNESS:  Yes.
11              (Audio recording was played.)
12  BY MS. BERS:
13  Q.      Okay.  Now, you also heard Ranger Walsh
14  say, "I'm pretty sure an AK-47 is not a
15  handgun."  Did you hear that part, Mr. Embody?
16  A.      Yes.
17  Q.      And did you hear the part where he said
18  that the orange threw him off?
19  A.      Yes.
20  Q.      Now, you continued walking until you came
21  to the visitor's center parking lot; is that
22  right?
23  A.      That's correct.
24  Q.      And when you got there, that's when you
25  encountered Ranger -- Ranger Ward; is that
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 60 of 177 PageID #: 110

1   right?

2   A.      Well, as I walked in, and I -- right as

3   soon as I basically got to my car, he -- he

4   arrived.

5   Q.      He arrived.  All right.  And at the time

6   that you encountered Ranger Ward, you still had

7   your weapon positioned across the front of your

8   chest; is that right?

9   A.      That's correct.

10  Q.      And it was while you had your weapon

11  positioned across the front of your chest that

12  -- that Ranger Ward came out and -- and pointed

13  his shotgun at you; is that correct?

14  A.      That's correct.

15  Q.      Now, he ordered you to relinquish your

16  firearm, didn't he?

17  A.      Yeah, he ordered me to drop the firearm.

18  Q.      To drop the firearm.  All right.

19          Did you comply with him?

20  A.      Yes.

21  Q.      He ordered you to lie face down, didn't

22  he?

23  A.      Yes.

24  Q.      And did you comply with him?

25  A.      Yes.

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 61 of 177 PageID #: 111

1  Q.    While you were lying face down, you

2  couldn't tell whether or not he still had the

3  shotgun pointed at you, could you?

4  A.    That's correct.

5  Q.    Okay.  So it's possible that at the time

6  that you laid down, he no longer had that

7  shotgun pointed at you; isn't that right?

8  A.    That's correct.

9  Q.    After he patted you down -- which he did;

10  is that right?

11  A.    Yes.

12  Q.    After he patted you down, he allowed you

13  to stand up, didn't he?

14  A.    After he patted me down, he searched me.

15  Q.    And searched you.  Then he allowed you to

16  stand up; is that right?

17  A.    Yes.

18  Q.    He never took your cell phone away from

19  you, did he?

20  A.    No.

21  Q.    Matter of fact, you were allowed to use

22  your cell phone during the time that you were in

23  the parking lot at Radnor Lake, weren't you?

24  A.    Yes.

25  Q.    And in fact you did?

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 62 of 177 PageID #: 112

1  A.    Yes.

2  Q.    You indicated that you had a recording

3  device with you.

4        He never told you to turn it off,

5  did he?

6  A.    No.

7  Q.    I think you indicated that the batteries

8  were dead in your recording device by that time;

9  is that right?

10 A.    Yes.

11 Q.    So you were not able to record what went

12 on in your discussion with Ranger Ward, were

13 you?

14 A.    That's right.

15 Q.    But it was not because he told you to

16 turn the thing off?

17 A.    That's correct.

18 Q.    Now, shortly after that the officers from

19 Metro Police arrived; isn't that right?

20 A.    Yes.

21 Q.    And they came in several cars?

22 A.    Yes.

23 Q.    They were calm and courteous and

24 respectful to you?

25 A.    Other than detaining me, yes.

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 63 of 177 PageID #: 113

```
 1   Q.      They were calm, courteous and respectful

 2   to you?

 3   A.      Yes.

 4   Q.      Ranger Ward at all times was courteous

 5   and respectful to you?

 6   A.      No.

 7   Q.      When was he not?

 8   A.      When he pointed the shotgun at my face.

 9   Q.      While you had your weapon across your

10   chest; is that right?

11   A.      That's correct.

12   Q.      After he allowed you to stand up, he was

13   calm, courteous and respectful to you

14   thereafter; is that right?

15   A.      Yes.

16   Q.      And you too were calm, courteous and

17   respectful to the officers, weren't you?

18   A.      Yes.

19   Q.      At one point you advised the police

20   officers for Metro that you wanted to speak to a

21   supervisor; is that right?

22   A.      Yes.

23   Q.      And the officers advised you that it

24   would take some time for that to happen; isn't

25   that so?
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 64 of 177 PageID #: 114

```
 1   A.      Yes.

 2   Q.      But -- but you were willing to wait for a

 3   supervisor to come; is that correct?

 4   A.      I had no choice.  I was arrested at that

 5   time.

 6   Q.      You asked for a supervisor; is that

 7   correct?

 8   A.      Yes.

 9   Q.      And you were -- you wanted one to come,

10   even though the officer said it would take

11   additional time; is that right?

12   A.      I had no choice.  I was arrested at that

13   time.

14               MR. DAVIDSON:  Excuse me one second.

15   Just listen to the question she's asking you.

16               THE WITNESS:  Okay.

17               MR. DAVIDSON:  Would you repeat the

18   question?

19               MS. BERS:  Would our court reporter

20   repeat the question for me, please?

21               (Question was read by the reporter.)

22               THE WITNESS:  Maybe I just don't --

23   maybe I just don't -- I don't understand the

24   question.

25   BY MS. BERS:
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 65 of 177 PageID #: 115

1   Q.     You've asked for a supervisor to come; is

2   that right?

3   A.     Yes.

4   Q.     The officer has advised you it will take

5   additional time; is that right?

6   A.     Right.

7   Q.     You still asked for an -- for a

8   supervisor to come?

9   A.     Yeah.

10  Q.     At no point did Ranger Steve Ward ever

11  place you in handcuffs, did he?

12  A.     No.

13         MS. BERS:  Let's stop for a moment.

14  Let's just take a break.  We have five minutes

15  remaining on tape, so why don't we stop and take

16  a break.  It's about 11:00, okay.

17         THE VIDEOGRAPHER:  This is the end

18  of Tape Number 1.  Going off the record, the

19  time is 11 a.m.

20         (Discussion off the record).

21         THE VIDEOGRAPHER:  On the record,

22  this marks the beginning of Tape Number 2.  The

23  time is 11:13.

24  BY MS. BERS:

25  Q.     Mr. Embody, we're back after we took a

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 66 of 177 PageID #: 116

1  brief break, and we were talking about the

2  events that occurred in the parking lot at

3  Radnor Lake on December the 20th of 2009.

4          And when we left off, we were

5  talking about the fact that you were there,

6  along with the park rangers and Metro police

7  officers.

8          Your contention in this lawsuit is

9  that that took too long, that time in the -- in

10  the parking lot; isn't that what you're saying

11  in your lawsuit?

12  A.      Basically, yes.

13  Q.      And your contention is that this was all

14  about the weapon that you were carrying at the

15  time; isn't that right?

16  A.      No, it -- actually, it's about my Fourth

17  Amendment right.

18  Q.      With regard -- all right.  But the -- but

19  the focus having been on the fact that you

20  brought this weapon to Radnor Lake; is that

21  right?

22          MR. DAVIDSON:  Let me enter an

23  objection to the form of the question.

24  BY MS. BERS:

25  Q.      All right.  Well, then let me -- let me

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 67 of 177 PageID #: 117

```
 1    start again.

 2    A.      Okay.

 3    Q.      Basically, your contention, of course,

 4    when you were at Radnor Lake was that that

 5    weapon was a handgun; is that right?

 6    A.      That's correct.

 7    Q.      And that it was a handgun under Tennessee

 8    law; right?

 9    A.      That's correct.

10    Q.      Now, before you went to Radnor Lake, I

11    assume that you read the guns in park law; is

12    that right?

13    A.      That's correct.

14    Q.      And I assume you also read the -- the

15    definition in Tennessee law of a handgun, didn't

16    you?

17    A.      Yes.

18    Q.      Well, okay, what -- what is the

19    definition of a handgun under Tennessee law?

20            MR. DAVIDSON:  I'm going to enter an

21    objection on the grounds it's asking him to

22    answer a legal question.

23            Go ahead.

24    BY MS. BERS:

25    Q.      Well, I'm asking you a question about
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 68 of 177 PageID #: 118

1  something you had studied before you went to

2  Radnor Lake.

3            And what was it that you learned

4  before -- before you went to Radnor Lake about

5  how this state defines a handgun?

6  A.    In the state of Tennessee the laws are --

7  are fairly confusing about that, because there

8  are some laws that contradict each other, but

9  generally a handgun is 12 inches or less.

10           And it depends on the statute you're

11 reading, because some statutes are 12 inches and

12 less; some are less than 12 inches, and they do

13 not have a shoulder stock.

14 Q.    All right.

15           MR. DAVIDSON:  And I'm -- the same

16 objection.

17 BY MS. BERS:

18 Q.    And that's what you -- that's what you

19 understood the law to be before you went to

20 Radnor Lake that day; is that correct?

21 A.    That's correct.

22 Q.    Now, the weapon that you were carrying,

23 you said was about 11 and a half inches, the

24 barrel?

25 A.    Yes.

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 69 of 177 PageID #: 119

```
 1   Q.     So the weapon that you were carrying was
 2   a half an inch shy of being outside what you
 3   understood to be the handgun definition?
 4              MR. DAVIDSON:  Again, let me object
 5   to the form of the question.  I'm --
 6              MS. BERS:  All right.
 7              MR. DAVIDSON:  -- I don't think he
 8   understands what you're asking.
 9   BY MS. BERS:
10   Q.     Your understanding from what you have
11   said, your understanding before that day was
12   that a barrel length of less than 12 inches
13   would qualify a weapon to be a handgun; is that
14   right?
15   A.     No.
16   Q.     All right.  What was your understanding
17   then?
18   A.     My understanding is that a weapon with a
19   less -- with the barrel length of less than 11
20   and a half inches, that does not have a shoulder
21   stock, is considered a handgun within the state
22   of Tennessee.
23   Q.     All right.  Was that a statute that you
24   read that said that?
25   A.     I think it's 3911.106, or it may have
```

Case 3:10-cv-00126  Document 16-1  Filed 11/30/10  Page 70 of 177 PageID #: 120

1    been like 3311.106, but there's also a couple

2    more in the -- in the 39.

3    Q.    So you yourself were confused about what

4    a handgun would be?

5    A.    No, I'm not confused.  Anything less than

6    12-inch -- 12-inch barrel without a shoulder

7    stock is a handgun in Tennessee.

8    Q.    So this particular weapon was 11 and a

9    half inches, its barrel, without a shoulder

10   stock; is that right?

11   A.    That's correct.

12   Q.    And so the barrel length of this

13   particular weapon was a half an inch shy of

14   being over the limit?

15   A.    Yes.

16   Q.    When you read up on the laws about

17   handguns before you went to Radnor Lake, did you

18   find anyplace in the law when you looked for it

19   that said that a Draco AK-47 pistol was legally

20   a handgun in Tennessee?

21   A.    No.

22   Q.    Before you went to Radnor Lake, did you

23   give the park rangers or police any advance

24   warning that you were going to in fact be

25   carrying a Draco AK-47 pistol into Radnor Lake?

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 71 of 177 PageID #: 121

1    A.      I didn't give warning that I was going to

2    carry a Draco pistol, but I believe I called

3    before to verify that there was no school field

4    trips going on at that time.

5                I'm not -- I'm not 100 percent sure,

6    but I've called other times to verify that

7    there's no school trips going on.

8    Q.      All right.  But my question to you was

9    whether or not you gave any advanced warning to

10   the park or to the police that you were going to

11   be carrying a Draco AK-47 pistol --

12   A.      No.

13   Q.      -- into Radnor?

14   A.      No.

15   Q.      The answer is no?

16   A.      That's correct.

17   Q.      We've already discussed the fact that in

18   your discussion with Ranger Ward, you indicated

19   that you thought that sometime you would be

20   running into a park ranger; do you remember your

21   saying that?

22   A.      Did you say Ward or Walsh?

23   Q.      Walsh, I'm sorry, I made that mistake.

24   A.      Okay.  Yeah, I -- I said that to Walsh.

25   Q.      Okay.  When you came to Radnor, other

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 72 of 177 PageID #: 122

1 than your handgun permit, you didn't bring any

2 other types of useful information, such as the

3 bill of sale, did you?

4 A.    No.

5 Q.    Nothing of that type to assist a ranger

6 in determining if this assault-type weapon in

7 fact came within the definition of a handgun?

8 A.    No.

9 Q.    After the event at Radnor on December the

10 20 -- 20th of 2009, you took that same weapon to

11 other public places?

12 A.    I don't think I did.  I don't -- I don't

13 recall.  I don't think I did.

14 Q.    Did you ever take it to the Bicentennial

15 Mall?

16 A.    No.

17 Q.    On December the 20th of 2009, park Ranger

18 Steve Ward never asked any Metro police officer

19 to arrest you, did he?

20 A.    I don't know.

21 Q.    In your earshot, did you hear anything of

22 that nature?

23 A.    No, I didn't hear anything of that

24 nature.

25 Q.    Do you have any information that he told

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 73 of 177 PageID #: 123

1     any police officer to arrest you?

2     A.     No.

3     Q.     To the best of your knowledge, Steve Ward

4     never opposed any Metro police officer or

5     officers when they allowed you to leave, did he?

6     A.     I'm sorry, repeat the question.

7     Q.     I will. Ranger Ward never opposed the

8     Metro police when they allowed you to leave that

9     day?

10     A.     Why -- the question is messed up, because

11     the police didn't allow me to leave. Ranger

12     Ward allowed me to leave.

13     Q.     Explain.

14     A.     Ranger Ward is the one that accompanied

15     me to my car and gave me my handgun back and

16     told me to leave at 7 p.m. that night.

17     Q.     And that's why you were saying he was the

18     one to allow you to leave?

19     A.     That's correct.

20     Q.     Did the Metro officers oppose your

21     leaving?

22     A.     No.

23     Q.     The only time that you know that Ranger

24     Ward pointed a shotgun at you was when you were

25     armed with an AK-47 across your chest; is that

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 74 of 177 PageID #: 124

1 right?

2 A.      That's correct.

3 Q.      When you were at Radnor Lake that day,

4 Mr. Embody, you were in fact testing the

5 authorities at Radnor to see what they knew

6 about guns in park law, weren't you?

7 A.      No, I -- I had already known they knew

8 about the guns in park law.

9 Q.      Were you testing to find out whether or

10 not they would arrest you for carrying an AK-47

11 at Radnor Lake State Park --

12 A.      No.

13 Q.      -- Natural Park?  You were not?

14 A.      No.

15 Q.      That was not your intent?

16 A.      That's right, it wasn't my intent.

17 Q.      When you went that day, you purposefully

18 and intentionally had painted the tip of your

19 weapon, hadn't you?

20 A.      I didn't paint it on that day, but I had-

21 -- my weapon was painted that day.

22 Q.      It was painted that day?

23 A.      Yes.

24 Q.      And you have made comments in the past

25 that the orange tip on that weapon was intended

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 75 of 177 PageID #: 125

1     to confuse officers?

2     A.     The comments that I've made on message

3     forums are -- can't be taken literally. I mean,

4     a lot of my comments are sarcastic. A lot of my

5     comments happen to relate to other posts. So a

6     post taken out of context doesn't make much

7     sense. But, yeah, I -- I mean, I painted -- I

8     painted it because I could paint the handgun.

9     Q.     Because what?

10     A.     Because I could paint it.

11     Q.     Yes.

12     A.     Since there's no law on painting a

13     handgun, you know, I went ahead and painted the

14     tip of my handgun, with the intent to later

15     paint my entire handgun orange, so it was my

16     first attempt to even paint a handgun.

17     Q.     When did --

18     A.     So -- so there wasn't a specific intent

19     to confuse an officer. It was -- it was an

20     intent to paint my handgun and -- and to have an

21     orange handgun at the end.

22     Q.     When did you paint your -- your weapon

23     orange?

24     A.     I don't recall the exact date, but it was

25     after December 20th.

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 76 of 177 PageID #: 126

1  Q.     Was it after you filed this lawsuit?

2  A.     I think I painted it orange before.

3  Q.     All right.  But it was after this

4  incident at Radnor that you painted the whole

5  weapon orange; is that right?

6  A.     That's correct.

7  Q.     You heard officer -- or Ranger Walsh say

8  to you that day that the orange threw him off,

9  didn't you?

10 A.     Yes.

11 Q.     And you indicated to him that it was a

12 custom job, the orange?

13 A.     That's correct.

14 Q.     Earlier in response to our request for

15 production of documents, we discussed the

16 documents or the papers -- the manual actually,

17 that came with your Draco weapon.

18          Remember I showed you this first

19 page, the owner's manual of Draco pistol?

20 A.     Yes.

21          (Discussion off the record.)

22 BY MS. BERS:

23 Q.     Flip over a couple of pages.  You will

24 see the "Ten Commandments of Firearm Safety."

25 Do you see them?

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 77 of 177 PageID #: 127

1  A.    The "Basics of" gun -- "Of Safe Gun

2  Handling"?

3  Q.    Yes.  Do you see the Ten Commandments

4  there?  It's called the "Ten Commandments of

5  Firearm Safety"?

6  A.    Yes.

7  Q.    If you look at commandment Number 9,

8  which is a couple of pages back, that

9  commandment says, "Don't alter" -- "do not alter

10  or modify your gun."  Do you see that?

11  A.    Yeah.

12  Q.    When you painted the tip of that weapon

13  orange, you were altering your weapon, weren't

14  you?

15           MR. DAVIDSON:  Objection.  Form.

16           THE WITNESS:  Yeah.

17  BY MS. BERS:

18  Q.    When you were walking through Radnor on

19  that day, December 20th of 2009, did you see any

20  other individuals carrying a AK-47?

21  A.    No.

22  Q.    As a matter of fact, when you and Ranger

23  Walsh were talking, an individual came up and

24  asked you if that thing was real, didn't he?

25  A.    Yes.

Case 3:10-cv-00126  Document 16-1   Filed 11/30/10  Page 78 of 177 PageID #: 128

```
 1   Q.      So that particular individual was

 2   confused by your weapon; isn't that true?

 3              MR. DAVIDSON:  Objection to the

 4   form.  He has no idea whether that person was

 5   confused or not.

 6   BY MS. BERS:

 7   Q.      Well, that person needed to ask you

 8   whether or not that was -- was real; isn't that

 9   true?

10   A.      I don't know if he needed to ask me.  He

11   was probably interested in the handgun.

12   Q.      When Ranger Walsh encountered you, he

13   indicated to you that he could not tell whether

14   that was a real weapon or not, didn't he?

15   A.      He asked me if it was real.

16   Q.      He asked you if it was real.  So during

17   that -- during that time that we listened to the

18   -- on the CD, at least two people during that

19   time asked you whether or not that was a real

20   gun; isn't that correct?

21   A.      Yes, that's correct.

22   Q.      Mr. -- that individual who came up and

23   talked to you and Ranger Walsh; is that right?

24   A.      Yes.

25   Q.      And so Ranger Walsh, who is a law
```

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 79 of 177 PageID #: 129

1  enforcement -- law enforcement officer, you can

2  surmise could not tell whether your weapon was

3  real or not; is that correct?

4  A.     At what point?  When he -- when he first

5  -- when he first saw me?

6  Q.     When he asked you that question.

7  A.     Yeah, he didn't -- he didn't know.

8  Q.     Okay.  You've indicated earlier that you

9  -- you've carried a firearm with you wherever

10  you go, or words to that effect; is that right?

11  A.     Yeah, I'd say most of the time I carry a

12  firearm.  I can't say every time I go everywhere

13  I carry a firearm, but I'd say most -- most

14  times I go I -- most places I go, I carry a

15  firearm.

16  Q.     Were you carrying a firearm while you

17  were driving the school buses for the Williamson

18  County Board of Education?

19  A.     No.

20  Q.     That would be one time that -- that you

21  were not?

22  A.     Well, there's lots of times that I --

23  that I wasn't, because I never carried -- in

24  fact, I never carried a handgun onto Williamson

25  County school property as an employee.

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 80 of 177 PageID #: 130

1  Q.     So that particular -- in that -- in that

2  job you did not carry a weapon with you when you

3  were driving school buses?

4  A.     That's correct.

5  Q.     How about your other places of

6  employment, did you carry a weapon with you at

7  those various places of employment?  And if you

8  wish, you can look at interrogatory Number 5 in

9  answer to that.

10 A.     I carried it at Truck Tops, Et Cetera,

11 but other than that, no.

12 Q.     Have you ever gone to Radnor when you

13 were not carrying a weapon?

14 A.     Yes.

15 Q.     How many times have you been to Radnor

16 when you were not carrying a weapon?

17 A.     Maybe two or three times.

18 Q.     Have you been back to Radnor Lake since

19 this incident on December 20th of 2009?

20 A.     No, I'm scared.

21 Q.     You were what?

22 A.     I'm scared.

23 Q.     Scared of what?

24 A.     Scared of getting assaulted.

25 Q.     What do you mean?

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 81 of 177 PageID #: 131

```
1    A.     The last time I was there, I was detained
2    for almost three hours and had a ranger point a
3    shotgun at my face.
4    Q.     When you said you had a ranger point a
5    shotgun at you, it was at a time that you
6    yourself were carrying an AK-47 across the chest
7    of your body; is that right?
8    A.     Well, no, I was carrying a AK-47 type
9    handgun.
10   Q.     What is the difference between an AK-47
11   type handgun and an AK-47?
12   A.     AK-47 is typically full automatic, a
13   machine gun, and it's an assault rifle, whereas
14   this is a pistol.  It is designed as a pistol.
15   It's manufactured as a pistol.  It's imported as
16   a pistol, and it's sold as a pistol.
17   Q.     Okay.  And that makes it not an AK-47?
18   A.     That's correct, it's semiautomatic.
19          MR. DAVIDSON:  Let me object to the
20   form.  He's not an expert in this stuff.
21          Again, go ahead and answer the best
22   way you can.
23          THE WITNESS:  Okay.  I'm sorry, can
24   you repeat the question?
25   BY MS. BERS:
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 82 of 177 PageID #: 132

```
 1   Q.      So that makes it not an AK-47?

 2   A.      That's correct.

 3   Q.      So you deny that the weapon that you were

 4   carrying at the time of this incident on

 5   December 20th of 2009 was an AK-47?

 6              MR. DAVIDSON:  Counsel, I'm going to

 7   object.  This is not questioning.  This is

 8   arguing with the witness.

 9              MS. BERS:  No.

10              MR. DAVIDSON:  The document speaks

11   for itself as to what type of weapon this was.

12   There's no question about what kind of weapon it

13   was.  And this line of questioning is just

14   argumentative, and I object to it.

15              MS. BERS:  This is the first time,

16   Counsel, that I've heard that this is not an

17   AK-47.

18              MR. DAVIDSON:  Again, I'm going to

19   object.  This is argument.  The document -- did

20   you introduce the owners' manual as the -- as an

21   exhibit?

22              MS. BERS:  I'm about to.

23              MR. DAVIDSON:  Well, let's do that.

24   Let's let the owner's manual tell -- tell the

25   Court and the jury what kind of weapon this is.
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 83 of 177 PageID #: 133



```
 1   My client is not an expert in this.
 2              MS. BERS:  All right.  Let's make
 3   the next numbered exhibit, let's make both the
 4   interrogatory responses and the request for
 5   production of document responses the next
 6   collective exhibit to Mr. Embody's deposition.
 7              MR. DAVIDSON:  No objection.
 8              (Document marked as Exhibit 6.)
 9   BY MS. BERS:
10   Q.    Mr. Embody, I'm going to show you some
11   photographs, and ask you -- let me show you this
12   first one.  Can you see it?
13              MR. DAVIDSON:  Did we provide these
14   to you?
15              THE WITNESS:  I don't -- I don't
16   remember getting those.
17              MR. DAVIDSON:  Can I ask, did we
18   provide these to you?
19              MS. BERS:  They may have been --
20   they may have been in my disclosure to you,
21   Mr. Davidson.
22              MR. DAVIDSON:  I don't remember ever
23   seeing this, this picture, but anyway.
24   BY MS. BERS:
25   Q.    Do you recognize that as the weapon that
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 84 of 177 PageID #: 134

1  you were carrying on December 20th of 2009 at

2  Radnor?

3  A.     Yes.

4  Q.     Do you recognize the magazine and the

5  round that is pictured as -- with that weapon

6  that you were carrying that day?

7  A.     Yes.

8            MS. BERS:  Okay.  Let's make that

9  the next-numbered exhibit.

10           (Document marked as Exhibit 7).

11           MS. BERS:  Let me take a break, and

12 I just want to confer with counsel outside in

13 the hallway.

14           THE VIDEOGRAPHER:  Going off the

15 record.  The time is 11:35.

16           (Discussion off the record.)

17           THE VIDEOGRAPHER:  Back on the

18 record.  The time is 11:40.

19 BY MS. BERS:

20 Q.     Mr. Embody, while -- while you are up

21 there, would you please demonstrate to us how

22 you fire that weapon that you had with -- with

23 you on that day at Radnor?

24           MR. DAVIDSON:  And I'm going to

25 object to the form.

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 85 of 177 PageID #: 135

BY MS. BERS:

Q.    How would you fire it?

A.    The -- there's several different ways to fire it.  You can have it supported by the sling and just have the sling around your neck and have it supported; you have it pushed away from your body.  You can fire it with one hand.  You can fire it with two hands on the grip.  You can fire it with one hand on the grip, one hand on the shroud.  I don't know.

Q.    Those would be the various ways that --

A.    Those would be the ways that I could think of.

Q.    That you would fire it?

A.    That particular handgun.

Q.    When -- when you were in the parking lot that day at Radnor Lake, you never heard Steve Ward ever say to you "you are under arrest," did you?

A.    No.

Q.    You never heard Steve Ward -- or you never had Steve Ward handcuff you; did -- did you?

A.    I never asked anyone to handcuff me.

Q.    No.  The question was, Ranger Ward never

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 86 of 177 PageID #: 136

1  handcuffed you; is that correct?

2  A.     That's correct.

3  Q.     It was a Metro police officer who

4  handcuffed you; is that right?

5  A.     Yes.

6  Q.     And in fact, it was a Metro police

7  officer who released you from the handcuffs; is

8  that right?

9  A.     Yes.

10 Q.     And the only time that you were placed in

11 the handcuffs was for a time when you were

12 placed in the Metro patrol car; is that right?

13 A.     Yes.

14 Q.     The other times your hands were totally

15 free; is that right?

16 A.     Yes.

17 Q.     You were offered at one time the option

18 of being issued a citation, weren't you?

19 A.     Yes.

20 Q.     And you turned that down, didn't you?

21 A.     Yes.

22 Q.     As a matter of fact, you preferred that

23 they take you -- that the officers from Metro

24 take you to -- downtown to police headquarters

25 instead; is that right?

Case 3:10-cv-00126  Document 16-1  Filed 11/30/10  Page 87 of 177 PageID #: 137

```
1   A.      Yes.

2   Q.      And so the officers agreed that that's

3   what they would do?

4   A.      No, I think they called their -- I think

5   they called the police sergeant at that point.

6   Q.      All right.  But -- but at one point they

7   -- they did concur with your request that you be

8   taken downtown; is that right?

9   A.      I don't know.  I don't think so, because

10  they didn't take me downtown.

11  Q.      But they were -- they placed you in a

12  patrol car; is that right?

13  A.      Yes.

14  Q.      And what was your understanding of why

15  they placed you in the patrol car?

16  A.      I don't know.  At that time -- at that

17  time I think they were conferring with Ranger

18  Ward, with all of the other police officers,

19  with their police sergeant.

20          And they were -- they were just

21  conferring and trying to figure out if they were

22  going to take me downtown or if they were going

23  to release me.

24          I -- I didn't know -- I didn't know

25  what -- they didn't really tell me -- I was
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 88 of 177 PageID #: 138

```
1   sitting on the hood of the police car, and they
2   said -- and they said -- they read me my rights;
3   they put me in handcuffs, put me in the back of
4   the car.
5   Q.      Who did that?
6   A.      One of the police officers.
7   Q.      From Metro?
8   A.      Yes.
9            MS. BERS:  That's all.  Thank you,
10  Mr. Embody.
11           THE VIDEOGRAPHER:  Going off the
12  record.  The time is 11:45.
13           (Discussion off the record.)
14           MR. DAVIDSON:  We'll read.
15           FURTHER DEPONENT SAITH NOT.
16           (Proceedings concluded at 11:45
17  a.m.)
18
19
20
21
22
23
24
25
```

Case 3:10-cv-00126   Document 16-1    Filed 11/30/10   Page 89 of 177 PageID #: 139

```
 1              REPORTER'S CERTIFICATE

 2              I certify that the witness in the

 3   foregoing deposition, LEONARD STANNIE EMBODY,

 4   was by me duly sworn to testify in the within

 5   entitled cause; that the said deposition was

 6   taken at the time and place therein named; that

 7   the testimony of said witness was reported by

 8   me, a Shorthand Reporter and Notary Public of

 9   the State of Tennessee authorized to administer

10   oaths and affirmations, and said testimony,

11   pages 5 through 89 was thereafter transcribed

12   into typewriting.

13              I further certify that I am not of

14   counsel or attorney for either or any of the

15   parties to said deposition, nor in any way

16   interested in the outcome of the cause named in

17   said deposition.

18              IN WITNESS WHEREOF, I have hereunto

19   set my hand this 19th day of October, 2010.

20

21

22     

23

24
                 Sandra Andrys, RMR, TLCR No. 583
25               My License Expires: 9-9-14
```

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 90 of 177 PageID #: 140

# E R R A T A

     I, LEONARD STANNIE EMBODY, having read
the foregoing deposition, pages 1 through 89, do
hereby certify said testimony is a true and
accurate transcript, with the following changes
(if any):


PAGE LINE    SHOULD HAVE BEEN

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

____ ____    _____

              _____
              LEONARD STANNIE EMBODY


_____
Notary Public


My Commission Expires: _____

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 91 of 177 PageID #: 141



THR > Tools and Technologies > Handguns: Autoloaders
**What is the best self defense ammo for my ak pistol?**

User Name  User Name    ☐ Remember Me?
Password

| Rules | Copyright | Register | FAQ | Calendar |
|-------|-----------|----------|-----|----------|

🔒 **Closed**                                          Page 1 of 2 **1** 2 >

                                              Thread Tools    Display Modes

December 18, 2009, 03:33 PM                                              #1

**kwikrnu**
member

Join Date: May 8, 2008
Location: tennessee
Posts: 106

😕 **What is the best self defense ammo for my ak pistol?**

I don't think my smith and wesson .38 special j frame is going to cut it for self defense anymore. So I'm going to start carrying my AK-47 pistol and an extra magazine or three. What is considered the best self defense ammo for this semi-automatic handgun?



This image or
video has been
moved or deleted

📷 photobucket

Public Service Announcement



*GrassRoots* South Carolina's "No Compromise,
*GunRights* No Surrender" gun rights organization

December 18, 2009, 03:37 PM                                              #2

**rcmodel**
Member

Join Date: September 17, 2007
Location: Eastern KS
Posts: 22,068

Well, you can call it a handgun if you want too.
But it isn't.

As for using 7.62x39 for a SD weapon?

I would only use expanding hollow-point varmint loads.
And pray over-penetration didn't kill someones grandma or baby four blocks down the street!

Quote:

extra mag or three

Wait, this is a joke post, right? 😳


Exhibit: # 1 Embody
Wit: b. Embody
Date: 10-14-10



rc
_____
If you don't belong to the NRA
Don't come whining about it when the next Gun Control Act gets passed!

December 18, 2009, 03:42 PM                                                    #3

**kwikrnu**
member

Join Date: May 8, 2008
Location: tennessee
Posts: 106

Quote:

> Originally Posted by **rcmodel**
> *Well, you can call it a handgun if you want too.*
> *But it isn't.*

It is a handgun and classified as such in I think all States and the BATF.

I'm limited to 7.62x39 because that is all it will shoot.

December 18, 2009, 03:49 PM                                                    #4

**rellascout**
Member

Join Date: December 22, 2004
Posts: 2,117

Gotta agree with rcmodel here... using a 7.62 pistol as an urban defense weapon is absurd.

It is way to powerful and if you ever have to use it you run the risk of killing someone other than the intended target.

Due to the barrel length is may very well be considered a class 3 SBR pistol according to the NFA but it is not a pistol in any practical sense of the term.

My advice is get a shotgun.

_____
"It's just a tool box. You pick the tool for the job." -Sam from Ronin

"It's just a gun it does not define you as a human being. Don't make a bigger deal out of it then it needs to be. It is just a tool."

December 18, 2009, 03:55 PM                                                    #5

**panoz77**
Member

Join Date: September 1, 2009
Location: NE Ohio
Posts: 69

Is it me, or does that "AK pistol" pictured have an orange tip, ROFL, I think the OP is trying to act like he is serious in a very weak attempt at starting a troll thread. Were you planning on your "mag or three" being 30 rounders or 40, I think 3 75 round drums would maximize your capacity.

DRACO owners unite!!!!!!!!

_____
Smoke em' if you got em'

December 18, 2009, 03:57 PM                                                    #6

**Z-Michigan**
Member

This is a joke, right?

Real defensive pistols are belt-fed.



Join Date: May 19, 2008
Location: Michigan
Posts: 2,273

December 18, 2009, 03:57 PM

**kwikrnu**
member

Join Date: May 8, 2008
Location: tennessee
Posts: 106

Quote:

> Originally Posted by **rellascout**
> Due to the barrel length is may very well be considered a class 3 SBR pistol according to the NFA

What is a class 3 short barreled rifle pistol? I've never heard of that.

December 18, 2009, 04:02 PM

**kwikrnu**
member

Join Date: May 8, 2008
Location: tennessee
Posts: 106

Quote:

> Originally Posted by **panoz77**
> Is it me, or does that "AK pistol" pictured have an orange tip, ROFL, I think the OP is trying to act like he is serious in a very weak attempt at starting a troll thread. Were you planning on your "mag or three" being 30 rounders or 40, I think 3 75 round drums would maximize your capacity.

The 75 drums are too wide and the 40 rounders are too long. The 30 round magazines work best I think.

I painted the muzzle nut/thread protector "blaze orange" because I have safety in mind. It means no one can and will shoot at me.

December 18, 2009, 04:02 PM

**rellascout**
Member

Join Date: December 22, 2004
Posts: 2,117

Troll alert.

"It's just a tool box. You pick the tool for the job." -Sam from Ronin

"It's just a gun it does not define you as a human being. Don't make a bigger deal out of it then it needs to be. It is just a tool."

December 18, 2009, 04:05 PM

**panoz77**
Member

Join Date: September 1, 2009
Location: NE Ohio

Ya thinks?

Smoke em' if you got em'



Posts: 69

---

December 18, 2009, 04:10 PM                                                        #11

**DHaught**
Member

Join Date: November 7, 2009
Posts: 13

Quote:

> Originally Posted by **rellascout**
> *Gotta agree with rcmodel here... using a 7.62 pistol as an urban defense weapon is absurd.*
>
> *It is way to powerful and if you ever have to use it you run the risk of killing someone other than the intended target.*
>
> *Due to the barrel length is may very well be considered a class 3 SBR pistol according to the NFA but it is not a pistol in any practical sense of the term.*
>
> *My advice is get a shotgun.*

I don't think there's a such thing as a "SBR pistol" (Short Barrelled Rifle pistol)

---

December 18, 2009, 04:13 PM                                                        #12

**DHaught**
Member

Join Date: November 7, 2009
Posts: 13

You better get a good IWB holster for that thing and make sure you don't print. You don't want to get "made".

I would also put a crimson trace grip and some night sights on it. Maybe a Hogue grip sock, or just some electrical tape on the grip.

---

December 18, 2009, 04:17 PM                                                        #13

**kwikrnu**
member

Join Date: May 8, 2008
Location: tennessee
Posts: 106

In my State we open carry, so I think a two point sling will work good.

---

December 18, 2009, 04:24 PM                                                        #14

**Carne Frio**
Member

Join Date: August 28, 2008
Location: Near Fairbanks
Posts: 241

I prefer the 20 round Hungarian magazines for my AK pistol. Federal makes a 125 gr spire point that works fine. Brownbear also has hollowpoints.

Case 3:10-cv-00126 Document 16-1 Filed 11/30/10



December 18, 2009, 04:27 PM                                                                      #15

**NG VI**
Member

Join Date: December 12, 2007
Location: Maine
Posts: 3,132

Yeah a sling would cover your holster needs just fine, as would duct taping it to your second trauma plate. Or is that spot reserved for taping a third trauma plate on?

Quote:

> Quote:
>
> > "The Les Baer 1911 feels like a man's tool, no doubt about it.
>
> ...you may want to re-word that.

December 18, 2009, 04:33 PM                                                                      #16

**rellascout**
Member

Join Date: December 22, 2004
Posts: 2,117

Quote:

> I don't think there's a such thing as a "SBR pistol" (Short Barrelled Rifle pistol)

The pistol part is a joke... like this thread.

"It's just a tool box. You pick the tool for the job." -Sam from Ronin

"It's just a gun it does not define you as a human being. Don't make a bigger deal out of it then it needs to be. It is just a tool."

December 18, 2009, 10:49 PM                                                                      #17

**kwikrnu**
member

Join Date: May 8, 2008
Location: tennessee
Posts: 106

Quote:

> Originally Posted by **rellascout**
> *The pistol part is a joke...*

It sounded more like you had no idea what you were talking about. This thread is no joke. As soon as I get my sling mounted I'll have a pic or two of me open carrying the firearm around town.

December 18, 2009, 11:01 PM                                                                      #18

**sarduy**
Member

Join Date: April 13, 2007
Location: Florida
Posts: 2,059

forget about the ak-pistol go with this



**Kalashnikov Picture Club**

---

December 18, 2009, 11:02 PM                                                    #19

**sarduy**
Member

Join Date: April 13, 2007
Location: Florida
Posts: 2,059

> Quote:
> I'll have a pic or two of me open carrying the firearm around town.

you will become the target!
—————————————
**Kalashnikov Picture Club**

---

December 18, 2009,
11:04 PM                                                                        #20

**Erik M**
Member

Join Date: June 14,
2009
Location: Black
Mountain, Kentucky
Posts: 1,136

> Quote:
>
>
>
>
>
>
>
>
>
>
>
> Originally Posted by **sarduy** 🔈
> forget about the ak-pistol go with this



Even the haircut is a deadly weapon. I would mount ma deuce to that chrysler in the background.

Also, its an AK, i would stick with standard ball ammo.

~ ΜΟΛΩΝ ΛΑΒΕ ~



---

December 18, 2009, 11:05 PM                                              #21

**kwikrnu**
member

Join Date: May 8, 2008
Location: tennessee
Posts: 106

Quote:

> Originally Posted by **sarduy**
> *you will become the target!*

Open carry deters crime. No regular joe citizen open carrying a gun has been attacked for his gun that I have ever read about.



---

December 18, 2009, 11:08 PM                                              #22

**Vonderek**
Member

Join Date: July 9, 2006
Posts: 812

Since it's replacing your J-frame, make sure you buy pants a size bigger. Finding a pocket holster will be a challenge though....



---

December 18, 2009, 11:11 PM                                              #23

**rellascout**

Good luck with that...your an idiot.



Member

"It's just a tool box. You pick the tool for the job." -Sam from Ronin

Join Date: December 22, 2004
Posts: 2,117

"It's just a gun it does not define you as a human being. Don't make a bigger deal out of it then it needs to be. It is just a tool."

December 18, 2009, 11:11 PM                                                                                            #24

**Darthbauer**
Member

Look at the OP location. He might actually open carry an AK pistol with some of the people I have seen come out of that area.

Join Date: April 1, 2007
Posts: 648

"Mass Genocide is the most exhausting activity one can engage in, next to soccer."

December 18, 2009, 11:16 PM                                                                                            #25

**highorder**
Member

Be sure it doesn't cover your CCW badge, or tear your tin foil hat.

Also, the painted tip?... for sake of a punchline, explain how its for safety?

Join Date: October 7, 2007
Location: Cincinnati
Posts: 3,607

"If I said it, I must have meant it; so I owe him an apology, or nothing at all." - HST

Closed                                                                                    Page 1 of 2  **1** 2 >

« Previous Thread | Next Thread »



**Posting Rules**

You **may not** post new threads
You **may not** post replies
You **may not** post attachments
You **may not** edit your posts

BB code is **On**
Smilies are **On**
[IMG] code is **On**
HTML code is **Off**

Forum Rules

**Forum Jump**
Handguns: Autoloaders



Similar Threads

| Thread | Thread Starter | Forum | Replies | Last Post |
|---|---|---|---|---|
| AK SBR kit or complete AK pistol? | Ian | Rifle Country | 3 | January 23, 2008 10:41 AM |
| AOW or not? AK pistol with folding | cpileri | Legal | 12 | August 26, 2004 09:28 |

| FOWARD pistol grip... | | | | PM |
| AK-47 For Self Defense | w1mnk | Legal | 2 | April 20, 2004 07:47 PM |
| AK-47 Defense Ammo? What do you recommend? | Logistar | Rifle Country | 24 | July 22, 2003 12:50 PM |
| Is choosing defense ammo based on available practice ammo rational? | DMK | Handguns: General Discussion | 7 | April 19, 2003 03:16 AM |

All times are GMT -4. The time now is 11:06 AM.

-- The High Road vBulletin 3 Style

Contact Us   The High Road Forums
Archive   Top

Powered by vBulletin® Version 3.8.6
Copyright ©2000 - 2010, Jelsoft Enterprises Ltd.

IMPORTANT DISCLAIMER

Although The High Road has attempted to provide accurate information on the forum, The High Road assumes no responsibility for the accuracy of the information. All information is provided "as is" with all faults without warranty of any kind, either express or implied. Neither The High Road nor any of its directors, members, managers, employees, agents, vendors, or suppliers will be liable for any direct, indirect, general, bodily injury, compensatory, special, punitive, consequential, or incidental damages including, without limitation, lost profits or revenues, costs of replacement goods, loss or damage to data arising out of the use or inability to use this forum or any services associated with this forum, or damages from the use of or reliance on the information present on this forum, even if you have been advised of the possibility of such damages.

I think they handled it as well as could be expected. I felt the cop who was trying to charge me with a violation of 39-17-1311 had no basis for the charge.

Radnor Lake rules

Tennessee State Code

Picture of park sign
http://i145.photobucket.com/albums/r...orlakesign.jpg

Carrying handguns in State Parks is legal with a handgun carry permit regardless of what the sign says.

see New Law public Chapter 428

Because signage prohibiting the possessing of firearms while within or on a public park, natural area, historic park, nature trail, campground, forest, greenway, waterway or other similar public place that is owned or operated by the state, or instrumentality thereof, and posted pursuant to §§ 39-17-1311, prior to July 1, 2009, remains necessary for visitors who are not authorized to carry a firearm pursuant to subsection (b), the department shall not replace or change any existing signs that prohibit firearms or erect any new signs at existing state areas relative to firearms. However, the department may replace or repair signs that have been damaged or are scheduled for replacement in accordance with the park's regular replacement schedule.

Picture of firearm
http://i145.photobucket.com/albums/r226/kwikrnu/ak6.jpg

---

**Mike**                                                                12-20-2009 05:26 PM
imported post

So, it remains illegal to carry long guns in TN state parks?

---

**kwikrnu**                                                             12-20-2009 06:26 PM
imported post

It is legal to carry with a permit, the Legislature decided in their infinite wisdom that the signs do not have to be changed to reflect the change in the law.

They tried to charge me with 39-17-1311 which prohibits rifles in parks. They couldn't grasp that the AK-47 pistol I carried was a pistol even though it does not meet the definition of a rifle.

If cops don't know the law how are they going to charge me with a crime? They aren't supposed to guess if people break the law and arrest them based upon a guess are they?

---

**Mike**                                                                12-20-2009 06:36 PM
imported post

Exhibit: 2
Wit: Embody
Date: 10-14-10
Rptr: SH

> **kwikrnu wrote:**
> Quote:
>
> > *It is legal to carry with a permit,*
>
> What do you mean by "it" - the gun ou were carrying, or long guns generally.

---

**kwikrnu**                                                    12-20-2009 06:49 PM
imported post

> **Mike wrote:**
> Quote:
>
> > ***kwikrnu wrote:***
> > *Quote:*
> >
> > > *It is legal to carry with a permit,*
> >
> > *What do you mean by "it" - the gun ou were carrying, or long guns generally.*
>
> The handgun I was carrying. You can't carry a rifle with a permit. You can transport a loaded rifle, but no rounds in the chamber, in your car with a permit.

---

**McX**                                                        12-21-2009 12:49 AM
imported post

> that is definitely one hell of a pistol!

---

**WCrawford**                                                  12-21-2009 02:01 AM
imported post

> kwikrnu, I think you need to get an "adventure buddy". Alone you seem to be an idiot magnet.
>
> Did you have your recorder with you for this? I'd love to hear the audio if available.

---

**kwikrnu**                                                    12-21-2009 02:51 AM
imported post

> The batteries died. I only have a partial of the conversation I had with the first park ranger. I need to get an external mic and double check the batteries before I leave the house next time, although I thought it showed full battery.
>
> I'm going to file a complain against the metro police and tn state parks. I will open carry the ak again.

My main concern is they wanted to charge me with a crime so bad. I thought it was illegal for cops to make up charges. Don't they need PC to make an arrest?

I get them stopping me for reasonable suspicion, but pointing a shotgun? I had already spoken to one ranger and showed him my carry permit and was not a threat. My hands were no were near my handgun and I made no threatening moves before the second pointed a shotgun at me.

I would think they would of needed PC to arrest me. Wouldn't PC be something like, the gun is a rifle? Clearly it is no rifle because it has no stock.

---

### Fallguy                                                                12-21-2009 03:20 AM
imported post

While OCing this weapon may have been technically legal, not sure it was the wisest decision.

I mean is this the only carry weapon you have?

---

### ProguninTN                                                            12-21-2009 03:26 AM
imported post

Mike, yes it is generally illegal to carry long guns in TN. As the poster stated, the legislature did pass a transportation exception for permit holders, however no rounds can be chambered. (Very idiotic that permit holders can have their handguns chambered but not their long guns. )

---

### kwikrnu                                                               12-21-2009 03:27 AM
imported post

> **Fallguy wrote:**
> Quote:
>
> > *While OCing this weapon may have been technically legal, not sure it was the wisest decision.*
> >
> > *I mean is this the only carry weapon you have?*

It makes no difference how many handguns I own. The AK-47 pistol is a handgun and it is not illegal to carry it.

---

### kwikrnu                                                               12-21-2009 03:30 AM
imported post

> **ProguninTN wrote:**
> Quote:

*It is illegal to carry long guns period.*

No it isn't. You may carry and unloaded long gun if there are no laws against the carry of that long gun. For example Williamson County and Franklin TN have no laws against the carry of a long gun. I could carry an unloaded one down the street just fine. Of course I would have to avoid off limit places such as parks and I believe I would have to stay 1000' away from schools too.

---

## ProguninTN
imported post

12-21-2009 03:38 AM

Yes, but what will you do with an unloaded rifle, use it as a club ?

---

## kwikrnu
imported post

12-21-2009 03:46 AM

You claimed carrying of long guns was illegal, PERIOD. Do whatever you want with an unloaded long gun. It is not illegal to carry it most places, but local ordinaces need to be checked first.

---

## protias
imported post

12-21-2009 03:47 AM

Off topic, but why do you have an orange tip?

---

## kwikrnu
imported post

12-21-2009 03:56 AM

Safety. cops don't shoot people with orange tipped handguns. When they do they think twice about it. Since most people assume it is an airsoft toy I will probably generate fewer MWAG calls.

---

## ProguninTN
imported post

12-21-2009 03:58 AM

**kwikrnu wrote:**
Quote:

*You claimed carrying of long guns was illegal, PERIOD. Do whatever you want with an unloaded long gun. It is not illegal to carry it most places, but local ordinaces need to be checked first.*

Yes I did, but then I went back and edited the post after I realized it could be misconstrued. (Notice the bottom where it shows I did so about 3 min. after the original.)

---

**kwikrnu**                                                           12-21-2009 04:07 AM
imported post

Okay, I see you changed the post now. We're good.

---

**turbodog**                                                         12-21-2009 04:51 AM
imported post

If the firearm in the photo is yours, I can clearly see the confusion. That looks like a rifle
with no shoulder stock to me too.

If you want to carry a handgun with less hassle, I would certainly go with something that
looks more like a handgun and less like a rifle.

Just because it's legal to carry doesn't mean it's the right thing to carry.

Just my 2 cents bro.

---

**kwikrnu**                                                          12-21-2009 04:54 AM
imported post

I called in a complaint to the internal investigations / professional accountability. I spoke
with Detective Carter. I complained that being detained for 2.5 hours was excessive. What
troubled me most about the phone call was that he thoughtone could only carry
concealed (this is going to be an uphill battle). He said he would try and find out who the
officers involved were and what the situation was. He said I would be informed of the
status of my complaint in writing.

---

**kwikrnu**                                                          12-21-2009 04:57 AM
imported post

**turbodog wrote:**
  Quote:

   *If the firearm in the photo is yours, I can clearly see the confusion. That looks like a rifle
   with no shoulder stock to me too.*

   *If you want to carry a handgun with less hassle, I would certainly go with something that
   looks more like a handgun and less like a rifle.*

   *Just because it's legal to carry doesn't mean it's the right thing to carry.*

   *Just my 2 cents bro.*

Just because it is legal to carry a 9mm you shouldn't because it looks dangerous.
Everyone should carry a .22lr handgun.:celebrate

The point is carrying a handgun in a park is okay so why was I detained 2 1/2 hours?

---

## Mike

imported post

> **kwikrnu wrote:**
> Quote:
>
>> *The point is carrying a handgun in a park is okay so why was I detained 2 1/2 hours?*
>
> Sounds like because you really pushed the limit as to what a "handgun" is and you appeared to the police to be disguising the gun as a toy with an orange cap, and carried like a rifle slung over your back at that - every judge in the world is going to cut the police a break on this, and give them qualified immunity.
>
> Next time try a normal looking handgun in a proper holster.

---

## turbodog

imported post

> **kwikrnu wrote:**
> Quote:
>
>> ***turbodog wrote:***
>> *Quote:*
>>
>>> *If the firearm in the photo is yours, I can clearly see the confusion. That looks like a rifle with no shoulder stock to me too.*
>>>
>>> *If you want to carry a handgun with less hassle, I would certainly go with something that looks more like a handgun and less like a rifle.*
>>>
>>> *Just because it's legal to carry doesn't mean it's the right thing to carry.*
>>>
>>> *Just my 2 cents bro.*
>>
>> *Just because it is legal to carry a 9mm you shouldn't because it looks dangerous. Everyone should carry a .22lr handgun.:celebrate*
>>
>> *The point is carrying a handgun in a park is okay so why was I detained 2 1/2 hours?*
>
> Most 9mm and .22 cal handguns look like the "common conception" of handguns, so I would expect no or minimal hassle from LEO in their case.But that thing you carried looks to much like an assaultrifle, whether legally a handgun or not. You say you carried it "slung" across your back at one point, yes? Most folks don't sling carry a sidearm on their back. That's a method of carrying a rifle not a pistol. I do understand where they were coming from in detaining you over it.
>
> Feel free to carry what ya want brother but I'm just sayin don't be gettin pissed or surprised at the reaction to that particular firearm. The AK has a fearsome reputation in the world and that's what you're up against carrying that.
>
> When you OC you automatically, wether intended or not, and wether you say a word about it or not, become a spokesman for the right to OC. Others will look at what you carry, how you carryit and how you deport yourself while carrying. While you might possibly be a great guy, polite, generous, kind to small children and animalsand all that, it still wouldn't make that firearm the right one for a spokesman to open carry because nobody sees you, all they see is the gun beloved of terrorists and drug thugs. Sorry bro, but that's a painful truth no matter how much YOU love that firearm.

See what I'm gettin at brother? No offense intended here.

---

**Fallguy**
imported post

12-21-2009 06:10 AM

> **Mike wrote:**
> Quote:
>
>> **kwikrnu wrote:**
>> Quote:
>>
>>> *The point is carrying a handgun in a park is okay so why was I detained 2 1/2 hours?*
>>
>> *Sounds like because you really pushed the limit as to what a "handgun" is and you appeared to the police to be disguising the gun as a toy with an orange cap, and carried like a rifle slung over your back at that - every judge in the world is going to cut the police a break on this, and give them qualified immunity.*
>>
>> *Next time try a normal looking handgun in a proper holster.*

I agreealso being detained for 2 1/2 hours is probably better than simply being arrested and explaining it all to the judge.

I hopeyou get some sense of satisfaction from your complaint, but to be honest I'm not sure I can fault the LEOs in this matter. ...and I among the first to speak out if I feel they have overstepped any bounds.

But it doessounds like Detective Carter is thinking of carry in National parks in a couple of months on concealed carry only though.

---

**aadvark**
imported post

12-21-2009 08:51 AM

In Tennessee, it is perfectly Legal to Open Carry a Long Gun, provided; that you are not a Felon, Drug Abuser, etc., and the Long Gun is Unloaded.

This is codified under 39-17-1307(a)(2)(A), but 39-17-1308(a)(1) and 39-171308(a)(5) both provide Lawful defenses from prosecution under 39-17-1307(a)(2)(A) as long as the Person in question is not a Person outlined under 39-17-1307(b)(1)-i.e. as stated above- Felons, and Drug Felons, in addition to Persons who are trying to committ a non/dangerous offense or who are prohibited under 18 U.S.C. 922(g)(8) or 18 U.S.C.922 (g)(9).

Furthermore 39-17-1307(e) provides an additonal defense for Persons who are in their own Private Motor Vehicles as long as the LongGun is not Loaded, but may be if they hold a Permit or are acting in Self-Defense.

Additionally, 39-17-1308(a)(3)(A) through 39-17-1308(a)(3)(C) provide exceptions, whether the same (Firearm/Long Gun) is Loaded or not while the Person in question is in/on/within theirown: 1. Home, 2. Land(Premises),or3. Place of Business, provided further, that the Person is not a Person who is ineligible under 39-17-1307(b)(1)-Felon, Drug Felon, or is otherwise ineligible under 18 U.S.C. 922(b) and 18 U.S.C. 922(g).

Page 1 of 7  **1**  2  3  ...  ▶      ▶▶

Show 40 post(s) from this thread on one page

All times are GMT -5. The time now is 11:56 AM.

Powered by vBulletin™ Version 4.0.7
Copyright © 2010 vBulletin Solutions, Inc. All rights reserved.

Home   Advertising   Arcade   Casino   GTArmY   Photo Gallery   Archive   Paid Memberships   Web Store

One draw and you'll be convinced!

Holsters, Gun-belts, & Mag Pouches

Gordon Carrell
Team Smith & Wesson

Register              Blogs              FAQ              Calendar

Glock Talk > Homepage > **Forums**

Sponsored Links

Glock Talk Advertisement

**Blackstone Tactical**
Quality Gear for the Professional Operator

User Name   User Name
Password
☐ Remember Me?  Log in

**View Single Post**     Thread: UPDATE: Charges dropped against hiker in military gear with air rifle

☐ 08-23-2009, 14:56                                                              #51

**kwikrnu**
Senior Member

Join Date: Sep 2004
Location: Tennessee
Posts: 1,574

» Site Links

Homepage
FAQ
Forums
User CP
Advertise
Gallery
Arcade
Casino
GT Blogs
Social Groups
GTArmY

> Quote:
>
> Originally Posted by **Sam Spade**
> *Beggin' your pardon, I told you what the
> statute was: Disorderly conduct.
> Beggin' your pardon again, I told you what
> the applicable elements of the crime are:
> Engaging in seriously disruptive behavior that
> disturbs the peace of a neighborhood.*
>
> *He wasn't charged with shooting at people
> (attempted murder). He wasn't charged with
> aiming his rifle at people (aggravated
> assault). He was charged with disorderly
> conduct. See above.*
>
> *And would you please fill me in on your
> location? You're making authoritive-sounding
> statements about what the laws say, and I'm
> trying to figure out why you're going wrong.
> See, I know what they say, and I've been to
> the area so I know what the neighborhood
> looks like and acts like. You?*

What was he doing that was "seriously disruptive"?

I can't wait for a cop to arrest me because I open
carried a handgun and someone called 911. It's
almost happened twice but no cigar, yet. Maybe
carrying a PLR-16 or AK pistol will change that.

*Last edited by kwikrnu; 08-23-2009 at 15:03.*

Exhibit: 3
Wit: Earlody
Date: 10-14-10
Rptr: SP



Sponsored Links

Glock
Talk
Advertisement





Please Help Support Glock Talk

Shotgun Ammo
Electric Airsoft
Tactical Firearms
Military Clothing
AR15Builder.com
Law Enforcement Articles
Rifle Silencers
Tactical Weapons
Vltor Parts
Frontsight Training
Handguns
Tactical Armor
AWC Silencers
Suppressors
Taser
Gun Training Reports
Handgun Parts
Tactical Supplies
Gun Cleaning Supplies
AR-15 Parts
Ads by TacticalRepublic.com

» Search Forums

[ Go ]

» Advanced Search

**» Online Users: 1976**

699 members and 1277 guests

Users Currently Online

Most users ever online was
5,723, 04-16-2009 at 10:36.



**HARD-USE GEAR
EVERYDAY!**

**CLICK HERE**

**#0613
FLIEGERDUFFEL
ADVENTURE BAG**

Powered by vBadvanced CMPS v3.0.1

All times are GMT -6. The time now is 13:49.

Contact Us - Glock Talk Home - Archive - Top

Powered by vBulletin® Version 3.7.3
Copyright ©2000 - 2010, Jelsoft Enterprises Ltd.
Advertisement System V2.5 By  Branden
Copyright ©2008, 2009, Glock Talk, All Rights Reserved.

**GlockTalk.com is owned and operated by GunServer.com**



**detained in a TN State Park for 2.5 hours nearly arrested because cops don't know definition pistol**

Printable View

Page 1 of 7 **1** 2 3 ... ▶ Last ▶▶                    Show 40 post(s) from this thread on one page

---

**kwikrnu**                                                              12-20-2009 03:15 PM
imported post

I went to the Tennessee State Radnor Lake State Park this afternoon to take in some nature and get some exercise. I dressed in boots, blue jeans, t-shirt, vest, and an old military issue gore-tex woodland camo jacket. I carried my new Romanian Draco AK pistol loaded with 31 123 grain FMJ ammunition from Walmart. I arrived at approximately 3:30 pm and with the pistol slung on my back I started my walk. It was mostly uneventful. I saw no deer and passed maybe 30 hikers. As I reached the end of the trail I made sure no one was close by and shifted the ak-47 pistol to the front of my body. I reached the end of the trail and turned onto the roadway where I saw the first ranger of the day. He asked me if it was an airsoft and I said no it was an AK-47 type pistol. He looked at me strangely and asked to see my permit. I showed my Tennessee handgun carry permit. He asked where I parked and I told him. He said I could keep walking I kept walking as he called someone. By the time I reached my car the ranger was no where in sight as I walk quickly. However, another ranger vehicle pulled in the parking lot and a ranger jumped out with a shotgun pointed at me and yelled at me to stay still and put the weapon on the ground. After I put the weapon down he told me to move away which I did. He then told me to put my face on the ground and my arms on my head. I complied. I think he had a gun trained on me the whole time, but I couldn't see. He searched me quickly and put my AK into the truck. This particular ranger has seen me before and has asked to see my TN handgun carry permit. He asked to see the permit again and asked for my driver license. I told him I would not give him my license, but he could see the permit.

Three Nashville metro cop cars showed up pretty quickly. They talked among themselves for about an hour and then a cop pulled out a citation for arrest. It said I was being arrested for 39-17-1311 unlawful possession of a weapon. He asked me to sign and I told him I wanted to speak with his supervisor. He said okay, but that it would take a long time and he just wanted to cite and release me for my convenience (yeah right). I asked what part of 39-17-1311 I violated he said I couldn't carry a rifle. I told him my firearm was classified as a pistol. It has no stock and never had a stock. I also pointed out that it has an 11.5″ barrel with complies with the length of a handgun definition in Tennessee. He said it looks like I had cut the stock off and another said they had never heard of a 7.62x39 handgun. It took about another ½ hour for the sergeant to show up. In the meantime one of the original cops left, another park ranger came and left and two more cops showed up. The sergeant showed and I tried to explain that the firearm was a handgun. I also told him if they were going to arrest me to just take me in front of the magistrate right away. They spent another ½ hour asking me if I had a form 1, that the ATF classifies my pistol as a rifle, and they had never seen an AK pistol before. Finally they told me they had gotten in touch with the manufacturer and the manufacturer said it indeed was a pistol. I highly doubt that, but that is what they told me. They released the handcuffs, and gave me back my magazine, ammo, and pistol.

Exhibit: 4
Wit: _Emelrod'y_
Date: 10-14-10
Rptr: _SA_

# Exhibit 5

# Audio Disc
# (not attached)

# To be filed separately

# By permission of the Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

LEONARD S. EMBODY,       )
                                )
      Plaintiff,          )      NO. 3:10-cv-00126
                                )      JURY DEMAND
V.                           )
                                )      JUDGE HAYNES
STEVE WARD, individually,   )
                                )
      Defendant.      )

### DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

INTERROGATORY NO. 1: State your full name, address, date and place of birth.

RESPONSE:

```
Leonard Stannie Embody
6620 Valley Dr.
Brentwood, TN 37027

Walnut Creek, California
```

INTERROGATORY NO. 2: State all other names you have ever gone by, with inclusive dates during which you used that name. This includes all names or appellations in any forums, blogs, internet discussion boards, news forums or any other websites related to transmissions on the internet that you have used to enter information, opinions, or other material, including, but not limited to, as a member or subscriber.

RESPONSE:

```
Lenny Embody, Lenny Stannie Embody until about 1990.  Leonard
Embody or Leonard Stannie Embody from 1990-2010.  Kwikrnu,
Kwirnu, Easterisland, Isladepascua, Leonardembody, as I recall.
```

Exhibit: 6
Wit: Embody
Date: 10-14-10

INTERROGATORY NO. 3:  Identify pursuant to Fed. R. Civ. P. 26(a)(2) each person whom you anticipate calling as an expert witness at trial, and attach a copy of the report prepared by each expert.

RESPONSE:

Without information

INTERROGATORY NO. 4: List any forums, blogs, internet discussion boards, news forums or any other websites related to transmissions on the internet that you have used to enter information, opinions, or other material, including, but not limited to, as a member or subscriber.

RESPONSE:

See attached

INTERROGATORY NO. 5:  Identify by name, address, telephone number and dates of employment each employer you have had or each period of self-employment you have pursued during the past twenty years, and the type of work performed with your rate of pay and average monthly income.

RESPONSE:

See attached

2

INTERROGATORY NO. 4:

Topix.com, Tennessean.com, commercialappeal.com, toyotanation.com, thehighroad.org, thehighroad.net, thehighroad.us, theakfiles.net, glocktalk.com, opencarry.org, thenashvillescene.com, thecitypaper.com, defensivecarry.com, usacarry.com, tngunowners.net, tncivilsociety.net, tfaonline.org, goldenretrieverforum.com, ih8mud.com, tacomaterritory.com, pwctoday.com, ttora.com, tundrasolutions.com, forums.iboats.com, packing4life.com, craigslist.com, thetreeofliberty.com, pirate4x4.com, modulardepot.com, marineengine.com, forumsevolutionm.net, blog.thepartainspace.com, yotatech.com, freerepublic.com, youtube.com, bobistheoilguy.com, polkaudio.com, impalas.com, streetcarforums.com, tennesspeed.net, americangunforum.com, ar15.com, saysuncle.com, grizzleygary.com, surplusrifleforum.com, knoxnews.com, thedeserteagle.com, gunownersclub.com, firearmsites.com, usms.org, facebook.com, myspace.com, wallsofthecity.net, waltherforums.com, watchuseek.com, Honda-tech.com, pafoa.com, theexaminer.com, ktog.org, kahrtalk.com, everydaynodaysoff.com, thefiringline.com, smith-wessonforum.com, silencertests.com, silencertalk.com, 1911forum.com, calguns.net, ak-47.net, turbomustages.net, corral.net, f150online.com, lightning.net, saiga12.com, allchile.net, ak47.net, fivesevenforum.net, theakforum.net, copwatch.com, blogspot.kwikrnu.com, photobucket.com, georgiapacking.com, porcupine411.com, tennesseeoffroad.com, emotivalounge.com, localsalesnetwork.com.

These are all that I can recall. There are probably more. I can't remember.

INTERROGATORY NO. 5:

1990-91     Century insulation (installer) Benicia, California. Don't remember pay, address, telephone, etc.

1994-02     US Army Reserves. Don't recall wage. (Training for war)

1995-99     UPS package (sorter), 3205 Whites Creek Pike, Nashville, TN 37207 800-367-5690 Don't recall wage.

1996-98     Matco Tools (picker), 4191 Murfreesboro Pike, Antioch, TN 37013 615-641-1900. Don't recall wage.

1998     Staffmark – temporary agency (cooling fins), 2336 Lebanon Rd., Nashville, TN 37210 615-889-0943 Don't recall wage.

1999-05     Truck Tops, Etc. (installer), 1330 Ft. Campbell Blvd., Clarksville, TN 37042 931-553-5078. About $2,000/mo.

2007     ASIG (aircraft refueling) BNA, Nashville Int'l. Airport, PO Box 17332, Nashville, TN 37217 615-275-2545. Don't recall wage.

2007     Gap, Inc. (picker), 100 Gap Blvd., Gallatin, TN 37066 866-411-2772 about $9.00/hr.

2008        Master Staff – temporary agency (picker), 611 Potomac Pl., Suite 103, Smyrna, TN 37167 615-223-5626. Don't recall wage.

2004-09        Yellow Freight (loader, 7300 Centennial Blvd., Nashville, TN 37209 615-350-5762. $16.50/hr. irregular work schedule.

2008-10        Williamson County Board of Education (bus driver), 1320 W. Main, Ste. 202, Franklin, TN 37064 615-472-4000.  $10.71/hr.  Approx. $1,500/mo.

INTERROGATORY NO. 6: For each time in which you have carried any type of firearm in Radnor Lake State Natural Area,[1] provide the date, and the make and model of the firearm you were carrying.

RESPONSE:

```
I carried a handgun three times to Radnor Lake.  Two occasions in
the fall of 2009 I carried a Smith and Wesson 29-3 6" 44 magnum,
I don't remember the exact dates.  December 20th I carried a
Draco ak-47 type handgun.
```

INTERROGATORY NO. 7: In paragraph 3 of the Complaint, you claim you had an AK-47 handgun with you at Radnor Lake on December 20. 2009.  Please identify this weapon by: serial number, manufacturer and/or carrier, model, caliber, barrel length at time of purchase, frame/material, finish/color at time of purchase, capacity for ammunition or magazine at time of purchase, accessories, and sights.

RESPONSE;

```
Serial #DR-4559-09 RO Draco C.N. ROMARM S.A.?CUGIR MADE in
Romania, 7.62x39, 11.5 inch barrel, color black with brown
barrel shroud, 2 30 round magazines, adjustable sights,
steel frame.
```

INTERROGATORY NO. 8: For the weapon described in paragraph 3 of the Complaint, state the date of purchase or transfer, price paid, and the name, address, and telephone number of the seller.

RESPONSE:

```
Purchase: 12-14-2009, transfer 12-16-2009, $414.76 paid,
Classic Arms, Inc., PO Box 125, Indian Trail, NC 28079 (707)
684-0650
```

---

[1] Hereinafter, "Radnor Lake."

3

INTERROGATORY NO. 9: State previous addresses at which you have resided since your eighteenth birthday and the dates you have resided at each address.

RESPONSE:

See attached

INTERROGATORY NO. 10: Describe any additions, changes, alterations, modifications you made, or had made, in the weapon described in paragraph 3 of the Complaint and magazine(s) on or before December 20, 2009.

RESPONSE:

Cut off barrel nut, stained barrel shrouds, added sling, painted barrel nut orange

INTERROGATORY NO. 11: Identify by manufacturer and type (e.g. hollow point, armor piercing, etc.), the ammunition you carried in weapon described in paragraph 3 of the Complaint, or with you, on December 20, 2009.

RESPONSE:

Winchester (whitebox) purchased at Walmart.  Full metal jacket.

INTERROGATORY NO. 12: Identify by manufacturer, make and model, and date of purchase, of the sling in which you carried the weapon described in paragraph 3 of the Complaint on December 20, 2009.

4

INTERROGATORY NO. 9:

I don't recall exact address:  xxxx Pintail Dr., Suisun City, CA 1990-91 & 1993; Ogden, UT
1991; Santiago, Chile 1991-1993; Fort Sill, OK 1994; Fort Sam Houston, TX 1994, 1011 Calvert
St. Nashville, TN 37xxx 1994-96; 5353 Cain Ridge Rd., Apt. 1411, Antioch, TN 37013 1996-97;
3728 Bakertown Rd., Nashville, TN 37211 1997-05; 6620 Valley Dr., Brentwood, TN 37027
2005-10.

RESPONSE

Urban ert, urban sentry two point/one point hybrid sling,
December 16, 2009.

INTERROGATORY NO. 13: Describe any additions, changes, alterations, modifications you

ever made, or had made, in the weapon described in paragraph 3 of the Complaint and

magazine(s) after December 20, 2009.

RESPONSE:

Besides that listed in #10, I painted the entire gun orange,
removed orange paint from barrel nut, epoxied the barrel
shrouds, sanded the barrel shrouds, removed sling, installed
a new grip nut, installed and removed flash hider and quick
detach mount for suppressor, installed 550 cord loop for sling.

INTERROGATORY NO. 14: Was the weapon described in paragraph 3 of the Complaint ever

modified to be an automatic weapon?

RESPONSE:

No.

INTERROGARORY NO. 15: Identify by name, address, telephone number each person whom

you know to have ever owned the weapon described in paragraph 3 of the Complaint, or who has

had that weapon in his or her possession.

RESPONSE:

See attached

5

INTERROGATORY NO. 15:

C.N. ROMARM S.A./CUGIR, CAI Georgia, VT, Classic Arms, Inc., PO Box 125, Indian Trail, NC 28079 707-684-0650, Capital View Pawn and Bargain, 1122 Charlotte Ave., Nashville, TN 37203 615-242-7296, Leonard Embody, 6620 Valley Dr., Brentwood, TN 37027 615-661-8067. There may have been other middle men or customs involved with the importation. There were several police officers also who had possession on December 20, 2009.

INTERROGATORY NO. 16: Identify by name, address, telephone number each person whom

you know to have ever fired the weapon described in paragraph 3 of the Complaint.

RESPONSE:

```
Leonard Embody, 6620 Valley Dr., Brentwood, TN 37027 (615)
661-8067.  Since most firearms are firedprior to sale, it is
my belief that someone else has fired the weapon, but I
don't know who they are.
```

INTERROGATORY NO. 17: List all firearms training courses you have ever attended,

including date, location, and trainer, and the score or grade you received in each course.

RESPONSE:

```
U.S. Army, Fort Sill, OK 1994.  I don't know score or grade or
the trainer.  Goodlettsville Gun Shop, 2001, Keith Breedlove.
Don't know score or grade.
```

INTERROGATORY NO. 18: List all law enforcement training courses you have taken either in

the military, as a civilian, or as a law enforcement trainee.

RESPONSE:

```
None.
```

INTERROGATORY NO. 19: List every federal, state or municipal park in which you have

carried a firearm, giving the date of entry, and the make and model of firearm you were carrying.

RESPONSE:

```
Radnor Lake 3 times - only remember date of Dec. 20, 2009 when I
carried the Draco ak-47 type handgun.  The other times I carried
a Smith Wesson 29-3 handgun.  3-4 times at Bicentennial State
Park.  Don't know dates where I carried a Smith Wesson 29-3
handgun.
```

6

INTERROGATORY NO. 20:  Identify by name, address, and telephone number of every

shooting range in which you have been a member in the last five years, with dates of

membership, and/or every shooting range in which you have fired any kind of firearm in the last

five years.

RESPONSE:

```
On Target, 915 No. Thompson Lane, Murfreesboro, TN 37129-4326
(615) 890-2960.  Stones River Range (Lavergne or Antioch), Hobson
Pike, TN.  Don't know exact address or phone.
```


INTERROGATORY NO. 21:  If you have ever had a firearms permit issued by another state or

governmental entity, identify that state or governmental entity, the type of permit issued, and the

inclusive dates in which you held such permit.

RESPONSE:

```
None
```


INTERROGATORY NO. 22:  For any time in which you have ever had a firearm permit denied,

suspended, or revoked, identify the state or governmental entity that denied, suspended, revoked

the permit, the date of such grounds, and the grounds given for the  action.

RESPONSE:

```
May 8, 2008 revoked by Tennessee Dept. of Safety - "ex-parte
order of protection."  March 10, 2010 suspended by Tennessee
Department of Safety - "material likelihood of risk of harm
to the public."
```

**INTERROGATORY NO. 23:** If you have ever been denied a request to purchase, transfer, or in any way acquire a weapon accessory, state the date and circumstances of such denial.

**RESPONSE:**
```
I purchased a Title II nfa suppressor on Dec. 22, 2009 from
Guns for America.  They called me on Dec. 23, 2009 and stated
I was a criminal and they would not complete the contracted
sale.  Transfer tax stamp denied on May 17, 2010 by the ATF,
Sheriff Jeff Long failed to properly execute the nfa
paperwork as required by TCA 39-17-1361.
```

**INTERROGATORY NO. 24:** If you have ever purchased, attempted to purchase, or inquired about purchasing armor piercing ammunition, state the date and person or entity with whom you communicated.

**RESPONSE:**
```
I only recall asking about armor piercing ammo on Glocktalk.com,
thehighroad.us or the highroad.net, and ar15.com.
```

**INTERROGATORY NO. 25:** For any period of military service, state the branch of service, each post or base where you were stationed, dates of service, job classification, final rank, and type of discharge received.

**RESPONSE:**
```
U.S. Army Reserve, Fort Sill, OK, Fort Sam, Houston, TX,
377 csh Chattanooga, 4203 usah Nashville, 1994-2002, E-5,
91qasiy7, honorable.
```

**INTERROGATORY NO. 26:** For any weapon you have ever brought to Radnor Lake at any time, identify it by make, model, serial number, and the date(s) in which you brought such weapon to Radnor Lake.

8

**RESPONSE:**

```
See #7 Dec. 20, 2009, and Smith Wesson 29-3 AHH9662 two times
don't recall dates.
```

**INTERROGATORY NO. 27:** List by make, model, and serial number each of firearm you

owned, possessed, or maintained in your household by you or anyone in your household on

December 20, 2009.

**RESPONSE:**

```
Marlin 1894 99080676, Smith Wesson 65-3 ans4686, Smith Wesson
65-3 ans4685, Marlin 1894, don't know serial number, Smith
Wesson 29-3 ahh9662, Smith Wesson 337 cd55770, see #7,
Henry Youth, don't know serial, Stevens Little Scout rifle
don't know serial number.
```

**INTERROGATORY NO. 28:** State the names and present addresses of all persons you have

lived or resided with since your eighteenth birthday, and the approximate dates or time periods

involved. This interrogatory is intended to include all family and friends and for any time period

of two weeks or longer.

**RESPONSE:**

```
See attached
```

**INTERROGATORY NO. 29:** Identify by name and relationship to you each person in your

household who has a handgun permit.

**RESPONSE:**

```
None
```

9

INTERROGATORY NO. 28:

Bill and Norece Embody, 1006 Clearview Point Rd., Cottontown, TN 37048 from 1990-91 and 1993-96, Tim Embody, 737 Harpeth Parkway West, Nashville, TN 37221 from 1990-91 and 1995-96, Katerine Embody 1996-10, Elizabeth Embody 1999-2010, Kimberly Embody 2002-10 current address, see #1. I lived in Santiago, Chile 1991-93 and do not recall the names of people I lived with. I lived in Ogden, UT 1991 and do not recall the people I lived with. I lived in Fort Sam Houston, TX 1994 and do not recall the names of people I lived with. I lived in Fort Sill, OK 1994 and do not recall the people I lived with.

INTERROGATORY NO. 30: State the schools you are attending or have attended, their location, the dates you have attended such schools, the dates you graduated from those schools, and the degrees, if any, which you received upon graduation.

RESPONSE:
```
Armijo High School, Fairfield, CA 1986-1990 H.S. diploma,
Solano Comm. College, Fairfield, CA 1991-1993, Vol. State
Comm. College, Gallatin, TN 1995-1996 and 2007 A.S.
sociology, Columbia State Comm. College, Columbia, TN 2009-
current.
```

INTERROGATORY NO. 31: Identify by case name, docket number, court and nature or substance of litigation for each and every civil lawsuit in which you have been a party or a witness.

RESPONSE:
```
See attached
```

INTERROGATORY NO. 32: For the cell phone you had with you and/or used while at Radnor Lake on December 20, 2009, identify the owner of the cell phone, the cell phone carrier, and the cell phone number

RESPONSE:
```
Leonard Embody, att, 615-448-7185
```

10

INTERROGATORY NO. 31:

Don't know # but was about 1996 in Davidson County Court. Lady ran into back of my car.
Don't know # but in 2001 in Davidson County, left car for repair at dealer and contents were
stolen. Don't know # but lady ran into back of car Davidson County. Don't know # but in
Davidson about 2004 dealer didn't fix car. Don't know # in 2008 Williamson County. Onsite
techs sold me locked programmer. 08-0p448 2008 Davidson County Order of Protection,
dismissed and expunged. Don't know # in 2008 Williamson County lady sideswiped car. 3:10-
cv-00126-2010 sued Federal Court state ranger. Don't know # appeal state handgun suspension.
2010 administrative hearing. 2010 38740 Brentwood Police Dept. in Williamson for reckless
negligence in lying on report. 10-1227-IV 2010 Davidson County sued state constitutional issue
gun permit suspension.

INTERROGATORY NO. 33: Identify by name and telephone number of each person, business, or other organization you called on December 20, 2009 at any time while you were at Radnor Lake.

RESPONSE:

862-8600 Nashville Police

I, Leonard S. Embody, having been duly sworn, state that the facts contained in the responses to the above interrogatories are true and correct to the best of my information, knowledge and belief.

Leonard S. Embody

State of Tennessee
County of

Sworn and subscribed to before me

on this  29  day of  August , 2010

NOTARY PUBLIC

My commission expires:

4/7/12

11

Respectfully submitted,

ROBERT E. COOPER, JR., BPR #010934
Attorney General & Reporter

*[signature: Mary M. Bers]*

MARY M. BERS, BPR #013159
Senior Counsel
Civil Rights & Claims Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-1845

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded by U.S. Mail, first-class postage pre-paid, to Phillip L. Davidson, 2400 Crestmoor Road, Suite 107, Nashville, TN 37215 on this ___30th___ day of ___July___, 2010.

*[signature: Mary M. Bers]*

MARY M. BERS

12

Respectfully submitted,

Phillip L. Davidson, #6466
2400 Crestmoor Road
Suite 107
Nashville, Tennessee 37215
(615) 386-7115

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was delivered by first class mail to

Mary M. Bers
Senior Counsel
Civil Rights & Claims Division
PO Box 20207
Nashville, TN 37202-0207

this the ___ day of September, 2010.

Phillip L. Davidson

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

LEONARD S. EMBODY, )
)
    Plaintiff, )    NO. 3:10-cv-00126
)    JURY DEMAND
V. )
)    JUDGE HAYNES
STEVE WARD, individually, )
)
    Defendant. )

## DEFENDANT'S FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS TO PLAINTIFF

REQUEST NO. 1: Produce a full and complete, unedited and unabridged copy of every audio and or video recording you made while you were present in Radnor Lake State Natural Area on December 20, 2009, or that you possess.

Audio CD

REQUEST NO. 2: For the firearm you identify in paragraph 3 of the Complaint, produce :

    the bill of sale for purchase of the firearm;

    all registration papers;

    any other proof of ownership;

    the original packaging for the firearm

See attached #2

REQUEST NO. 3: For the firearm you identify in paragraph 3 of the Complaint, produce:

    printed specifications for the firearm you received at purchase or transfer, or at any other time;

    copies of all written material that came with the firearm at the time of purchase, transfer, or receipt.

See attached #3

REQUEST NO. 4: For each type of ammunition you carried or had with you while at Radnor

Lake State Natural Area[1] on December 20, 2009, produce the bill of sale for that ammunition.

`Don't have`

REQUEST NO. 5: For the sling in which you carried the weapon described in paragraph 3 of

the Complaint, and while at Radnor Lake on December 20, 2009, produce the bill of sale for its

purchase, and all written materials that came with the sling at the time of purchase.

`See attached #5`

REQUEST NO. 6: Produce copies of all your past or present firearm permits and applications

for permits.

`See attached #6`

REQUEST NO.: 7 For any denial, suspension, or revocation of a firearm permit by a state or

agency, produce all documentation associated with the denial, suspension, or revocation, any

appeal by you, and any all responses or decisions by the state or agency

`See attached #7, all documentation will take me weeks to gather`
`and there are 100's of documents`

REQUEST NO. 8: Produce for inspection at a mutually convenient time and place for all parties

the weapon described in paragraph 3 of the Complaint (unloaded), and all components, including

all magazines.

`Will comply`

REQUEST NO. 9: Produce for inspection at a mutually convenient time and place for all parties

the ammunition you carried or had with you on December 20, 2009. If the ammunition no

longer exits, please produce any ammunition identical to it that you presently have in your

possession.

`I have 31 rounds present at Radnor Lake`

---

[1] Hereinafter, "Radnor Lake."

2

Respectfully submitted,

ROBERT E. COOPER, JR., BPR #010934
Attorney General & Reporter

*MARY M. BERS*

MARY M. BERS, BPR #013159
Senior Counsel
Civil Rights & Claims Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-1845

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded by U.S. Mail, first-class postage pre-paid, to Phillip L. Davidson, 2400 Crestmoor Road, Suite 107, Nashville, TN 37215 on this 30th day of July, 2010.

*MARY M. BERS*

MARY M. BERS

3

Respectfully submitted,

Phillip L. Davidson, #6466
2400 Crestmoor Road
Suite 107
Nashville, Tennessee 37215
(615) 386-7115

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was delivered by first class mail to

Mary M. Bers
Senior Counsel
Civil Rights & Claims Division
PO Box 20207
Nashville, TN 37202-0207

this the _1_ day of ___Sept___, 2010.

Phillip L. Davidson

| SALES RECEIPT | 74479 |
|---|---|

**Capitol View Pawn & Bargain**
1122 Charlotte Ave.
Nashville, TN 37203
(615) 242-7296

Date 12/16/09
Time 14:36:51
Employee Will_G

Thank you for your business!!!
I agree that this/these item(s) has/have been tested to
my satisfaction. All items sold AS-IS with no warranties
(except as written or for expressly warranted items)
There are no refunds or exchanges!!!

| | | |
|---|---|---|
| | Sale Price | 10.00 |
| | Tax | 0.93 |
| | Total Due | 10.93 |
| Buyer's Signature | | (PPP) |

| ITEM # | DESCRIPTION | RETAIL |
|---|---|---|
| 166821 | Draco7.62x39/modak Style/pist | 10.00 |
| | Serial DR4559-09 (PPP) Draco | |
| | Model ak st Caliber: 7 62x39 | |
| | Type: PIST New | |

CLASSIC ARMS
3000 SARDIS DR
INDIAN TRAIL, NC 28079
(704) 684-0650

**Phone Order**

ID: 003
Merchant ID: 000002500076
Bank ID: 1340
12/14/09                    15:04:00
Batch#: 348001
Retrieval Ref #: 90904653

DISCOVER              Entry Method: Manual
XXXXXXXXXXXX1632
Appr Code: 014561      Inv #: 000028
AVS Code: Y            CVV2 Code: M

Total:          $      414.76

Customer Copy

Classic Arms, Inc.
P.O. Box 125
Indian Trail, NC  28079

Phone: (704)684-0650
Fax: (704)684-0674

Bill To:
00138184
CAPITOL VIEW PAWN & BARGAIN STORE
1122 CHARLOTTE AVE
NASHVILLE TN. 37203-

Ship To:
00138184
CAPITOL VIEW PAWN & BARGAIN STORE
1122 CHARLOTTE AVE
NASHVILLE TN. 37203

Invoice No. 260685

| Invoiced | Order # | Sales ID | Customer P.O. | Customer Req. | Page |
|----------|---------|----------|---------------|---------------|------|
| 12/14/09 | 0000251393-001 | 22 | VERBAL | | 1 |

| Order Placed By | Shp Date | Boxes | Terms |
|-----------------|----------|-------|-------|
| W | 12/14/09 | 1 | PRE-PAID-CHECKS |

Ship Via United Parcel Service GROUND

| Ordered | Shipped | B/O | WH Item/Description | Unit Price | Ext Price |
|---------|---------|-----|---------------------|------------|-----------|
| 1 | 1 | 0 | 01 AK-DRACO-HG | 389.95 | 389.95 |
| | | | DRACO AK STYLE 7.62X 39 PISTOL SA CENTURY | | |

DR455909

CLASSIC ARMS FFL # 156179012A04419 EXP 01/12 - ALL SALES FIN
AL AFTER 15 DAYS. TO RETURN CALL FOR RA # PACKAGE MUST HAVE
INVOICE AND A LEGITIMATE REASON, 20 % RESTOCK MAY APPLY!

| | Tax # | | Subtotal |
|---|---|---|---|
| | | | 389.95 |
| Shipping&Handling | Taxes | Misc Charges | Invoice Amount |
| 24.81 | 0.00 | 0.00 | 414.76 |
| | | Payment | |
| | | Net Due | |

Partial Shipping OK
*** Picking Ticket ***

New Order

0000251393

nted    Sold
'14/09  12/14/09
03:02   09:01:57

d To:    00138184
PITOL VIEW PAWN & BARGAIN STORE
22 CHARLOTTE AVE
SHVILLE,TN 37203-

Ship To:    00138184
CAPITOL VIEW PAWN & BARGAIN STORE
1122 CHARLOTTE AVE
NASHVILLE,TN 37203

PO:VERBAL                Req Number:
J:12/14/09  Ship By:12/14/09    Carrier:United Parcel Service
):22        Terms:PRE-PAID-CHECKS    Method:GROUND

| e WH Item Number | Aisle | Bin | Ordered To Pick Pick | Box Nbr | Box Wht |
|---|---|---|---|---|---|
| 01 01 AK-DRACO-HG | | | 1          0 | | |
| DRACO AK STYLE 7.62X 39 PISTOL SA CENTURY | | | Mfg Nbr: | | |

mments:
    FOR LEONARD EMBODY 615-448-7185
    6620 VALLEY DR BRENTWOOD TN 37027

DR-4559-09

icked: _____  Packed: _____  Checked: _____/_____  Boxes:_____

2



PISTOL MDL DRACO 7.62x39 W/US PARTS    HG1382-N

*IR-4559-09*

Tracking.ID
*R091002814*

10/26/09 02:01pm MBEAULIEU

HG1382-N

Tracking.ID
*R091002814*

Serial.ID
*IR-4559-09*

10/26/09 02:01pm MBEAULIEU
JPF-RLU

0 874450 05135 5

WARNING: If this is a used or surplus firearm, it is not new, therefore, it must be inspected by a qualified gun the responsibility of every firearm owner and user. Become intimately familiar with the operation of your firearm and Always point the muzzle of the firearm in a direction where if a discharge occurs no one will be the proper caliber. Failure to follow these rules may result in injury or unauthorized person, c were loaded. Always firearms and unloaded can result in a child or in good condition and of the right caliber. Using firearms and handling ammunition can result in exposure to lead and the away and unloaded when not in use. Use firearms and handling ammunition can result in exposure to lead and the be fined or sent to prison or both. Using serious physical injury. Firearms are dangerous and user assumes all risks at defects, reproductive harm and other serious warnings and instructions provided with firearm or on carton before using.

smith before firing. Firearms safety is
re loading it. Treat every firearm as if it
d. Use only factory loaded ammunition
l access by always keeping guns locked
btains and improperly uses it, you may
r substances known to cause birth
sociated with their use. Read all

3

# CLASSIC ARMS

Phone 704-684-0650    FAX 704-684-0674

P.O. BOX 125 INDIAN TRAIL. N.C. 28079

DEAR VALUED CUSTOMER

THANK YOU FOR YOUR FIREARM PURCHASE. BEFORE LOADING OR ATTEMPTING TO FIRE YOUR NEW FIREARM, THERE ARE CERTAIN SAFETY GUIDELINES THAT YOU SHOULD FOLLOW.

* TREAT EVERY FIREARM AS IF IT WERE LOADED AT ALL TIMES.

* NEVER POINT A FIREARM EITHER LOADED OR UNLOADED AT ANYTHING WHICH YOU DO NOT INTEND TO SHOOT.

* WHEN CHAMBERING A ROUND INTO ANY FIREARM, PARTICULARLY SEMI-AUTOS, ALWAYS HAVE THE FIREARM POINTED IN A SAFE DIRECTION. WHILE RARE, ACCIDENTAL DISCHARGES (ALSO KNOWN AS SLAM FIRES) HAVE BEEN KNOWN TO OCCUR IN SEMI-AUTO WEAPONS.

* WE STRONGLY RECOMMEND TAKING A FIREARMS SAFETY COURSE AND OBTAINING A MANUAL TO LEARN EVERYTHING POSSIBLE ABOUT YOUR FIREARM BEFORE FIRING.

* ALL FIREARMS SHOULD BE VISUALLY INSPECTED AND PROPERLY CLEANED BEFORE ATTEMPTING TO FIRE. SPECIAL CARE SHOULD BE TAKEN WITH MILITARY SURPLUS FIREARMS AS THEY ARE SOMETIMES PACKED IN COSMOLINE (A HEAVY GREASE) WHICH CAN CLOG THE BORE OR IMPEDE THE INTERNAL PARTS OF THE WEAPON FROM FUNCTIONING AS INTENDED. IF NOT PROPERLY CLEANED THIS COSMOLINE MAY INCREASE INTERNAL PRESSURES IN THE WEAPON AND LEAD TO SERIOUS INJURY OR DEATH UPON FIRING OR EVEN UPON CHAMBERING OF THE ROUND. ALL EXCESS PACKING GREASE SHOULD BE THOROUGHLY CLEANED BOTH INTERNALLY AND EXTERNALLY AND THE FIREARM WIPED DRY BEFORE ATTEMPTING TO FIRE. FOR SAFETY'S SAKE ALWAYS DISASSEMBLE, CLEAN AND VISUALLY INSPECT ANY SURPLUS WEAPON BEFORE FIRING. IF YOU HAVE ANY DOUBTS OR CONCERNS ABOUT YOUR F1REARt\II PLEASE CONTACT A QUALIFIED GUNSMITH OR THE MANUFACTURER.

*** A SPECIAL NOTE ABOUT SKS RIFLES. SKS RIFLES BY DESIGN HAVE WHAT IS KNOWN AS A FREE FLOATING FIRING PIN. THIS MEANS THAT THE FIRING PIN SHOULD MOVE BACK AND FORTH FREELY WITHIN THE BODY OF THE BOLT. UNDER NORMAL CIRCUMSTANCES THE FIRING IS PIN IS DRIVEN FORWARD BY THE HAMMER AND INTO THE PRIMER CAUSING THE ROUND TO FIRE WHEN THE TRIGGER IS PULLED. IF FOR ANY REASON THE FIRING PIN BECOMES STUCK IN THE OUT POSITION IT COULD CAUSE THE RIFLE TO FIRE UPON THE CHAMBERING OF THE ROUND. THIS CONDITION IS KNOWN AS A SLAM FIRE. SLAM FIRES COULD BE CAUSED BY EXCESSIVE BUILDUP OF GREASE, DIRT, CARBON OR RUST WITHIN THE BODY OF THE BOLT, HINDERING THE FIRING PIN FROM MOVING BACK AND FORTH. IT IS EXTREMELY IMPORTANT ON THESE WEAPONS TO VISUALLY INSPECT THE FIRING PIN TO BE SURE IT RECEDES FREELY INTO THE BOLT FACE.

AS A DISTRIBUTOR OF FIREARMS, CLASSIC ARMS HAS NO TESTING FACILITY AND ASSUMES NO LIABILITY FOR THE SAFE FUNCTIONING OF FIREARMS OR AMMUNITION. THE PRODUCTS WE CARRY ARE GUARANTEED AND INSPECTED BY THE MANUFACTURER AND OR IMPORTERS. WE ARE NOT INSPECTORS OR TESTERS AS BY INDUSTRY STANDARDS MOST DISTRIBUTORS ARE NOT.

## PLEASE MAKE SAFETY YOUR TOP PRIORITY WHILE HANDLING FIREARMS.

VISIT US ONLINE AT: WWW.CLASSICARMS.US

# Owner's Manual

## DRACO Pistol

**For calibers: 7.62x39mm, .223 and .22LR**



Congratulations on your purchase of a DRACO Pistol. With proper care and handling it will give you long, reliable service. The DRACO is a semi-automatic pistol with a ten round capacity detachable magazine. It is imported from Romania.

We specifically disclaim any responsibility for damage or injury whatsoever, incurring as a result of the use of faulty, non-standard or remanufactured ammunition, any modifications or changes made to the firearm; improper use or unsafe handling of the weapon. FIREARMS SAFETY IS THE SOLE RESPONSIBILITY OF THE SHOOTER. ALWAYS TREAT ALL FIREARMS AS IF THEY WERE LOADED.

Distributed by:
Century International Arms, Inc.
236 Bryce Boulevard, Fairfax, VT 05454
www.centuryarms.com
Sales: 1-800-527-1252 - 1-561-998-1997

**IMPORTANT!** READ ALL INSTRUCTIONS AND WARNINGS IN THIS BOOKLET BEFORE USING THIS FIREARM. 

© 2007 Century International Arms, Inc. All rights reserved.

3



### IMPORTANT SAFETY MESSAGE

Children are attracted to, and can operate firearms which can cause severe injuries or death. Prevent child access by always keeping guns locked away and unloaded when not in use. If you keep a loaded firearm where a child obtains and improperly uses it, you may be fined or sent to prison.

**Firearm Safety Depends on You!**

A gun is only as safe as the person operating it. You can never be overly careful when handling a firearm. Carelessness is often the cause of shooting accidents, such as failing to keep the muzzle pointed in a safe direction, not being sure of your target and what is behind it, failing to engage the safety properly, leaving ammunition in the chamber or using improper loads. Since a bullet can never be called back once fired, such errors in gunhandling can result in the loss of life, severe injury or property damage. It is thus crucial for your safety and the safety of those around you that you learn the principles of safe gun handling and storage before you begin to use your new rifle. Be a safe shooter - please read this instruction book thoroughly even if this is not your first firearm purchase as not all firearms are the same. The first step in being a safe shooter is to learn the rules for the safe operation and handling of firearms. There is nothing more important in gunhandling than safety.

### THE TEN COMMANDMENTS OF FIREARM SAFETY

The Ten Commandments of Firearm Safety must be etched into your memory before you begin to handle firearms. These rules are intended to be followed by all persons handling firearms in the field, on the range, or at home. Please read, review and understand these rules before you begin to use or even take your new rifle out of its box. Remember, firearms safety depends on you!

#### Commandment #1



**Always Keep the Muzzle Pointed in a Safe Direction.**

This is the most basic and most important safety rule. A safe direction is one in which an accidental discharge will not cause injury to yourself, to others or property damage. This is particularly important when loading or unloading your firearm. Never point your gun at anything you do not intend to shoot. Treat every gun as if it were loaded at all times.

#### Commandment #2



**Firearms Should Be Unloaded When Not Actually in Use.**

Firearms should only be loaded when you are in the field or on the target range or shooting area, ready to shoot. When not in use, firearms and ammunition should be secured in a safe place, separate from each other. Remember to unload your firearm completely, so that there is no ammunition in the chamber or magazine. Before handling this or any firearm, or handing it to someone else, visually check the chamber, receiver and magazine to ensure they do not contain ammunition. Always keep the gun's action open when not in use. Never assume a gun is unloaded - even if you were the last person to use it. Never cross a fence, climb a tree, wade through a stream, or perform any awkward movement with a loaded gun. When in doubt, unload your gun!

Never pull or push a loaded firearm toward yourself or another person. And never carry a loaded gun in a scabbard, a holster not being worn, or a gun case. Common sense prevails in gun safety!

**Alcohol, Drugs and Guns don't mix. Make no mistake about it!** Never handle firearms after consuming alcohol or taking drugs which can affect your judgment.

© Century International Arms, Inc.

DRACO Pistol Manual

3



### Commandment #3

**Don't Completely Rely on Your Gun's Safety.**

Treat every gun as though it could fire at any time, even if you are not applying pressure to the trigger. The "safety" on a firearm is a mechanical device which, like any such device, can become inoperable at the worst possible time and fail to function. By mistake, you may think the safety is "on" when it actually is not. Or you may think your gun is unloaded when there is actually a round of ammunition in it. The safety serves as a supplement to proper gun handling but cannot serve as a substitute for common sense. Never handle a gun carelessly and assume that the gun won't fire, just because "the safety is on." Never touch the firearm's trigger until you are ready to shoot. Keep your fingers away from the trigger when loading or unloading. Never pull the trigger when the safety is engaged or when the safety is positioned between the "safe" and "fire" positions. Never place your finger on the trigger unless you intend to fire.

### Commandment #4



**Be Sure of Your Target - And What Is Beyond It!**

Once fired, a bullet (or shot charge) can never be called back, so before you shoot know where the bullet is going and what it will strike. Be certain your shot will not injure someone or strike something beyond the target. Never fire in the direction of noise, a movement, or at any object you cannot positively identify. Be aware that a .22 Short bullet can travel over 1-1/4 miles. A centerfire cartridge, such as the .30-06, can send its bullet over 3-miles. Shotgun pellets can travel 500-yards and a shotgun slug has a range of over a half-mile. Make sure your shot has a backstop such as a hillside. Keep in mind how far the bullet will travel if it misses your intended target.

### Commandment #5



**Use the Correct Ammunition.**

Every firearm is designed to use a certain caliber or gauge of ammunition. It is important that you use the correct ammunition for your firearm. Information on the correct ammunition to use with your firearm appears in the firearm's instruction manual and the manufacturer's markings on the firearm itself. Use of the wrong ammunition or improperly reloaded ammunition can result in the destruction of the firearm, serious personal injury and/or death.

Form the habit of examining every round of ammunition before you put it into your gun to ensure it is of the proper gauge or caliber and that it is in good condition.

### Commandment #6



**If Your Gun Fails to Fire When the Trigger Is Pulled, Handle With Care.**

If a cartridge or shell does not fire when the trigger is pulled, follow Commandment #1 and keep the firearm's muzzle pointed in a safe direction. Keeping the muzzle pointed away from your face and anything you do not intend to shoot, wait at least 20-seconds (to ensure that the ammunition is not delayed in firing) before carefully opening the action, unloading the firearm and disposing of the ammunition safely.

### Commandment #7



**Always Wear Eye & Ear Protection When Shooting.**

Exposure to shooting noise can permanently damage hearing and flying debris, such as powder residue and ejected cartridge cases can injure your eyes. Thus, it is only common sense to wear both eye protection (such as shooting glasses) and ear protection (such as a sound muffling headset) whenever shooting. Also, wear eye protection when cleaning or disassembling your gun to ensure that cleaning solvent and tensioned parts (such as springs), do not come into contact with your eyes.

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 146 of 177 PageID #: 196

3



## Commandment #8

**Be Sure the Barrel Is Clear of Obstructions Before Shooting.**

Discharging a firearm with an obstruction in the barrel can result in personal injury, property damage or death. Before you load your firearm, check the chamber and magazine to ascertain that no ammunition is inside. Also, check the inside of the barrel (called the "bore") to ensure it is free of obstructions. Even a small amount of mud, snow or excess lubricating oil or grease in the bore can cause excessive pressures resulting in a bulged or burst barrel which can injure or kill the shooter and bystanders. It's a good idea to make a habit of cleaning the bore and checking for obstructions with a cleaning rod just before each shooting session. If the noise or recoil experienced upon firing seems low or weak, or something doesn't feel "right", cease firing immediately and check to make sure that there is no obstruction in the barrel. Placing an undersized shell or cartridge into a gun (such as a 20-gauge shell in a shotgun chambered for 12-gauge ammunition) can result in the smaller round of ammunition falling into the barrel and acting as an obstruction. When a round is subsequently fired, the barrel may burst causing injury to the shooter and bystanders. For reference, re-read Commandment #5.

## Commandment #9



**Do Not Alter or Modify Your Gun and Have It Serviced Regularly.**

Firearms are complex mechanisms that are designed to function properly in their original condition. Any alterations or changes made to a firearm after its manufacture can make the gun unsafe and will void its warranty. Do not jeopardize your safety or the safety of others by altering the trigger, mechanical safety or other mechanisms of your firearm. You should have your firearm periodically checked for proper functioning and serviced by a qualified gunsmith.

## Commandment #10



**Learn the Mechanical and Handling Characteristics of Your Firearm.**

Not all firearms operate the same way. The method of carrying, handling and operating firearms varies with the mechanical characteristics of each gun. Thus, you should never handle any firearm until you become familiar with the safe handling, loading, unloading and carrying procedures for that particular firearm, as well as the rules for safe gun handling in general.



**WARNING!** Discharging firearms in poorly ventilated areas, cleaning firearms or handling ammunition may result in exposure to lead and other substances known to cause birth defects, reproductive harm and other serious injury. Have adequate ventilation at all times when shooting. Wash hands thoroughly after exposure.

## Basics of Safe Gun Handling

1. Always keep the muzzle pointed in a safe direction.
2. Firearms should be unloaded when not actually in use.
3. Don't totally rely on your gun's safety.
4. Be sure of your target and what's beyond it.
5. Use the correct ammunition for your firearm.
6. If your gun fails to fire when the trigger is pulled, handle with care.
7. Always wear eye and ear protection when shooting.
8. Be sure the barrel is clear of obstructions before shooting.
9. Don't alter or modify your firearm and have your firearm(s) serviced regularly.
10. Learn the mechanics and handling characteristics of the firearm you are using.

 **Safe gun handling depends on you! A safe shooter is a knowledgeable shooter.**

There is one other rule that must be strictly observed when handling firearms - **Shoot Sober!** Alcohol, certain kinds of drugs and firearms don't mix. Safe firearms handling requires alertness and concentration on one's actions. You cannot handle a firearm safely after consuming alcohol. Never consume anything that can impair your judgement or physical coordination when handling a firearm.

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 147 of 177 PageID #: 197

3



Illustration # 1
Diagram showing major operational parts of the DRACO Pistol

The picture above shows the main operational parts of the DRACO Pistol.
Study of this picture will aid you in understanding the instructions in this book.

 **IMPORTANT NOTICE!** DRACO Pistol is a surplus firearm. As with all surplus products, it should be carefully inspected before use, preferably by a competent gunsmith! This is to ensure your safety and the safety of those around you.

**DRACO Pistol background -** Your new DRACO Pistol, while designed for sporting use, has as its design inspiration of the famous AK-47 rifle designed by Mikhail Kalashnikov of Russia. Since 1947, when the AK47 first entered Russian military service, over 30 million AK-47's have been produced in countries around the world, attesting to the design's reliability.

The basic design of the AK-47 (and thus your DRACO Pistol) incorporates some of the best elements of previous, proven firearm designs. The double locking lugs, unlocking raceway, and trigger mechanism are clearly derived from the earlier American M1 Garand Rifle. The safety lever is surprisingly similar to the John Browning-designed Remington Model 8 rifle. The genius in Kalashnikov's design is in the simplification of those contributing designs into a compact, reliable, and highly durable package adapted to mass production. The AK-47 can be seen as a fusion of the best that the M1 Garand offered combined with some of the positive attributes of the German StG44 assault rifle.

**Operational Characteristics:**
The DRACO Pistol is a semi-automatic, gas-operated pistol with a detachable box magazine. It is equipped with an adjustable rear sight and a post front sight. It has a 10-round magazine. It has a wood handguard and a plastic pistol grip.
Specifications:
Caliber available in: 7.62x39mm, .223 and .22LR
Magazine Capacity: 10 rounds
Overall Length: 22-inches
Weight: 5-1/2 pounds
Sights: Front post, Rear adjustable
Finish: Black
Country of Manufacture: Romania
Handguard material: Wood
Pistol Grip: Plastic

To load the rifle :

 **WARNING!** Before loading, make sure the inside of the barrel is free of dirt or other obstructions.
**WARNING!** Always check each cartridge to ensure it is of the correct caliber before loading the firearm.
**WARNING!** Keep your fingers away from the trigger while loading.
**WARNING!** Keep muzzle pointed in a safe direction.

DRACO Pistol Manual

© Century International Arms, Inc.

Page 5

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 148 of 177 PageID #: 198

3

1. Place the safety lever in the "ON" or "SAFE" position. The safety lever is in the "ON" position when it is moved to its uppermost (top) position. You should hear an audible "click" when it is correctly in place. (illustration #2)

Illustration #2




**NOTE:** When the safety lever is in its lower position (covering the stamped letter "F" [meaning "Fire"] on the receiver just above the magazine well), the safety lever is in the "FIRE" position. Pulling the trigger when the safety lever is in this lower position will result in the pistol firing a round. To avoid serious injury, death or causing property damage, make sure you know the "SAFE" and "FIRE" positions of the safety lever before loading your rifle!

Safety Lever in upper or "SAFE" position. Lever is covering the imprinted letter "S" stamped into receiver.

2. Press the magazine release lever forward to release the magazine from the receiver.
3. Load the magazine with up to 10-rounds of correct ammunition by pressing the cartridges one-at-a-time into the spring-loaded magazine's feed lips.
4. Install the magazine back into the pistol by inserting the flat-sided edge first into the magazine well and then angling the magazine so that its other edge (containing a pronounced projection) locks into place in front of the trigger guard. Pull on the magazine slightly to ensure it is locked into position (illustration #3).
5. Move the safety lever downward to the "FIRE" position so that the safety lever is covering the letter "F" meaning "Fire!" (illustration #4).
6. Keeping your finger off the trigger and pointing the pistol in a safe direction, pull back the operating handle to its fully-rearward position and release. As it moves rapidly forward under spring pressure, the bolt will strip a round from the magazine and insert it into the chamber of the barrel, readying the pistol for firing.
7. Move the safety lever back to its top "SAFETY" position.

Illustration #3



The loaded magazine is inserted into the pistol's magazine well by angling the magazine and inserting its flat-sided edge into the magazine well first, and then moving it into the well so that its other edge (containing a projection) locks into place in front of the trigger guard. Pull on the magazine slightly to ensure it is locked into position.



**WARNING!** The pistol is now loaded and will fire if the safety lever is moved to the "OFF" or "FIRE" position and the trigger is pulled! Handle with extreme caution and keep the muzzle (the end of the barrel) pointed in a safe direction!

**To Fire the Pistol:**
1. Keeping the 10 Commandments of Shooting Safety in mind, aim the pistol downrange at the target.
2. Release the safety lever by moving it fully downward until it covers the stamped "F" meaning 'FIRE' position.
3. Place the trigger finger inside the trigger guard and on the trigger.
4. After aligning the sights on the target, slowly press the trigger back to fire the first round
5. Being a semi-automatic, after the first round is fired, the pistol's action (its moving parts) will cycle and as the bolt moves rearward, the extractor will pull the empty cartridge case from the chamber and eject it from the pistol (make sure there are no bystanders in close proximity on either side of the pistol who could be hit and injured by the ejected cartridge casing).
6. Note: If the trigger is again pressed, the pistol will fire! Keep the pistol pointed in a safe direction.
7. Firing may be continued in this manner until the magazine is empty.
8. When firing is finished, place the safety lever in its "ON" or "SAFE" position by rotating it fully-upward until it covers the letter "S" stamped into the receiver. An audible "click" should be heard when the safety lever is correctly positioned. (illustration #2)

   © Century International Arms, Inc.   DRACO Pistol Manual

3

**Unloading the Pistol:**

⚠️ **WARNING!** Keep muzzle pointed in a safe direction.

**WARNING!** Keep muzzle pointed in a safe direction.

1. Remove the magazine by pressing forward on the magazine release lever while pulling the magazine out of the rifle (Illustration #4).

2. Ensure that the chamber is empty by pulling back the operating handle (Illustration #5).

3. When storing the rifle, it is a good idea to keep the safety lever in the "ON" or "SAFE" position. Store the magazine and ammunition in a separate place from the rifle.

4. When storing the pistol, it is a good idea to keep the safety lever in the "ON" or "SAFE" position. Store the magazine and ammunition in a separate place from the pistol.



Illustration #4

Safety Lever in lower "FIRE" position. Lever is covering the stamped letter "F" in the receiver. Exercise extreme caution when handling pistol in this condition!

**Cleaning the Pistol:**

**WARNING!** You should wear eye protection, such as shooting glasses or goggles when cleaning your firearm to protect your eyes from tensioned parts, such as springs, that may become dislodged during disassembly.

**WARNING!** Before beginning the cleaning process, check to ensure the pistol is unloaded. To do so, while keeping the pistol's muzzle pointed in a safe direction, place the safety lever in the "ON" or "SAFE" position by moving it fully upward until an audible "click" is heard (Illustration #2). Remove the magazine and lay it aside. Keeping the muzzle pointed in a safe direction and your finger off the trigger, place the safety lever in the lower or "FIRE" position (Illustration #4). Check the chamber by retracting the operating handle and looking into the open action to ensure there is no cartridge in the barrel chamber. Firearms can inflict death or serious injury. You can never be 'too safe.' Follow this procedure each time you clean your pistol to ensure safety.

## TO CLEAN THE BARREL

1. Obtain a good quality gun cleaning kit and thoroughly review the instructions provided therein.

2. To clean the barrel, select the correct caliber cleaning brush and attach it to a cleaning rod.

3. Dampen the brush with gun cleaning solvent and then push the brush through the barrel several times.

4. Remove the brush and attach a correctly-sized cloth cleaning patch to the cleaning rod and push it through the barrel several times to remove loosened fouling.

5. Repeat this process with the brush and cleaning patches until a final patch comes out clean after swabbing the bore.

6. Repeat the procedure just followed to clean the bolt, and other action parts (swab with brush followed by cloth cleaning patches).

7. Remove all shooting residue from the outside of the pistol by wiping outside surfaces with a piece of soft cloth dabbed in solvent.

8. Wipe down the outside surfaces with a dry cloth. Finally, wipe down all outside surfaces with a soft cloth dipped in a good quality metal preservative oil.

*WARNING!* There may be sharp edges on parts of the firearm. Keep fingers protected, such as by wearing a pair of gloves, when cleaning.

*WARNING!* Excessive use of cleaning solvents or lubricants can adversely affect the functioning of your firearm. Always wipe out the inside of the barrel before firing to ensure it is dry.

*WARNING!* This firearm should be checked periodically for worn or damaged parts by a competent gunsmith. This will help ensure its safe functioning and a long service life.

*WARNING!* Some cleaning solvents produce hazardous vapors. Read and follow the solvent manufacturer's cautions found on the product's package.

*WARNING!* Handling ammunition and cleaning firearms results in exposure to lead and other substances that could pose health risks. Always wash your hands and face after firing your pistol or after cleaning it.

© Century International Arms, Inc.

DRACO Pistol Manual

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 150 of 177 PageID #: 200

3

## Disassembly



*WARNING! You should wear eye protection, such as shooting glasses or goggles when disassembling and reassembling your pistol to protect your eyes from tensioned parts, such as springs, that could become dislodged during the procedures.*

Illustration #5



Receiver retainer button →

**Press inward on the receiver retainer button while lifting the receiver cover.**

1. To disassemble the pistol for cleaning and maintenance, first ensure it is unloaded by removing the magazine and then pulling back the operating handle to ensure there is no ammunition in the chamber.
Lay the magazine aside as it must be out of the pistol during the disassembly process.
2. Press in on the retainer button located at the top rear of the pistol's receiver while simultaneously lifting up on the rear of the receiver's top cover and removing it. (illustration #5)
3. Slide recoil spring guide and spring forward, out of their notch in the rear of the receiver and remove.

4. The bolt and carrier are now free to move. Slide these parts to the rear while lifting upward slightly on the operating handle until the assembly can be lifted out of the receiver by pulling them to the rear.
5. The bolt is now removed by pushing it to the rear of the bolt carrier and then rotating it so that its lugs clears the raceway on the underside of the bolt carrier. It is then pulled forward and free out of the carrier.
6. The bolt is removed from the bolt carrier by turning clockwise and pulling forward.
7. Rotate the gas cylinder tube lock latch upward to free the gas cylinder tube (illustration #6). Pull up on the rear of the top handguard to free and remove the tube.

Illustration #6



**Rotate the gas cylinder tube locking latch upward to free the gas cylinder tube.**

No further disassembly is needed.

Clean the removed parts with a good quality gun cleaning solvent as well as the inside of the receiver. A bronze or nylon bristle brush dabbed in solvent will aid the cleaning process. Before re-assembly, lightly oil the bolt carrier and bolt.

### Re-assembly

1. Align the front opening of the gas cylinder tube with the gas cylinder.
2. Seat the rear of the tube into the rear sight base. Rotate the gas cylinder tube lock down to its locked position. The bolt is inserted into the carrier by pulling it first from the front to the rear and then rotating the bolt to the left so it can be pushed to the front of the carrier.
2. Holding the bolt carrier assembly to ensure it remains assembled with the bolt, insert it into the receiver while pushing the gas piston end into its protection tube and pressing the guide ribs of the carrier into the corresponding grooves in the rear end of the receiver. The bolt carrier is then pushed to the front.
3. The recoil spring assembly is pushed into the boring in the rear of the receiver by pressing the spring, first forward and downward, and then letting the guide move gently to the rear.
4. The receiver cover is re-installed by inserting the front end of the cover in the groove in the rear end of the piston protection tube and then pressing the cover down so that the catch in the end of the recoil spring guide fits into the cutout in the rear of the cover. Rotate the gas cylinder tube lock latch downward to its locked position.

### STORAGE

When putting your pistol away for storage. It should be thoroughly cleaned and lightly lubricated: Outside surfaces should be wiped with a light coat of good quality gun oil. CHECK TO ENSURE YOUR FIREARM IS UNLOADED BEFORE PUTTING IT AWAY FOR STORAGE BY VISUALLY EXAMINING BOTH ITS CHAMBER AND MAGAZINE. When the firearm is to be reused, remove all excess lubrication before firing. Make certain that the bore (inside of barrel) is dry and free of obstructions before firing.

 © 2007 Century International Arms, Inc. All rights reserved DRACO Pistol Manual

Case 3:10-cv-00126   Document 16-1   Filed 11/30/10   Page 151 of 177 PageID #: 201

3

#4254      **Order yhst-89887447921587-4254 for**
                                     **Yhst-89887447921587**

| | |
|---|---|
| **Date** | Wed Dec 16 06:33:00 CST 2009 |
| **Ship to** | Leonard Embody<br>6620 Valley dr.<br>Brentwood TN 37027<br>US United States<br>615-448-7185 |
| **Bill to** | Not Available |
| **E-Mail** | leonardembody@gmail.com (emailed) |
| **Via** | USPS Priority Mail ( INSIDE USA ONLY & for FPO APO military addresses)<br>2-3 days for delivery |
| **Tracking Information** | Shipped |
| **Payment** | PayPal |

| Item | Code | Qty | Unit Price |
|---|---|---|---|
| Click here to build your URBAN-SENTRY TWO POINT/ ONE POINT HYBRID SLING<br>FRONT MODULAR ADAPTER SELECTION = Speed-Loop Male Webbing Adapter-15 add (+.50)<br>PLEASE SELECT YOUR COLOR = BLACK-BK<br>REAR MODULAR ADAPTER SELECTION = Speed-Loop Male Webbing Adapter-15 add (+.50)<br>Would you like a discounted Weapons Catch Adapter with this order? = YES Regularly $9.75 add only (+7.00)<br>(Shipped) | 2- | 1 | 62.45 |

| | |
|---|---|
| **Subtotal** | 62.45 |
| **Coupon discount (patriotinexile)** | -6.25 |
| **Subtotal** | 56.20 |
| **Shipping** | 5.65 |
| **Tax** | 0.00 |
| **Total** | 61.85 |

*Leonard-*
*Thank you*
*CM*



## *UNLOAD THE WEAPON PRIOR TO INSTALLATION ! ! !*
### AVAILABLE URBAN-E.R.T. SPECIFIC SLINGS.

**U-S/1 & U-S/2 URBAN-SENTRY 1" & 2" SLINGS:**
In **Single Point Mode**, applied to any weapon system with a rear receiver single point sling attachment, the numerous available adaptor assemblies will secure your weapon to a single mounting point. This modular system permits the tactical operator to simply punch the weapon out and over the sling to transition the weapon to an offhand shooting position. Single Point Mode affords the military or law enforcement operator the ability to search dangerous urban areas with multiple threat zones & transition the weapon to either shoulder thus exposing a minimal amount of their body to the enemy. This is extremely important in urban areas, specifically building searches involving staircases, and multiple threat zones. In the event that a secondary weapon transition is necessary, the slung weapon will fall to your off hand side, barrel pointing down, ensuring a clear path to your secondary weapon. In **Two Point Mode**, applied to any weapon system's existing sling attachment points, the numerous available adaptor assemblies will secure your weapon in a two point configuration. The URBAN-SENTRY in Two Point Mode far exceeds the conventional 2-point sling. Using the cinch strap, the tactical operator is able to shoulder the weapon with the sling on, and also cinch the sling down to snug the weapon up close to their torso. This allows the tactical operator to go hands free & engage an unarmed combatant with the weapon in front of them or slung on their back. To re-deploy the weapon simply un-cinch the sling, and rapidly engage the threat.

**IMPD 3-POINT TACTICAL SINGLE POINT SLING:** You don't have to find a release a buckle to transform the sling and you don't have to worry about fumbling around trying to reconnect the buckle with both hands.
Our Prussik Slide Release Tab (PSRT) utilizes the weight of the weapon to tightly grip the webbing when slung. This prevents the PSRT from sliding towards the rear into the single point configuration. To configure the sling into a single point sling, simply grab the rear tab of the PSRT and pull it towards the rear. Now the military or law enforcement operator can search dangerous urban areas with multiple threat zones & transition the weapon to either shoulder thus exposing a minimal amount of their body to the enemy. The 2" design allows for continuous comfortable carry.

**PATROL VEST SLING (P.V.S.):**
The PVS allows the uniformed Police Officer or a PSD Dignitary Protection Operator the ability to have a fully functional Single Point Sling attached to their concealed soft body armor. If the need arises to deploy a long gun, and you only have time to grab the weapon, shooting the weapon is paramount. During an active shooter incident, or dignitary attack, dealing with putting a sling on you have sling material interfering with the mechanics of the weapon should be the last thing on your mind. You simply grab the weapon and get to business. When it is convenient and most importantly safe to do so, you simply reach into your uniform shirt, into your polo or what ever you are wearing over your soft body armor at the time, quickly grab the side release buckle and connect it to the already attached weapon adaptor. The PVS attaches to the soft body armor, and is supported by the vest. The PVS is lightweight, & undetectable.

**SWAT/IBA/MTV Slings (S.I.M. Sling) for BALLISTIC VESTS:**
This sling option connects directly to a tactical operator's main ballistic body armor. With this sling, the tactical operator does not have to worry about putting a sling over the already bulky vest and magazine pouches. The S.I.M. Sling can be attached to either shoulder to allow the weapon to fall to your off hand side. The S.I.M. Sling can be cinched down or let out to allow for the perfect shoulder and cheek weld. The tactical operator can also install an individual S.I.M. Sling on each shoulder. Two S.I.M. Slings combined with the S.I.M. Bridge, will allow the weapon to hang right in the center of your chest. This is particularly handy while riding in a vehicle such as a SWAT van, Humvee, Striker, or Aircraft. This allows for the weapon to remain close, muzzle down, and centered. The tactical operator simply needs to evacuate the vehicle and not worry about having their sling getting tangled on any equipment. To get out of the body armor, the tactical operator simply needs to hit one of the two side release buckles on the S.I.M. Bridge, and remove their armor. The S.I.M. Sling is also more than capable of supporting any full size ballistic shield on the market available to Law Enforcement, PSD and Military Operators. This configuration prevents the tactical operator from getting prematurely fatigued during a prolonged search, or operation. Having the ballistic shield connected to a Dual Bridged S.I.M. Sling allows the operator to simply guide the shield, and not have to worry about carrying it during the operation.

**COMMON FEATURES:**
1. *The various available adaptor assemblies with the male side release buckles remain attached to the weapon systems. Having multiple inexpensive adaptor assemblies attached to several different weapons, means you can mission select any weapon from your arsenal.*
3. *The URBAN-SENTRY-US1" and US2" slings come standard with an emergency break away side release buckle to enable the emergency breakaway of the entire weapon system should any issue of sling or weapon entanglement arise. Our side release buckles have an approximate breaking strength of 175-250 pounds shock-load. This capacity was chosen in the event that you fall and get hung up on an obstruction, and can't reach the break away buckle. The sling will likely break away under your body weight, freeing you from entanglement. If this occurs, send the sling back, and we will replace any of the components that purposely broke free of charge, and ship it back to you. Your life is more important!*
4. *Any weapon from your arsenal can be safely and rapidly deployed or stowed, eliminating timely sling selection and adjustment to the needs of a wide range of missions and different Tactical Operators.*
5. *All URBAN-E.R.T. slings are designed to be 100% ambidextrous and will accommodate all shooters, and are constructed of 1" and or 2" high strength nylon webbing.*

AVAILABLE AT: www.urbanertslings.com , info@urbanertslings.com, (317) 223-6509.
IN ORDER TO IMPROVE OUR SLINGS, THE DESIGN MAY VARY FROM LISTED PHOTOS. We design weapon specific slings universal to all. If you wish to have something custom made, please contact us.

© URBAN-E.R.T. SLINGS, LLC, www.urbanertslings.com 2005-07. All Rights Reserved

## Visit our website for more details. Sling Installation link.
## PRIOR TO HANDLING THE WEAPON, ENSURE THAT IT IS UNLOADED !
**DONNING THE URBAN-E.R.T. URBAN-SENTRY (US1 & US2)** *IN SINGLE POINT MODE:*

  

Right hand operator: **+ (1.)** Throw the main body of the sling over your right shoulder with the "Quick Cinch Strap" in front. **+ (2.)** Grab the adaptor with your left hand as seen in the photos, and push it out in front of your chest. **+ (3.)** Grab the "Quick Cinch Strap" tab with your right hand as seen in the photos. **+ (4.)** Cinch the sling down so that there is about 2" of webbing remaining on the "Quick Cinch Strap". **+ (5.)** If there is more than 2" remaining on the "Quick Cinch Strap", adjust the main body of the sling out until there is only 2" remaining. The sling should ride high on your chest, and rest above your sternum as seen in the photos. **+ (6.)** To remove the sling, push the "Quick Cinch Strap" Strap-Loc tab upward, just like on a backpack. (Left hand operators complete the previous steps in opposite fashion.)

**DONNING THE URBAN-E.R.T. URBAN-SENTRY (US1 & US2)** *IN TWO POINT MODE:*

  

Right hand operator: **+ (1.)** Attach the portion of the sling that has the Elastic & the "Quick Cinch Strap" to the front sling attachment of the weapon using the supplied Weapon Adaptor. **+ (2.)** Attach the 2" wide main body of the sling to the rear sling attachment of the weapon with the female side release buckle using the supplied rear Weapon Adaptor. **+ (3.)** If you are right handed, place your left arm, and head through the sling, so that the two inch main body of the sling rests on your right shoulder, and the barrel points down towards your left foot. **+ (4.)** To extend the sling & engage the threat, pull the Strap-Loc tab back on the "Quick Cinch Strap". This will release the tension, and allow the webbing to slide out of the Strap-Loc, thus extending the weapon. **+ (5.)** Try to shoulder the weapon with the butt stock fully extended. **+ (6.)** If you can't achieve a sight picture, extend the two inch portion of the sling out with the 2" (tri-glide), until you can achieve a proper sight picture and still keep the sling snug. **+ (7.)** Once adjusted, and you can effectively & rapidly deploy the weapon, or re-cinch the "Quick Cinch Strap" using your left hand by pulling the Strap away from you just as you would tighten a backpack on your shoulder. **+ (8.)** Now the sling should rest snug against your torso. You can also throw it over your back to go hands on with a combatant. (Left hand operators complete the previous steps in opposite fashion.)

### PATROL VEST SLING (P.V.S.):  Visit our website for more details & photos.
**+ (1.)** If your concealed soft body armor has the loop Velcro* on the back ballistic panel carrier, simply attach the hook Velcro patch panel to the bottom rear of your vest with the 1" sling webbing pointing up. **+ (2.)** Route the 1" sling webbing up over the shoulders of the vest. The double webbing goes over the right shoulder, and the single webbing goes over the left shoulder. **+ (3.)** The sling's female buckle attaches to the front vest panel using the supplied male buckle with the strip of hook Velcro. **+ (4.)** Now route the elastic shoulder straps through the webbing retention bands which you will find on both the single and double 1" sling webbing. (The retention bands prevent the 1" sling webbing from rubbing on your neck while using the sling.) **+ (5.)** Put your vest on, and adjust the right side double 1" sling webbing out using the Tri-Glide until the single point assembly in front rests just below your outer shirt. You should not be able to see the assembly while wearing your uniform shirt, but you should be able to reach the assembly to release the buckle without unbuttoning or unzipping your outer shirt. Once adjusted properly, you should not notice that you have the sling on.
  * If your soft body armor is older, or does not have the loop Velcro on the back ballistic panel carrier, and has the elastic straps sewn directly to the side of the carrier, a loop Velcro adaptor panel can be provided. Simply have the loop Velcro adaptor panel sewn to the bottom rear seam of the ballistic panel carrier. The white stitch needs to face outward away from the vest, and pointing down as indicated on the provided instructions.

### INSTALLING THE SWAT/IBA/MTV Slings (S.I.M. Sling) on BALLISTIC VESTS:
**+ (1.)** Route the 1" tubular webbing that is on the opposite side of the female side release buckle through your offhand shoulder sling retention straps of your ballistic vest. **+ (2.)** Using the supplied and already installed Strap-Loc, undo the webbing, and route the webbing through either the PALS/MOLLE webbing strip, or the drag handle of your ballistic vest then re-route the webbing back through the Strap-Loc. **+ (3.)** For the Dual Bridged S.I.M. Sling, install the second S.I.M. to the strong hand shoulder sling retention straps of your ballistic vest. **+ (4.)** Connect the weapon system or shield adaptor to the single S.I.M. or to the S.I.M. Bridge. **+ (5.)** Now you can cinch the weapon or shield in tight, or un-cinch it for more maneuverability.

## FOR ADDITIONAL INSTALLATION ASSISTANCE & PHOTOS, PLEASE GOTO

WWW.URBANERTSLINGS.COM OR CALL 727-223-4504
© URBAN-E.R.T. SLINGS, LLC, www.urbanertslings.com 2005-07. All Rights Reserved

THIS APPLICATION WILL NOT BE PROCESSED UNLESS ALL QUESTIONS HAVE BEEN ANSWERED, all required...

THIS APPLICATION BECOMES PUBLIC RECORD UPON SUBMISSION.

| LAST | FIRST | MIDDLE |
|------|-------|--------|
| Embody | Leonard | Shane |

| STREET | CITY | STATE | COUNTY | ZIP CODE |
|--------|------|-------|--------|----------|
| 3788 Bakertown Rd | Nashville | TN | Davidson | 37211 |
| 5353 Chessfield Rd Apt 1101 | Antioch | TN | Davidson | 37013 |

Telephone: Home 615 554-6860   Work 931 553-5078

| Sex | Race | Height | Weight | Hair | Eyes |
|-----|------|--------|--------|------|------|
| M | W | 5' 10" | 190 | BR | HZ |

Applicant's Signature _____   Date 3/30/01

Cashier's Signature _____   Date 3/3/02   $5.00







Tennessee Department of Safety | DEPARTMENT USE ONLY - DCN | APPLICATION/RENEWAL

**HANDGUN CARRY PERMIT**

Please type or print in black or blue ink

DCN: 11801100049

X New Applicant ☐ Renewal ☐ Duplicate

**Section I.**

THIS APPLICATION WILL NOT BE PROCESSED UNLESS ALL QUESTIONS HAVE BEEN ANSWERED, all required supporting documents, two (2) full sets of fingerprints, and applicable fees have been submitted. (See fees under General Information.)

FEES ARE NON-REFUNDABLE.    THIS APPLICATION BECOMES PUBLIC RECORD UPON SUBMISSION.

**MANDATORY**

Social Security or Alien Registration Number

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| Embody | Leonard | Stanne |

Any Alias: Leonard

You must list your addresses for the last five (5) years. (Ask for an address supplement if needed.)

| Current Address | STREET | CITY | STATE | COUNTY | ZIP CODE |
|---|---|---|---|---|---|
| | 828 Shoterown Rd | Nashville | TN | Davidson | 37211 |
| Previous Address | 5353 Cane Ridge Rd Apt 1411 | Antioch | TN | Davidson | 37013 |

Telephone    Home (615) 834-6862    Work (931) 553-5078

| Date of Birth | Sex M | Race W | Height 5 ft 10 in | Weight 170 | Hair Color BR | Eye Color HZ |
|---|---|---|---|---|---|---|

**SECTION III.  THE FOLLOWING ARE TO BE ANSWERED "YES" OR "NO"**

| | YES | NO |
|---|---|---|
| Are you twenty-one (21) years of age or older? (T.C.A. 39-17-1351) | | X |
| Are you a resident of Tennessee? (Non-residents are not eligible for permitting) (T.C.A. 39-17-1351) | X | |

(remaining questions illegible, mostly marked NO)

**SECTION IV.  AFFIDAVIT**

| Applicant's Signature | Date 3/30/01 |
|---|---|
| | 04/27/02 |



**Section I.**

NAME: Last — Embody  First — Leonard  Mid — Jannice

Current Address: 5116 Echota —— Rd.  City — Nashville  State — TN  County — Davidson  Zip Code — 37211

Telephone — Home (615) 832-5752

Sex — M   Height — 5'11"   Weight — 195   Hair Color — brown   Eye Color — hazel

THE FOLLOWING ARE TO BE ANSWERED YES OR NO





||||||0171618|||||

**HANDGUN CARRY PERMIT APPLICATION/RENEWAL**
Please type or print in black or blue ink
☐ NewApp665  ☐ Ren666  ☑ Dup667

**Section I.**
THIS APPLICATION WILL NOT BE PROCESSED UNLESS ALL QUESTIONS HAVE BEEN ANSWERED, and all required supporting documents and applicable fees have been submitted. (See fees under General information.)
FEES ARE NON-REFUNDABLE. THIS APPLICATION BECOMES PUBLIC RECORD UPON SUBMISSION.

667/94

**Section II. See inside of front cover for instructions.** MANDATORY

Applicant's Driver License #

| NAME | LAST | FIRST | MIDDLE |
| --- | --- | --- | --- |
| | Embody | Leonard | Stannie |

Any Aliases: _____  Place of Birth: CA

**You must list your addresses for the last five (5) years. (Use supplement on previous page)**

| Current Address | STREET | CITY | STATE | COUNTY | ZIP CODE |
| --- | --- | --- | --- | --- | --- |
| 6620 Valley Dr. | | Brentwood | TN | Williamson | 37027 |

Telephone: Home 615 507-1782    Work ( )

| Date of Birth | Sex | Race | Height | Weight | Hair Color | Eye Color |
| --- | --- | --- | --- | --- | --- | --- |
| | M | W | 5 ft 11 in | 200 | BR | HZ |

**Section III. THE FOLLOWING ARE TO BE ANSWERED YES OR NO (USE SUPPLEMENT ON PREVIOUS PAGE)**

1. Are you twenty-one (21) years of age or older? ☑ YES ☐ NO
2. Are you a United States Citizen or a Lawful Permanent Resident? ☑ YES ☐ NO
3. (A) Are you a resident of Tennessee? ☑ YES ☐ NO
   (B) Are you a valid out-of-state permit holder applying for a non-resident permit? ☐ YES ☐ NO
   If so, you must provide proof of employment in Tennessee for at least thirty (30) hours per week for six (6) consecutive months.
4. Have you been convicted of a criminal offense punishable for a term exceeding one (1) year, which does not include federal or state offenses pertaining to anti-trust violations, unfair trade practices, restraints of trade or other similar offenses relating to the regulations of business practices? (18 U.S.C. 922(g)) ☐ YES ☑ NO
5. Are you currently under indictment or information for any criminal charge punishable for a term exceeding one (1) year, which does not include any federal or state offenses pertaining to anti-trust violations, unfair trade practices, restraint of trade or any other similar offenses relating to the regulations of business practices? (18 U.S.C. 922(g)) ☐ YES ☑ NO
6. Are you a fugitive from justice? (18 U.S.C. 922(g)) ☐ YES ☑ NO
7. Have you been discharged from the Armed Forces under dishonorable conditions? (Only persons who have been discharged from the armed forces by a military tribunal following conviction can be denied a handgun permit in Tennessee.)(Rule 1340-2-5-.02 (6)) (18 U.S.C. 922(g)) ☐ YES ☑ NO
8. Are you an alien illegally or unlawfully in the United States? (18 U.S.C. 922(g)) ☐ YES ☑ NO

```
1 Item(s) Sold
Cash          $5.00
Total $5.00

902 Handgun - Duplicate $5.00
DL# 834313542
DI20137 6/3/2008 5:45:53 PM 330A0013853
```

9. Have you ever renounced your United States Citizenship? (18 U.S.C. 922 (g)). ☐ YES ☑ NO
10. Do you currently have an order of protection or restraining order filed against you? (18 U.S.C. 922(g)) ☐ YES ☑ NO
11. (A) Are you an unlawful user of or addicted to alcohol or any controlled substance? (18 U.S.C. 922(g)) ☐ YES ☑ NO
    (B) Have you been a patient in a rehabilitation program or hospitalized for alcohol or controlled substance abuse or addiction within ten (10) years from date of application? ☐ YES ☑ NO
    (C) Have you been convicted of Driving Under the Influence in this state or any other state within five (5) years from the date of application? ☐ YES ☑ NO
    (D) Have you been convicted two (2) or more times for Driving Under the Influence in this state or any other state within the last ten (10) years from the date of this application? ☐ YES ☑ NO
12. Are you subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that: (a) was issued after a hearing of which such person received actual notice, and at which you had the opportunity to participate; and (b)(i) includes a finding that such person presents a credible threat to the physical safety of such intimate partner or child; or (b)(ii) by its terms explicitly prohibits the use, or threatened use, of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury? (If so, you must provide a copy of such order.) (18 U.S.C.922(g)) ☐ YES ☑ NO
13. (A) Have you ever been adjudicated as a mental defective or have you been committed to or hospitalized in a mental institution? ☐ YES ☑ NO
    (B) Have you had a court appoint a conservator for you by reason of a mental defect? ☐ YES ☑ NO
    (C) Have you been judicially determined to be disabled by reason of mental illness, development disability or other mental incapacity? ☐ YES ☑ NO
    (D) Have you been found by a court to pose an immediate substantial likelihood of serious harm, as defined in T.C.A. §33-6-501 because of mental illness within seven (7) years from the date of application? ☐ YES ☑ NO
14. Have you been convicted of a misdemeanor crime of domestic violence as defined in 18 U.S.C. 921(33)? "Misdemeanor crime of domestic violence" is generally defined as any offense, whether or not explicitly described in a statute as a crime of domestic violence which has, as its factual basis, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by the victim's current or former domestic partner, parent or guardian. The term "convicted" is defined as excluding anyone whose conviction has been expunged or been set aside or has received a pardon. ☐ YES ☑ NO
15. Are you receiving Social Security disability benefits by reason of alcohol dependence, drug dependence, or mental disability? ☐ YES ☑ NO
16. Have you been convicted of the offense of stalking? ☐ YES ☑ NO

RECEIVED
JUN 06 2008

**Section IV. AFFIDAVIT**
I hereby affirm under oath that the answers to the above questions are true and correct. I understand that making any false oral or written statement, or exhibiting any false or misrepresented identification or documentation, with the intent to deceive, is punishable as a felony offense pursuant to the penalties of perjury. (T.C.A. §39-16-702)
**ONLY NEW APPLICATIONS MUST BE SIGNED IN THE PRESENCE OF A DRIVER LICENSE EXAMINER**

Applicant's Signature _____  Date: 06 03 2008

Social Security or Alien Registration Number _____  Exp.: 06/03/2008

Examiner's Signature _____  Station # 330  Date: 06/03/2008

6



RECEIVED

JUN 06 2008

||||| 0180723

**HANDGUN CARRY PERMIT APPLICATION/RENEWAL**

Please type or print in black or blue ink

☐ NewApp665    ☐ Ren666    ☑ Dup667

94

## Section I.

THIS APPLICATION WILL NOT BE PROCESSED UNLESS ALL QUESTIONS HAVE BEEN ANSWERED, and all required supporting documents and applicable fees have been submitted. (See fees under General Information.)
FEES ARE NON-REFUNDABLE. THIS APPLICATION BECOMES PUBLIC RECORD UPON SUBMISSION.

## Section II. See inside of front cover for instructions.

**MANDATORY**
Applicant's Driver License #

| NAME | LAST | FIRST | MIDDLE |
|---|---|---|---|
| | Embody | Leonard | Stannie |

Any Aliases: _____    Place of Birth: C.A

You must list your addresses for the last five (5) years. (Use supplement on previous page)

| Current Address | STREET | CITY | STATE | COUNTY | ZIP CODE |
|---|---|---|---|---|---|
| 6620 Valley Dr. | | Brentwood | TN | Williamson | 37027 |

Telephone:  Home (615) 661-8067    Work ( )

| Date of Birth | Sex | Race | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|
| | Male | Caucasian | 5 ft 11 in | 210 | Brown | Brown |

## Section III. THE FOLLOWING ARE TO BE ANSWERED YES OR NO (USE SUPPLEMENT ON PREVIOUS PAGE)

THANK YOU FOR YOUR PAYMENT

Credit Card
$55.00
S137 902-Duplicate HG Permit
$55.00
Batch #: 4635
Trans #: $17
PAID: 03/31/09
$55.00

Office 34901330

1. Are you twenty-one (21) years of age or older? ☑ YES ☐ NO

2. Are you a United States Citizen or a Lawful Permanent Resident? ☑ YES ☐ NO

3.(A) Are you a resident of Tennessee? ☑ YES ☐ NO
(B) Are you a valid out-of-state permit holder applying for a non-resident permit? ☐ YES ☐ NO
If so, you must provide proof of employment in Tennessee for at least thirty (30) hours per week for six (6) consecutive months.

4. Have you been convicted of a criminal offense punishable for a term exceeding one (1) year, which does not include federal or state offenses pertaining to anti-trust violations, unfair trade practices, restraints of trade or other similar offenses relating to the regulations of business practices? (18 U.S.C. 922(g)) ☐ YES ☑ NO

5. Are you currently under indictment or information for any criminal offense punishable for a term exceeding one (1) year, which does not include any federal or state offenses pertaining to anti-trust violations, unfair trade practices, restraint of trade or any other similar offenses relating to the regulations of business practices? ☐ YES ☑ NO

6. Are you a fugitive from justice? (18 U.S.C. 922(g)) ☐ YES ☑ NO

7. Have you been discharged from the Armed Forces under dishonorable conditions? (Only persons who have been discharged from the armed forces by a military tribunal following conviction can be denied a handgun permit in Tennessee.)(Rule 1340-2-5-.02 (5)) (18 U.S.C. 922 (g)) ☐ YES ☑ NO

8. Are you an alien illegally or unlawfully in the United States? ☐ YES ☑ NO

9. Have you ever renounced your United States Citizenship? (18 U.S.C. 922 (g)). ☐ YES ☑ NO

10. Do you currently have an order of protection or restraining order filed against you? (18 U.S.C. 922(g)) ☐ YES ☑ NO

11. (A) Are you an unlawful user of or addicted to alcohol or any controlled substance? (18 U.S.C. 922(g)) ☐ YES ☑ NO
(B) Have you been a patient in a rehabilitation program or hospitalized for alcohol or controlled substance abuse or addiction within ten (10) years from date of application? ☐ YES ☑ NO
(C) Have you been convicted of Driving Under the influence in this state or any other state within five (5) years from the date of application? ☐ YES ☑ NO
(D) Have you been convicted two (2) or more times for Driving Under the influence in this state or any other state within the last ten (10) years from the date of this application? ☐ YES ☑ NO

12. Are you subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that: (a) was issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate; and (b)(i) includes a finding that such person presents a credible threat to the physical safety of such intimate partner or child; or (b)(ii) by its terms explicitly prohibits the use, or threatened use, of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury? (If so, you must provide a copy of such order.) (18 U.S.C.922(g)) ☐ YES ☑ NO

13. (A) Have you ever been adjudicated as a mental defective or have been committed to or hospitalized in a mental institution? ☐ YES ☑ NO
(B) Have you had a court appoint a conservator for you by reason of a mental defect? ☐ YES ☑ NO
(C) Have you been judicially determined to be disabled by reason of mental illness, development disability or other mental incapacity? ☐ YES ☑ NO
(D) Have you been found by a court to pose an immediate substantial likelihood of serious harm [as defined in T.C.A. §33-6-501 because of mental illness within seven (7) years from the date of application? ☐ YES ☑ NO

14. Have you been convicted of a misdemeanor crime of domestic violence as defined in 18 U.S.C. 921(33)? "Misdemeanor crime of domestic violence" is generally defined as any offense, whether or not explicitly described in a statute as a crime of domestic violence which has, as its factual basis, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by the victim's current or former domestic partner, parent or guardian. The term "convicted" is defined as excluding anyone whose conviction has been expunged or been set aside or has received a pardon. ☐ YES ☑ NO

15. Are you receiving Social Security disability benefits by reason of alcohol dependence, drug dependence, or mental disability? ☐ YES ☑ NO

16. Have you been convicted of the offense of stalking? ☐ YES ☑ NO

## Section IV. AFFIDAVIT

I hereby affirm under oath that the answers to the above questions are true and correct. I understand that making any false oral or written statement, or exhibiting any false or misrepresented identification or documentation, with the intent to deceive, is punishable as a felony offense pursuant to the penalties of perjury. (T.C.A. §39-16-702)

ONLY NEW APPLICATIONS MUST BE SIGNED IN THE PRESENCE OF A DRIVER LICENSE EXAMINER

Applicant's Signature _____    Date: 03 31 2009

Social Security or Alien Registration Number _____    Exp.: 3-31-09

Examiner's Signature _____    Station # 330    Date: 3-31-09

ID 9787

## TENNESSEE DEPARTMENT OF SAFETY

### HANDGUN CARRY PERMIT SUPPLEMENT

From _06/1997_ to _06/2005_
Street Address: _3728 Bakertown Rd_
City: _Nashville_
County: _DAVIDSON_                    Zip Code: _37211_

From_____to_____
Street Address:_____
City:_____
County:_____ Zip Code:_____

From_____to_____
Street Address:_____
City:_____
County:_____ Zip Code:_____

If you answered "YES" to any of the questions 4 through 16, use the section below to explain. Be sure to list the question number.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

RECEIVED
APR

BY:...................

**Making any false oral or written statement or exhibiting any false or misrepresented identification or documentation is a Class B misdemeanor punishable by a fine not to exceed Five Hundred ($500.00) Dollars.**

**T.C.A. §39-14-114 (a) A person commits an offense who forges a writing with intent to defraud or harm another.**

Applicant's Signature: _____ Date: _05/31/09_

## APPLICATION INFORMATION AND INSTRUCTIONS
### Please type or print in black or blue ink
### Handgun Permit Office 1-866-849-3548

**SECTION I.**
Read this section carefully.
**SECTION II.**
The applicant's complete Social Security number is Mandatory. (T.C.A. §39-17-1351) The Social Security Number should not be printed on the Handgun Permit.
Any Aliases: Any name(s) you are known by other than your legal name
Place of Birth (Pursuant to T.C.A. §39-17-1351) only United States Citizens or Lawful Permanent Residents will be issued a Handgun Permit. If you have not lived at your current address for the last five (5) years, you will need to complete the supplement supplied on the back of this page.

**DATE OF BIRTH** - Example: August 8, 1946, should be listed as 8/8/46.
**SEX** - Use M for Male and F for Female
**RACE** - Use W for White, B for Black, A for Asian, I for Indian, H for Hispanic, O for Other
**HEIGHT** - Use feet and inches.
**WEIGHT** - Use pounds only
**EYES AND HAIR** - To describe color of eyes and hair, use the appropriate two letter code from the list:

| COLOR | CODE | |
|---|---|---|
| Bald* | NN | (Hair Only) |
| Black | BK | (Hair Only) |
| Blond or Strawberry | BL | (Hair Only) |
| Blue | BL | (Eyes Only) |
| Brown | BR | |
| Gray or Partially Gray | GR | |
| Green | GN | (Eyes Only) |
| Hazel | HZ | (Eyes Only) |
| Red or Auburn | RD | (Hair Only) |

*Bald (NN) is to be used when subject has lost most of the hair on top of his head.

**SECTION III.**
All questions must be answered in this section and must be answered with a YES or a NO.
If you answered "YES" to any of the questions 4 through 16, use Handgun Supplement on back to explain.
**SECTION IV.**
New Applicant - Please read the affidavit carefully; then sign and date the application *in the presence of a Driver License examiner.*
Renewal/Duplicate - Please read the affidavit carefully; sign and date the application.

In addition to the information required, the applicant shall submit proof of the successful completion of a Department of Safety approved handgun safety course within the past six (6) months. Such course must include both classroom hours (4), and firing range hours (4). (Refer to the General Information page for exceptions to the firing range requirements.) This proof must be submitted at the time the completed application is submitted to the Department of Safety.

### INCOMPLETE APPLICATIONS CANNOT BE PROCESSED.
### FEES ARE NON-REFUNDABLE



STATE OF CALIFORNIA
DEPARTMENT OF HEALTH

OFFICE OF
THE STATE REGISTRAR
OF VITAL STATISTICS

CERTIFICATE OF LIVE BIRTH
STATE OF CALIFORNIA—DEPARTMENT OF HEALTH

THIS CHILD — Leonard — Stannie — Embody

Male — Single

PLACE OF BIRTH — Kaiser Foundation Hospital — 1425 South Main Street — Walnut Creek — Contra Costa — California

MOTHER OF CHILD — Norice — Gale — Doyle — Caucasian — California

FATHER OF CHILD — Pittsburg — Contra Costa — California — William — Michael — Embody — Caucasian — 19

INFORMANT'S CERTIFICATION — Norice Gale Embody

ATTENDANT'S CERTIFICATION — R.H. Fair, MD — April 29, 1972

LOCAL REGISTRAR — Memphis — Walnut Creek — Glen W. Kent, MD — May 4, 1972

NOVEMBER 22, 1977

HANDGUN CARRY PERMIT
Tennessee
The Volunteer State

PERMIT NO.
LEONARD STANNIE
EMBODY
6620 VALLEY DRIVE
BRENTWOOD, TN 37027



# STATE OF TENNESSEE
## DEPARTMENT OF SAFETY
### Certificate of Completion
#### for
#### Handgun Safety Course

I do hereby certify that _Leonard Stevens Endsley_,
Name of Student

_____ of _Davidson_ County has successfully
Social Security Number    Legal Residence

completed all requirements of a Department of Safety approved Handgun

Safety Course conducted by _Kurt Breedlove_, a state certified
Name of Instructor

Handgun Safety Instructor, this _25_ day of _March_ 19 _01_.

**This certification will be valid for only six (6) months from the date of issue for the purpose of obtaining a Handgun Carry Permit.**

_Kurt Breedlove_
Certified Instructor

_410 49 2694_
Instructor ID Number

_Goodlettsville Gun Shop_
Name of School

_2-19-4_
School ID Number

| Student's Handgun |  |
|---|---|
| Manufacturer | |
| _Kahr_ | |
| Model | Caliber |
| _M_ | _9mm_ |

_Applicant must submit "D.O.S." copy to the Department of Safety when applying for a Handgun Carry Permit._



# TENNESSEE DEPARTMENT OF SAFETY
## Handgun Unit
### 1148 Foster Avenue
Nashville, Tennessee 37210

March 10, 2010

Leonard S. Embody                                     Driver License Number: 083431342
6620 Valley Dr.                                       Date of Birth: 4/27/1972
Brentwood, TN 37027

Dear Mr. Embody,

By authority of T.C.A. 39-17-1352, you are officially notified that your Handgun Carry Permit has been suspended.

This suspension is the result of the following information received by this department:

3/2/2010        Poses a material likelihood of risk to the public        Belle Meade, TN Police Department

You must surrender your permit to the department within ten (10) days of this notice. You may mail your permit to this office at the above address, Attn: Handgun Office or you may return it to your nearest driver license testing station.

It is a Class A Misdemeanor punishable by up to one (1) year in jail for the permit holder to knowingly fail or refuse to surrender the permit to the department within the ten (10) day period. If you fail to surrender the permit, a law enforcement official will be directed to take possession of the permit.

You have thirty (30) days from the date of this notice to either petition the General Sessions Court in your County of Residence for Judicial Review or make a written request for a departmental hearing regarding the suspension of your handgun permit

Due to the confidential nature of all criminal histories and dispositions, records may not be discussed by telephone. Should you have further questions, please forward all inquiries in writing to the above address, Attn: Handgun Permit Office.

Lieutenant Robert Eckerman
Program Manager

Enclosure: Petition Forms (2)

Cc: Williamson County District Attorney
    Williamson County Sheriff's Department
    Belle Meade Police Department

sjs

motion.

7



RECEIVED
2010 MAR 22 PM 3:01
LEGAL OFFICE

**TENNESSEE DEPARTMENT OF SAFETY**
**DIVISION OF LEGAL SERVICES – MIDDLE TENNESSEE REGION**
1150 Foster Avenue, McCord Building, Room 107
Nashville, TN 37249-1000

PHONE: (615) 251 - 5296                    FAX: (615) 253 - 2098

## PETITION FOR HEARING

DATE: _3-12-10_                    D.O.S. CASE NO.: _____

I, _Leonard Stannie Embody_, residing at _6620 Valley Dr._
(Name)                                              (Street Address)

_Brentwood_      _TN_        _37027_              ( _615_ ) _448- 7185_
(City)              (State)        (Zip Code)         (Area Code)    (Phone)

hereby file this PETITION pursuant to TCA § 39-17-1353 et seq. and request a hearing to review the department's determination of handgun permit status.

Handgun Carry Permit Number:    ███████████

Date of Notice:                 _3-12-10_

Permit Status Determination:    Revoked ( )  Suspended (✓)

If your handgun carry permit has not been previously surrendered, it must be surrendered at the time the request for hearing is made. A request for hearing does not stay the permit suspension or revocation.

**This form** must be received by the Legal Office within **thirty (30) days** of Notice or your interest will be forfeited. __DO NOT LEAVE ANY BLANK LINES.__

(Petitioner's Signature) X _[signature]_

RECEIVED MAR 2 3 2010

LT  ECKERMAN
HANDGUN  PERMITS



# STATE OF TENNESSEE
## DEPARTMENT OF SAFETY
### 1150 FOSTER AVENUE
### NASHVILLE, TENNESSEE 37243

May 8, 2008

Leonard Embody
6620 Valley Drive
Brentwood, TN 37027

Driver License Number: 083431342
Date of Birth: 4/27/72

Dear Mr. Embody,

By authority of T.C.A. 39-17-1352, you are officially notified that your Handgun Carry Permit has been revoked.

This revocation is the result of the following information received by this department:

April 4, 2008          Ex Parte Order of Protection          Davidson County, TN

You must surrender your permit to the department within ten (10) days of this notice. You may mail your permit to this office at the above address, Attn: Handgun Office or you may return it to your nearest driver license testing station.

It is a Class A Misdemeanor punishable by up to one (1) year in jail for the permit holder to knowingly fail or refuse to surrender the permit to the department within the ten (10) day period. If you fail to surrender the permit, a law enforcement official will be directed to take possession of the permit.

You have thirty (30) days from the date of this notice to petition the General Sessions Court in your County of Residence for Judicial Review of this department's denial of a handgun permit.

If you are able to provide this office with documentation from the court to clear this matter prior to your court date we will review the documentation and follow up with a response, only after the permit has been received. Documentation must be certified by the court.

Due to the confidential nature of all criminal histories and dispositions, records may not be discussed by telephone. Should you have further questions, please forward all inquiries in writing to the above address, Attn: Handgun Permit Office.

Program Manager
Handgun Permit Unit

Enclosure: Petition Form

jb

Leonard Embody
6620 Valley Dr.
Bentwood TN 37027
615-507-1782 home phone
931-538-5962 cell phone
leonardembody@gmail.com

Driver license # 83431342



# Fax

| To: | Dept. of Safety   Attn. Judith Person | From: | Leonard Embody DL # 83431342 |
|-----|---------------------------------------|-------|------------------------------|
| Fax: | 615-532-3056 | Pages: | 2 |
| Phone: | 615-251-8590 | Date: | 5/9/08 |
| Re: | Handgun Carry Permit Revocation | cc: | |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

**My handgun carry permit was revoked due to a crazy woman who filed an ex parte order of protection against me last month. I never even saw her before the court date. She was not related to me at all. We never had any children together. Anyway, I defended myself in court 5-7-08 and the REAL Judge (not a commissioner/magistrate) dismissed it. I sent a copy of the actual certified court document to your office this morning 5-8-08. I just received your certified letter this afternoon 5-9-08. The second page of this fax is another copy of the dismissal.**

**Please let me know if I need to file a petition with the court to get my handgun carry permit back. Please let me know if I must turn the permit in to a driver testing station. Thanks.**

**You may contact me at 931-538-5962. Leonard Embody.**

# IN THE GENERAL SESSIONS COURT
# FOR DAVIDSON COUNTY, TENNESSEE



Deidre Summa
**Petitioner,**

2008 MAY -7 AM 9: 57

RICHARD M ROOKER, CLERK

vs.

Leonard Embry
**Respondent,**

CASE NO. 08 OP 448

I DO HEREBY CERTIFY THIS TO BE A TRUE
AND CORRECT COPY OF THE JUDGMENT
ENTERED IN THIS CASE ON 5-7-2008
THIS _____ 9th _____ DAY OF May, 2008

RICHARD R. ROOKER, CLERK
BY _____ D.C.

## ORDER OF DISMISSAL

IT APPEARING to this Court:

_____ The petitioner wishes not to petition this Court for an Order of Protection

_____ The Petitioner has failed to proceed with the Petition for Order of Protection or

__X__ The petitioner has failed to prove by a preponderance of the evidence the allegations contained in the Petition for Orders of Protection.

_____ The Petitioner/Respondent has filed a Petition to Modify requesting this Court to set aside the Order of Protection entered on _____, 200 __.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that:

[X] The Petition is dismissed.

[ ] The Order of Protection previously entered on this case is Set Aside and this case Dismissed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the [X] Petitioner [ ] Respondent shall pay the costs of this cause, for which execution shall issue if necessary.

ENTERED, this 7th day of May, 2008.

_____
Judge, Division XV

### Certificate of Service

I hereby certify that a true and exact copy of the foregoing Order has been mailed to the respondent at the following address: 6620 Valley Rd Bfr 3000 on the 7th day of May, 2008.

_____
Deputy Clerk

*Petitioner's signature for request of Dismissal          __The Respondent was present in court



Exhibit: 7
Wit: Embody
Date:
Rptr: SA