IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| **LEONARD S. EMBODY,** | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:10-cv-00126 |
| | ) | JURY DEMAND |
| V. | ) | |
| | ) | JUDGE HAYNES |
| **STEVE WARD, individually,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT BY STEVE WARD

Pursuant to Fed. R. Civ. P. defendant Steve Ward moves for summary judgment:

1. When plaintiff Leonard Embody was seen walking through a state park dressed in camouflage, carrying an AK-47 type weapon modified to resemble a toy gun, and alarming park visitors, and when defendant Park Ranger Steve Ward himself encountered Embody with the weapon in a sling across his chest in a tactical "ready" position, Ward did not violate Embody's Fourth Amendment rights by stopping Embody at gunpoint and then detaining him for the two and a half hours needed for the assisting Metro Police Officers to research and investigate the weapon to determine what it was, and whether it was a legal weapon

2. The same undisputed facts show that Ward did not violate Embody's Second Amendment rights when state law permits a law enforcement officer to disarm a handgun permit holder at any time when the officer reasonably believes it is necessary for the protection of the permit holder, officer, or other individual or individuals, and when Ward has such a reasonable belief.

3. Even if there had been any constitutional violation, Ranger Ward is entitled to qualified immunity because he did not violate any clearly established rules by relying on state

law governing handguns, and on the authority that state law gave him as a law enforcement officer.

## STATEMENT OF UNDISPUTED FACTS

On Sunday afternoon, December 20, 2009, Leonard Embody, carrying what would later be determined to be an AK-47 pistol in a tactical sling, and wearing camouflage, entered Radnor Lake State Natural Area ("Radnor Lake"), a popular park in Nashville, and proceeded to walk on the trails. (Deposition of Leonard Embody, pp. 36-40, 46-48, 82). (Deposition of Joshua Walsh, pp. 4-5, 7). Embody had painted tip of the barrel, or "barrel nut," of the weapon orange. (*Id.,* p. 34). Federal law requires any toy, look-alike, or imitation firearm to have a blaze orange plug inserted in the muzzle end of the barrel. *See* 15 U.S.C. § 5001 (b)(1).

Park Ranger Joshua Walsh, a law enforcement officer, encountered Embody, and thought that the weapon was an AK-47, but was not sure it was real because of the orange barrel tip. (Deposition of Joshua Walsh, p. 4-5, 7; Deposition of Leonard Embody, pp. 60, 79-80). Embody said it was a real AK-47. (Deposition of Leonard Embody, Exhibit 5, recording). Embody's weapon was fully loaded at the time. (*Id.*, p. 35).

Embody contended the AK-47 was a handgun. (Deposition of Leonard Embody, p. 59, 72-73). Just six months before this, the Tennessee General Assembly had passed a law allowing persons with handgun permits to carry handguns into state parks and natural areas. *See* 2009 Tenn. Pub. Ch. 428 (2009) (Copy attached). *See also* Tenn. Code. Ann. S 39-17-1311(b)(1)(H) (hereinafter "guns in parks law").

Walsh was uncertain whether it was a legal handgun. (Deposition of Leonard Embody, p. 60; Deposition of Joshua Walsh, p. 14). At one point, after Embody insisted it was a handgun, Walsh stated, "Technically it's a handgun, but I don't know why you need it out here."

2

(Deposition of Joshua Walsh, p. 5). Embody was armed with an AK-47, and Walsh did not want to start a confrontation by arguing about whether it was a handgun. (Deposition of Joshua Walsh, p. 8). But later, Ranger Walsh said to Embody, "I'm pretty sure an AK-47 is not a handgun." (Deposition of Leonard Embody, p. 60; Deposition of Joshua Walsh, p. 14).

Embody anticipated that a ranger would stop him about the weapon. (Deposition of Leonard Embody, p. 59). Embody recorded his discussion with Ranger Walsh. (Deposition of Leonard Embody, Exhibit 5, recording).[1]

Embody was not confrontational with Walsh, and Walsh did not feel threatened so that he needed to draw his own weapon. (Deposition of Joshua Walsh, pp. 6, 8). But a visitor walking by held his hands up, got to the side of the road, and asked if it was a real weapon. (Deposition of Joshua Walsh, p. 6). Walsh could tell that the visitor was not joking and was feeling threatened. (*Id.*) Shortly after this, as Walsh was following Embody, several other visitors stopped Walsh to tell him about the man with the weapon, and to express their concern. (*Id.*, p. 15).

Walsh called his supervisor, Ranger Steve Ward, a law enforcement officer and the Radnor Lake Manager, at home, and told him there was a man on the trail with a weapon that Walsh thought was an airsoft (toy) gun, that the tip of the barrel was painted orange, but that the man said it was real. (Deposition of Joshua Walsh, p. 7; Deposition of Steve Ward, pp. 5, 9, 11, 22). It was standard operating procedure only to call an off-duty ranger when there was an emergency, and Ward could tell by the tone of Walsh's voice that Walsh was very concerned. (Deposition of Steve Ward, pp. 21, 23). While Ward on the phone with Walsh, an elderly couple

---

[1] At the beginning of the recording, Embody documents that it is Radnor Lake, December 20, 2009. (Deposition of Embody, p. 57). The discussion with Ranger Walsh is toward the end of the recording, about ¾ of the way through it.

3

started beating on the door of Ward's house, to tell him that there was a man on the road with an assault rifle. (Deposition of Steve Ward, p. 20).

Ranger Ward instructed Walsh to back off from the situation with Embody, and to call the police. (Deposition of Joshua Walsh, pp. 8-9; Deposition of Steve Ward, pp. 12, 27). Walsh then followed Embody, and kept Ward updated by phone about where Embody was headed and what he was doing. (Deposition of Joshua Walsh, pp. 7-8; Deposition of Steve Ward, p. 25).

Ranger Ward headed for Radnor Lake to assist Walsh. (Deposition of Steve Ward, pp. 16, 24). On the way, Ward called his supervisor, Chief State Park Ranger Shane Petty, to tell him about the situation. (*Id.*, p. 25; Affidavit of Shane Petty). Petty agreed that the weapon did not seem to be a valid handgun. (Affidavit of Shane Petty, ¶ 5). Because it was a high powered weapon, because the carrier was dressed in camouflage, and because the barrel tip had been painted orange like a toy, possibly to get the upper hand of law enforcement officers, Petty concluded with Ward that there were sufficient grounds to question whether a crime had been committed. (*Id.*) He and Ward decided that Ward should do a felony take down at gunpoint. (*Id.*, ¶ 6). Petty contacted Assistant Commissioner Michael Carlton, also a law enforcement officer, to advise him of the situation at Radnor Lake, and of the plan of action. (*Id.*, ¶ 7)

Steve Ward pulled up into the west parking lot at Radnor Lake, where Embody was standing with the weapon across his chest. (*Id.*, pp. 13-14). Embody was near his own car, but Ward saw no indication that Embody was getting into it. (*Id.*) With his shotgun pointed at Embody, Ward told Embody to put the weapon on the ground, and then, because Ward was unsure if Embody had another weapon, told Embody to lie down on the ground. (*Id.*, pp. 28-29).

Ward searched Embody and then allowed him to get up. (Deposition of Leonard Embody, p. 62). To Ward, the situation was no longer an emergency. (Deposition of Steve

4

Ward, p. 34). Ward did not handcuff Embody. (Deposition of Leonard Embody, pp. 86-87; Requests for Admission to Plaintiff). He allowed Embody to use his cell phone and to make calls. (Deposition of Leonard Embody, p. 62). Ward testified that he did not place Embody under arrest; and to Embody's knowledge, Ward never told any other police officer to arrest him. (Deposition of Steve Ward, pp. 32, 36; Deposition of Leonard Embody, p. 73).

Embody had come to Radnor Law twice before this in the fall of 2009, carrying a Smith & Wesson revolver in a holster. (Deposition of Leonard Embody, p. 43). Once, Ranger Ward had stopped him and asked to see his permit. (*Id.*, p. 44). Ward reviewed the permit, returned it to him, and walked away. (*Id.*, p. 44-45). On December 20, 2009, Ward did not realize it was Embody at first. (Deposition of Steve Ward, pp. 26).

Officers from Metropolitan Nashville Police Department ("Metro Police") arrived as Ward finished patting down Embody. (Deposition of Steve Ward, p. 34). Both the Metro Police and the State Park Rangers have law enforcement jurisdiction over Radnor Lake. (Deposition of Steve Ward, pp. 36, 37). The Metro Police have technological capabilities for checking the legality of the weapon that the State Park Rangers do not have. (*Id.*, p. 35).

Ward and the police thought that the weapon was illegal; the barrel tip had been modified, painted orange. (Deposition of Steve Ward, p. 38). They had never seen a weapon like that before. (*Id.*, p. 46). Ward had no information about how the weapon had been manufactured, and whether it had been changed, and, further, there were abrasions on the back of the weapon that concerned them. (*Id.,* p. 46). Ward was also concerned about the manner in

5

which the weapon had been carried. (*Id.*). Ward had seen the weapon across Embody's chest. (Deposition of Steve Ward, p. 13).[2]

Ward later testified, "We needed to be sure we knew what we were dealing with, with the weapon." (*Id.*, p. 34). Ward explained to Embody that they were going to need to figure out whether this weapon was legal, and that he would need to wait. (Deposition of Steve Ward, p. 32). Ward took photos of the weapon taken from Embody that day. (Affidavit of Steve Ward and exhibits 1, 2. 3).

It took 2 ½ hours, from about 4:30 p.m. to about 7:00 p.m. for the Metro Police and Ward, to investigate the weapon and what laws might be applicable to the situation. (Deposition of Steve Ward, p. 44). Ward and Petty agreed with the decision to get the ATF involved to determine the nature of the weapon and if the owner had illegally altered it. (Affidavit of Shane Petty, ¶ 8).

After Embody later complained about the length of time, the Metro Police Department conducted an internal review of the events. (*See* Affidavit of Lt. Natalie K. Lokey, custodian of records, Metro Police Department and attached information and disposition, hereinafter "Police Complaint Investigation"). The review reflected that during the two and a half hours that Embody was detained, there were three Metro Police officers, two Metro Police sergeants, a Metro Police detective, and two State Park Rangers involved at the scene. (Affidavit of Lt. Natalie K. Lokey, Police Complaint Investigation). Additionally, the Metro Police consulted with a Metro Field Captain, a Night Commissioner, and an ATF agent. (*Id.*)

---

[2] William T. (Tom) Long, an expert on police conduct and tactical training who reviewed the record on behalf of the defendant, noted this was a "ready" or "port arms" position. (Affidavit of Long, and Expert Report, p. 4, ¶ 8).

6

Also, during that time, Steve Ward consulted with Chief Ranger Petty, and Petty communicated with his superior, Assistant Commissioner Michael Carlton, also a law enforcement officer. (Affidavit of Shane Petty, ¶¶ 7-8). Adding to the length of time, Embody wanted a police supervisor come to the scene, even after a police officer told him it would take additional time. (Deposition of Leonard Embody, p. 68).

The Metro Police Complaint Investigation included the statements and supplemental statements of the police officers involved, and documented the sequence of events from time of arrival of the officers until Embody was told he was free to go. (Affidavit of Lt. Natalie K. Lokey, Police Complaint Investigation). The incident ended when the ATF advised that Embody's weapon was manufactured as a pistol, and met federal requirements for a pistol/handgun. *Id.*

Upon that conclusion, Ward went to his vehicle and got Embody's weapon to return to Embody. (Deposition of Steve Ward, p. 45). A Metro police officer walked Embody to his car. (*Id.*, p. 45). The incident ended around 7:00 P.M. (*Id.*, p. 44).

The Metro Police Complaint Investigation concluded that Embody's complaint about the length of time was "exonerated," meaning the incident did occur but the action was consistent with established policy, rules, and procedure. (Police Complaint Investigation, Supplemental Report, Lt. Shawn Parris). In a separate investigation, Tennessee Environment and Conservation Assistant Commissioner Carlton concluded that the complaint was unfounded. (Affidavit of Michael Carlton, and exhibit, Customer Complaint and Review of Complaint). Carlton found that Ward "had probable cause to believe that Embody was in violation of Tenn. Code Ann. § 39-17-1307 for illegal possession of a weapon, due to the fact that it appeared that he was

7

carrying an AK-47 semi-automatic rifle that had been altered to resemble a toy for unknown reasons." (*Id.*).

William T. (Tom) Long, an expert on police standards of conduct and tactical training reviewed the records in this case at the defendant's request, and opined in a report previously furnished to the plaintiff that Ward acted within reasonable and accepted police protocol in stopping Embody at gunpoint, and that the two and one-half hour investigative detention was reasonably related to the purpose of determining if Embody's weapon was manufactured legally as a pistol/handgun. (Affidavit of William T. (Tom) Long and attached Expert report).

Under Tenn. Code Ann. § 39-11-106(16), a "handgun" is "any firearm with a barrel length of less than twelve inches (12") that is designed, made or adapted to be fired with one (1) hand." Embody testified that the weapon he was carrying was a "Draco AK-47 pistol," and that the barrel was 11 ½ inches long. (Deposition of Leonard Embody, pp. 71-72). He also testified that he painted the barrel tip orange because "I could paint it." (*Id.*, p. 76).

## ARGUMENT

### I. SUMMARY JUDGMENT

The Supreme Court has declared: "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Embody cannot establish violation of his constitutional rights, or that Ward acted inconsistently with any clearly established law at the time.

## II. PLAINTIFF'S BURDEN IN FEDERAL CIVIL RIGHTS CASES

Government officials, including police officers, are immune from civil liability unless in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006), *cert. denied*, 549 U.S. 1130 (2007). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009).

Courts have applied a two-step inquiry. *Saucier v. Katz*, 522 U.S. 194, 198 (2001). The first question is whether the facts allegedly show that the officer violated a constitutional right. *Saucier,* 522 U.S. at 199. If so, then the next question is whether the right was clearly established. *Id.* The Sixth Circuit has added a third inquiry: whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *See Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).

The Supreme Court has directed that courts should be permitted to exercise their sound discretion in deciding which of the two *Saucier* prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson,* 129 S.Ct. at 818. However, the core analysis in *Saucier* remains. *See Jones v. Byrnes*, 585 F.3d 971, 976 (6th Cir. 2009)

## III. FOURTH AMENDMENT CLAIM: WHEN EMBODY CARRIED A HIGH POWER WEAPON, HAD PAINTED THE BARREL TIP ORANGE LIKE A TOY, AND WAS DRESSED IN CAMOUFLAGE, AND WHEN PARK VISITORS WERE ALARMED,

9

**WARD DID NOT VIOLATE EMBODY'S CONSTITUTIONAL RIGHTS BY STOPPING HIM AT GUNPOINT, AND DETAINING HIM FOR FURTHER INVESTIGATION.**

The Fourth Amendment to the Constitution provides that "the right of persons to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. U.S. Const., Amend IV; *Terry v. Ohio*, 392 U.S. 1, 9 (1968). What the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures. *Terry*, 392 U.S. at 9. The interest in effective crime prevention and detention "underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22.

Investigatory stops and seizures are analyzed under the Fourth Amendment, which plainly does not mandate perfection of the part of the law enforcement officer or require that only actual criminals be detained. *Terry*, 392 U.S. at 9. An investigatory stop is permissible if supported by an officer's "reasonable suspicion" that criminal activity is afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Reasonable suspicion" requires more than a "mere hunch," but is satisfied by a likelihood of criminal activity less than probable cause. *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). In determining whether the officer acted reasonably, due weight must be given to the specific reasonable inferences that the officer is entitled to draw from the facts in light of the officer's experience. *Terry*, 392 U.S. at 27. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Reasonable suspicion is measured by "all the information available to law enforcement officials at the time." *Feathers*, 319 F.3d at 849.

**A. Ward acted as a reasonable officer in stopping Embody**

10

The reasonableness of a stop is determined by two factors: "(1) whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by the reasonableness of the officials' conduct given their suspicions and the circumstances." *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986), *cert. denied,* 479 U.S. 1097 (1987)

> 1. <u>Ward's suspicion of criminal activity leading to the stop was based on specific and articulable facts.</u>

Ward had gotten an emergency call from Walsh that a man was walking through Radnor Lake dressed in camouflage, carrying a high powered weapon in a tactical sling, and, according to Walsh, the weapon had been modified to look like a toy with an orange tip, even though the man claimed it was a real AK-47. (Deposition of Steve Ward, pp. 5, 9, 11, 22). At the same time, an elderly couple had come to Ward's house fearful about a man with an assault weapon. (*Id.* at 20). When Ward gave his superior this information, Chief Ranger Petty agreed that these factors gave sufficient grounds for suspicion that a crime had been committed. (Affidavit of Shane Petty, ¶ 4-5).

William "Tom" Long, with whom the defense consulted in this litigation, showed that it would be reasonable for an officer to be concerned about an orange barrel tip on a real weapon. (Affidavit of Long and attached Expert Report, p. 7). For example, if the weapon has been physically altered with the orange tip, how far do the alterations go? Was the owner's intent in painting the barrel tip orange to slow down a police officer's reaction when confronting the individual carrying the weapon, or to probe law enforcement response for a future violent act? (*Id.*, Expert Report at 7).

11

The purported legality of Embody's actions when each action is examined separately does not by itself establish a Fourth Amendment violation. An officer may still have grounds to stop an individual even if the officer has observed the individual go through a series of acts, each of them perhaps innocent in itself, but which taken together warrant further investigation. *See Terry*, 392 U.S. at 22. *See also United States v.* Garza, 10 F.3d 1241, 1245 (6th Cir. 1993).

In stopping Embody, Ward had reason to suspect that Embody's weapon did not come within the state definition of "handgun." (*See generally,* Deposition of Joshua Walsh, p. 5). The barrel length, 11 ½ inches, was just shy of the "under 12 inches" length limit. (Deposition of Leonard Embody, p. 71). *See* Tenn. Code Ann. § 39-11-106 (16). Walsh, the first Ranger to encounter Embody, could not tell if it was a handgun. (Deposition of Joshua Walsh, p. 14). Plus, it was unlikely to see such a weapon in Radnor Lake. (Deposition of Joshua Walsh, p. 6 ("…I don't know why you need it out here.")). When Ward encountered Embody in the parking lot, Ward could not determine if the weapon was a ½ inch short from a distance of 30 yards. (Deposition of Steve Ward, p. 33). Coming closer would have been dangerous when Embody had the weapon in a "ready" position across his chest.

Ward also had reason to suspect that Embody's weapon itself was illegally altered.[3] (Deposition of Steve Ward, p. 38.) He and Chief Ranger Petty discussed that the barrel tip of the weapon may have been painted orange like a toy to get the upper hand of law enforcement officers. (Affidavit of Shane Petty, ¶¶ 5-6). Ward's grounds for reasonable suspicion would not have been resolved merely by measuring the length of the barrel of Embody's weapon, or by examining his handgun permit, or by considering Embody's willingness to cooperate. These

---

[3] For example, it would be illegal to alter a weapon to be a short-barreled rifle. *See* Tenn. Code Ann. § 37-17-1302(a). *See also* 18 U.S.C. § 922(a)(4). Alteration of the tip of the barrel would make this a very strong possibility, especially since Ward had noted abrasions on the back of the weapon, possibly signifying removal of a rifle butt. (Deposition of Steve Ward, p. 46).

12

would not have eliminated the possibility of criminal activity in Radnor Lake or the surrounding community.

> 2. <u>The use of force in stopping Embody was reasonably related to Ward's suspicions.</u>

The mere use or display of force in making a stop will not necessarily convert a stop into an arrest. *Hardnett*, 804 F.2d at 357. When police officers reasonably fear that suspects are armed and dangerous, they may draw their weapons when those steps are "'reasonably necessary for the protection of the officers'" *Houston v. Clark County Sheriff Deputy John Does*, 174 F.3d 809, 814-15 (6th Cir. 1999), *quoting Garza*, 10 F.3d at 1246. "[I]f the surrounding circumstances give rise to a justifiable fear for personal safety, a seizure effectuated with weapons drawn may properly be considered an investigative stop." *Hardnett*, 804 F.2d at 357.

Ward pointed the shotgun at Embody only so long as needed to disarm Embody. Before Ward stopped Embody, he and Chief Ranger Petty discussed the appropriate level of use of force to use, and Petty agreed with use of a felony take down with weapon drawn. (Affidavit of Shane Petty, ¶ 6). Ward pointed a shotgun at Embody only when Embody was armed with an AK-47 type weapon across his chest. (Deposition of Steve Ward, p. 13-14). Upon disarming Embody, and ensuring officer safety by searching Embody, Ward considered the emergency to be over, and allowed Embody to get up. (*Id.*, pp. 28-31, 34).

Ward did not violate Embody's Fourth Amendment rights in the decision to stop Embody, and in the manner in which Ward performed that stop.

**B**. **The 2 ½ hour length of the stop was reasonably related to researching the nature of Embody's weapon and whether he had illegally modified it.**

There is no "'rigid time limitation'" on a *Terry* stop. *Garza*, 10 F.3d at 1246, *quoting United States v. Sharpe*, 470 U.S. 675, 685 (1985). Courts should consider the law enforcement

13

purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. *Sharpe*, 470 U.S. at 685. While it may be desirable to give law enforcement authorities a clear rule to guide their policies, any hard and fast rule would "'undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.'" *Sharpe*, 470 U.S. at 686, *quoting United States v. Pace*, 462 U.S. 696, 709 (1983). "When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate." *Houston*, 174 F.3d at 815.

In assessing whether a detention was too long in duration to be justified as an investigative stop, it is appropriate "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 687. Was the person detained longer than reasonably necessary for officers to complete the purpose of the stop? *See Sharpe*, 470 U.S. at 685.

Embody was not detained any longer than needed to complete the purpose of the stop. Ward asked the Metro Police to assist in investigating the weapon. (Deposition of Steve Ward, p. 37). The Metro Police had technological capabilities for checking the legality of the weapon that the State Park Rangers did not have. (Deposition of Steve Ward, p. 35). If Ward had attempted to undertake the investigation by himself, it would have taken much longer since he did not have those capabilities. Asking the Metro Police to assist was "a means of investigation that was likely to confirm or dispel the officers' suspicions quickly during which time it was necessary to detain the defendant. *Sharpe*, 470 U.S. at 686.

14

Before going to Radnor Lake, Embody had researched the laws about handguns, the definition of a handgun, and guns in parks. (Deposition of Leonard Embody, p. 68). For law enforcement officers who must keep up with many laws, it was reasonable that they should have the same opportunity to research statutes that might be applicable to the question whether the weapon was legal.

Further, even though Embody anticipated that a Ranger would stop him in Radnor Lake that day about his unusual weapon (Deposition of Leonard Embody, p. 59), and even though he had activated a recording device as soon as he arrived, and recorded the Ranger who stopped him, Embody did not bring any information about his weapon that could have been useful to a Ranger, such as the bill of sale. (Deposition of Leonard Embody, p. 72-73). Ward had no information available to him about the difference in the weapon that day from when it was manufactured, and that it concerned him. (Deposition of Steve Ward, p. 45). It is permissible to consider the suspect's own actions in deciding whether the period of detention comported with an investigative *Terry* stop. *See Sharpe*, 470 U.S. at 687-88. Embody's own lack of concern about the situation he would be creating for Rangers with his unusual weapon should be factored into the time it took the officers to research the weapon. Further, Embody lengthened the duration of the stop by specifically requesting that a police supervisor come to the scene, even when he was told it would take additional time. (Deposition of Leonard Embody, p. 68).

After Embody complained to the Metro Police about the length of his detention, that agency documented the incident with statements and supplemental statements from every police officer who was present, and with a detailed sequence of events during the period of detainment. (*See* Affidavit of Lt. Natalie K. Lokey, custodian of records, Metro Police Department, and attached Police Complaint Investigation). Ranger Ward relied on the assistance of the Metro

15

Police that day, and the Police Complaint Investigation evidences the Metro Police's own accounting for what the officers did in researching Embody's weapon, and how long it took.

Similarly, after Embody complained to the Department of Environment and Conservation about the length of his detention, Assistant Commissioner Michael Carlton concluded that, among other factors, the length of detention was affected by "the immediate lack of information available to officers on the scene about the AK-47 Pistol and its qualifications as a legal handgun." (*See* Affidavit of Michael Carlton, Consumer Complaint and Review of Complaint. p. 3).

Police expert William T. Long observed that during the 2 ½ hours, Ward and the Metro officers had placed phone calls going all the way to the ATF headquarters in Virginia on Sunday afternoon when the majority of information process is usually unavailable. (Affidavit of Long, Expert Report at 8). He stated that it was "absolutely exceptional" that the officers were able to get information from the ATF as soon as they did. (*Id.*)

Ward did not violate Embody's Fourth Amendment rights. He should be dismissed.

### III. THE SAME UNDISPUTED FACTS SHOW THAT WARD DID NOT VIOLATE EMBODY'S SECOND AMENDMENT RIGHTS.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. 2. However, "[t]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, __ U.S. __, 128 S.Ct. 2783, 2815-16 (2008). *See also Hamblen v. United States*, 591 F.3d 471, 479 (6th Cir. 2009), *cert. denied*, 552 U.S. 992 (2007).

Tenn. Code Ann. § 39-17-1351 governs legal carrying of handguns by citizens of Tennessee: "The citizens of this state have a legal right to keep and bear arms for their common

16

defense; but the general assembly has the power, by law, to regulate the wearing of arms with a view to prevent crime." Embody does not challenge the constitutionality of Tenn. Code Ann. § 39-17-1351 here. Therefore, any Second Amendment claim against Ward, acting under color of state law, should be considered within the framework of this state law.

Relevant to the case at hand, Tenn. Code Ann. §39-17-1351 gives law enforcement personnel the authority to disarm a permit holder under certain conditions:

> Any law enforcement officer in this state or of any county or municipality may, within the realm of the officer's lawful jurisdiction and when the officer is acting in the lawful discharge of the officer's duties, disarm a permit holder at any time when the officer reasonably believes it is necessary for the protection of the permit holder, officer or other individual or individuals. The officer shall return the handgun to the permit holder before discharging the permit holder from the scene when the officer has determined that the permit holder is not a threat to the officer, to the permit holder, or other individual or individuals provided that the permit holder has not violated any provision of this section and provided the permit holder has not committed any other violation that results in the arrest of the permit holder.

Tenn. Code. Ann. § 39-17-1351(t).

As shown above, Steve Ward had specific, articulable grounds for suspecting that Embody's AK-47 type weapon was illegal because it had already been modified with an orange barrel tip to make it look like a toy. (Deposition of Steve Ward, p. 38). Stated in terms of Tenn. Code Ann. § 39-17-1351(t), Ward had a reasonable belief that disarming Embody was "necessary for the protection of the permit holder, officer or other individuals or individuals."

Further, Embody's weapon was returned to him when the Metro Police investigation concluded that Embody's weapon was a legal handgun. (Deposition of Steve Ward, pp. 44-45; Affidavit of Lt. Natalie K. Lokey, and attached Police Complaint Investigation; Affidavit of Michael Carlton, Consumer Complaint and Review of Complaint). The same facts show that Ward did not violate Embody's Second Amendment rights. Ward should be dismissed.

17

## III. EVEN IF THERE WERE A CONSTITUTIONAL VIOLATION, RANGER WARD IS ENTITLED TO QUALIFIED IMMUNITY.

"Governmental officials performing discretionary functions generally are shielded from liability for civil damages in so far as their conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense of qualified immunity generally provides "government officials with a qualified immunity, shielding them from damages…as long as their actions could have reasonably been consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Therefore, an officer would be entitled to qualified immunity if based on information provided, the officer had a sufficient factual basis for believing the officer was acting consistently with *Terry*. *See Feathers*, 319 F.3d at 851.

In order to prove that a right was clearly established at the time it was alleged to have been violated, a plaintiff must prove each of the following elements: that the plaintiff identified a clearly established right alleged to have been violated, and that a reasonable person under the defendant's circumstances should have known that his actions would violate the identified right. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994). A constitutional right is "clearly established" if the issue has been determined by the Supreme Court, the Sixth Circuit, or this Court. *See Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177-78 (6th Cir. 1988).

In this case, plaintiff Embody alleges that his weapon was an "AK-47 handgun," that it came within the definition of a "handgun" under state law, and that he took it into a state park or natural area as state law allowed him to do. (*See generally* Amended Complaint). He contends he did nothing illegal, showed his permit to two Rangers, and fully complied with the Rangers' directions to him. (*Id.*) He contends that Ranger Ward stopped him at gunpoint, and then

18

Case 3:10-cv-00126 Document 18 Filed 11/30/10 Page 18 of 20 PageID #: 408

detained him for three hours when Embody had his permit and the weapon came within the statutory definition of a handgun. (*Id.*) He claims Ward violated his Second and Fourth Amendment rights. (*Id.*)

However, at the time of this incident, the "guns in parks" law, Tenn. Code Ann. § 39-17-1311(H), was only six months old. Further, there was no case law guiding law enforcement officers as to their authority to disarm and detain handgun permit holders under § 39-17-1351(t). There are no cases that clearly establish that, in a case such as this, Ward lacked reasonable suspicion to stop and detain an individual such as plaintiff Embody.

Embody's motives are unclear as to why he came to Radnor Lake that day with a weapon he anticipated would get the Rangers' attention and that was just under the maximum barrel length for a weapon to be a "handgun" under state law. His motives are also unclear for why he painted the tip of the weapon orange, why he dressed in camouflage, and why he started his recording device as soon as he got out of his car at Radnor Lake that day. If he was testing law enforcement officers to see if they knew the law, this does not make Ward liable. For Ranger Ward who was required to interpret the state criminal statute governing handguns, Tenn. Code Ann. § 39-17-1351, "no more than a reasonable degree of certainty can be demanded." *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952). As for Embody whose own actions raised reasonable officer suspicions: "[It is not] unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." (*Id.*) Ranger Ward had a reasonable belief that Embody had "crossed the line."

The facts of this case demonstrate the tough judgment calls that a law enforcement officer must make, and the reasons for qualified immunity. When Ranger Ward was asked about the "guns in parks" law, he stated that the law could have been written better, but "it's just

19

something that we have to deal with as law enforcement officers." (Deposition of Steve Ward, pp. 6, 39-40). He observed, "Each situation is different. We have to approach it that way." (Deposition of Steve Ward, p. 39). When asked what he was going to do when he saw the next citizen walking in Radnor Lake with a gun similar to the one in this case, Ward answered: "I'm going to make sure my officers and our visitors are safe, that's what I'm going to do." (Deposition of Steve Ward, p. 39). Ranger Ward is entitled to qualified immunity. He should be dismissed.

## CONCLUSION

Defendant Steve Ward asks that he be dismissed with prejudice.

Respectfully submitted,

ROBERT E. COOPER, JR., BPR # 010934
Attorney General and Reporter

s/Mary M. Bers, BPR # 013159
Senior Counsel

s. Dawn M. Jordan, BPR # 020383
Senior Counsel
Office of the Attorney General
P. O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-1845

### CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2010, a copy of the foregoing was filed electronically to Phillip L. Davidson, 2400 Crestmoor Road, Suite 107, Nashville, TN 37215. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Copies will be served by the Court's electronic filing service on the following counsel of record:

s/ Mary M. Bers