# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LEONARD S. EMBODY,                    )
                                      )
    Plaintiff,                        )          No.  3:10cv-00126
                                      )          JUDGE HAYNES
v.                                    )
                                      )
STEVE WARD, Individually,             )
                                      )
    Defendant.                        )

### M E M O R A N D U M

Plaintiff, Leonard S. Embody, filed this action under 42 U.S.C. § 1983 against the

Defendant Steve Ward, a park ranger with the Tennessee Department of the Environment and

Conservatory.  Plaintiff's claims[1] are that Ward violated his Second Amendment right to bear

arms and his Fourth Amendment right to be free of unreasonable seizure when Ward temporarily

seized Plaintiff and his weapon at the Radnor Lake State Park.  Plaintiff alleges that he had a

permit for his weapon that was a legal handgun.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 21)

contending, in sum, that the temporary seizure of Plaintiff and his weapon, an AK-47 pistol, at

the Radnor park area, was reasonable under the Fourth Amendment given the weapon's altered

status and Plaintiff's possession of that weapon in a state park.  In addition, Defendant argues

that state law authorizes temporary seizure of Plaintiff and his weapon under such circumstances,

---

[1] In his original complaint (Docket Entry No. 1), Plaintiff asserted only a Fourth Amendment claim, but in his response to Defendant's motion for summary judgment, Plaintiff asserts a claim for violation of his Second Amendment right (Docket Entry No. 22-3 at 4) to which the Defendant also briefed.  (Docket Entry No. 18 at 16-20).  The Court entered an Order that Plaintiff identify his pleadings to reflect whether Plaintiff was asserting a Second Amendment claim and Plaintiff did so.  See Docket Entry No. 42.

1

as here Plaintiff posed a danger to others.  Thus, the Defendant argues that he did not violate

Plaintiff's Second Amendment right to bear arms.

In response, Plaintiff asserts that he had a permit for his weapon and that his weapon, an

AK-47 pistol, is legal.  Thus, Plaintiff contends that the Defendant lacked probable cause to seize

him and his weapon.  Plaintiff also contends that the manner of his seizure was unreasonable and

interfered with his Second Amendment right to bear arms.

### A.  Findings of Fact[2]

On December 20, 2009, Plaintiff was walking in the Radnor Lake State Park, dressed in

camouflage clothing with an AK-47 in a sling.  (Docket Entry No. 22-3, Plaintiff's Response to

Defendant's Statement of Undisputed Facts at ¶ 1).  Plaintiff's weapon had an orange-colored

barrel tip that Plaintiff painted onto the barrel between December 16, 2009 and December 20,

2009.  Id. at ¶¶ 2, 3.  Joshua Walsh, a state park ranger at the Radnor Park, encountered Plaintiff

and was initially uncertain if Plaintiff's weapon was real given its orange barrel tip.  Id. at ¶¶ 4,

5.  Walsh questioned Plaintiff who responded that the weapon was in fact an AK-47.  Id.

Plaintiff's weapon was fully loaded with 30 rounds in the magazine and a round in the chamber.

Id. at ¶ 6.  Walsh told Plaintiff: "Technically it's a handgun, but I don't know why you need it

out here." Id. at ¶ 8.  Walsh also told Plaintiff, "I'm pretty sure an AK-47 is not a handgun."  Id.

---

[2] Upon a motion for summary judgment, the factual contentions are viewed in the light most
favorable to the party opposing the motion for summary judgment.  Duchon v. Cajon Co., 791
F.2d 43, 46 (6th Cir. 1986).  As discussed infra, upon the filing of a motion for summary
judgment, the opposing party must come forth with sufficient evidence to withstand a motion for
directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where
there has been an opportunity for discovery.  Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986).
Based upon the parties' responses to the Statement of Undisputed Facts (Docket Entry No. 22-3)
and the applicable law, the Court finds that there are not any material factual disputes and this
section constitutes findings of fact under Fed. R. Civ. P. 56(b).

2

During Plaintiff's discussion with Walsh, a park visitor approached them and asked if the weapon were real. Id. at ¶ 10. Walsh considered the visitor's inquiry serious. Id. at ¶ 11. Two or more park visitors also told Walsh they were "very concerned" about Plaintiff and his weapon. Id. at ¶ 12. Walsh then called Defendant Steve Ward, his supervisor, and explained that he (Walsh) initially thought the gun was an air toy gun given its orange-color tip, but Plaintiff admitted the weapon was an AK-47. Id. at ¶ 13.

Ward instructed Walsh to continue to follow Plaintiff and keep him informed by telephone of Plaintiff's movement and acts. Id. at ¶18. Ward, in turn, notified Shane Petty, his supervisor and Chief Ranger of Tennessee State Parks, about Plaintiff. Id. at ¶¶ 20, 21. Walsh again called Ward with Walsh's tone of voice expressing grave concern about Plaintiff. Id. at ¶ 15. During that latter conversation, an elderly couple was beating on the door of Ward's home in the park area to report a man with an assault rifle in the park. Id. at ¶¶ 15, 16.

From Walsh's description of the weapon, Petty did not believe the weapon was a valid handgun and instructed Ward that Walsh should disengage and call the Metropolitan Nashville ("Metro") police department.[3] Id. at ¶ 23. Ward, in turn, instructed Walsh to call the Metro police. Id. at ¶ 17. Petty and Ward also agreed to a "felony take down" of Plaintiff with Ward initiating the stop with his weapon. Id. Petty then called Michael Carlton, his supervisor and Assistant Commissioner, to advise him of Ward's report and Petty's instructions. Id. at ¶ 25.

Ward pulled into the west parking lot at Radnor Lake and observed Plaintiff with his weapon on his chest. Id. at ¶ 26. Plaintiff was near his vehicle when Ward pointed a shotgun at Plaintiff and ordered Plaintiff to put his hands up and place himself and the weapon on the ground. Id. at ¶ 28. Ward then instructed Plaintiff to remain on the ground while Ward checked

---

[3] Metro Police and the park rangers share jurisdiction over Radnor Lake. Id. at ¶ 39.

him for any other weapons and Plaintiff complied.  Id. at ¶ 24.  Metro Police arrived as Ward was patting down Plaintiff.  Id. at ¶ 38.  After a pat down, Ward allowed Plaintiff to stand up, but did not handcuff him.  Id. at ¶¶ 30, 31.  Ward also allowed Plaintiff to use his cell telephone and did not formally arrest Plaintiff.  Id. at ¶¶ 32, 33.  Plaintiff refused to sign a citation in lieu of arrest because he had committed no crime.  (Docket Entry No. 16-1, Plaintiff's Deposition at 87 and Docket Entry No. 26 at ¶ 26).  After Metro police arrived, Plaintiff was compliant and willing to have his weapon seized.  (Docket Entry No. 26 at ¶ 27.  Ward never instructed a police officer to arrest Plaintiff.  (Docket Entry No. 16-1, Plaintiff's Deposition at 73).

Ward told the Metro police officers of his concern that Plaintiff's weapon was illegal.  Ward also told Plaintiff to wait until a determination was made whether Plaintiff's weapon was legal.  (Docket Entry No. 22-3 at ¶ 44.  Metro police officer had the technology (that the State park rangers lack) to conduct a weapon check on Plaintiff's weapon and did so.  Metro police also contacted the United States Bureau of Alcohol, Tobacco and Firearms ("ATF"), that advised Metro police that Plaintiff's weapon was manufactured as a pistol and met federal requirements for a pistol/handgun.  Id. at ¶ 49.  Ward returned Plaintiff's weapon.  Id. at ¶ 50.  Ward photographed Plaintiff's weapon, sling and his ammunition.  This December 20, 2009 incident lasted two and a half hours from approximately 4:30 p.m. to 7:00 p.m.  Id. at ¶ 46.  Plaintiff concedes Defendant and the officers were calm, courteous, and respectful.  (Docket Entry No. 16-1, Plaintiff's Deposition at 63-64).

On two prior visits to the Radnor Lake in the fall of 2009, Plaintiff carried a Smith & Wesson revolver in a holster.  Id. at 43.  During one of those visits, Ward asked for Plaintiff's handgun permit and returned the permit to Plaintiff after a brief discussion without incident.  On

October 29, 2010, Ward also photographed Plaintiff's camouflage jacket, weapon, ammunition and sling at the Radnor Park, but did not initially recognize Plaintiff on December 20, 2009. (Docket Entry No. 16-3, Ward Deposition at 26). Embody anticipated that a park ranger would stop him in Radnor Lake on December 20th about his unusual weapon (Docket Entry No. 16-1, Plaintiff's Deposition at 59).

Plaintiff filed administrative complaints with the State and Metro officials about this incident Metro police investigated Plaintiff's complaint about his detention and concluded that police officers followed established policy, rules and procedure. (Docket Entry No. 22-3 at ¶ 51). Plaintiff also filed an administrative complaint with the Tennessee Department of Environment and Conservation ("TDEC") that deemed the complaint meritless. Id. at ¶ 53. Michael Carlton, TDEC's assistant commissioner, found that under the circumstances, Ward had probable cause for Plaintiff's violation of Tenn. Code Ann. § 39-17-1307 for illegal possession of a weapon because the AK-47 semi-automatic rifle had been altered to resemble a toy for unknown reasons. Id.

### B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986), the United States Supreme Court explained the nature of a motion for summary

judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary
> judgment `shall be rendered forthwith if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that the moving party is
> entitled to a judgment as a matter of law.'  By its very terms, this standard
> provides that the mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material.  Only
> disputes over facts that might affect the outcome of the suit under the governing
> law will properly preclude the entry of summary judgment.  Factual disputes that
> are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part).  Earlier the Supreme Court

defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'"

<u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations

omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986).  Where there has been a reasonable

opportunity for discovery, the party opposing the motion must make an affirmative showing of

the need for additional discovery after the filing of a motion for summary judgment.  <u>Emmons v.</u>

<u>McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989).  But <u>see</u> <u>Routman v. Automatic Data</u>

<u>Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the

required showing of the respective parties as described by the Court in <u>Celotex</u>

6

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and] . . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (cites omitted).  See also Hutt v. Gibson Fiber Glass Products, No. 89-

5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment

must determine `whether the evidence presents a sufficient disagreement to require a submission

to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting

Liberty Lobby)).

> If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute
> about a material fact is `genuine' that is, if the evidence is such that a reasonable
> jury could return a verdict for the nonmoving party.
>
> * * *
>
> Progressing to the specific issue in this case, we are convinced that the inquiry
> involved in a ruling on a motion for summary judgment or for a directed verdict
> necessarily implicates the substantive evidentiary standard of proof that would
> apply at the trial on the merits.  If the defendant in a run-of-the-mill civil case
> moves for summary judgment or for a directed verdict based on the lack of proof
> of a material fact, the judge must ask himself not whether he thinks the evidence
> unmistakably favors one side or the other but whether a fair-minded jury could
> return a verdict for the plaintiff on the evidence presented.  The mere existence of
> a scintilla of evidence in support of the plaintiff's position will be insufficient;
> there must be evidence on which the jury could reasonably find for the plaintiff.
> The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could
> find by a preponderance of the evidence that the plaintiff is entitled to a verdict --
> `whether there is [evidence] upon which a jury can properly proceed to find a
> verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

> It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the
> evidence in its most favorable light in favor of the party opposing the motion and
> against the movant.  Further, the papers supporting the movant are closely
> scrutinized, whereas the opponent's are indulgently treated.  It has been stated
> that: `The purpose of the hearing on the motion for such a judgment is not to
> resolve factual issues.  It is to determine whether there is any genuine issue of
> material fact in dispute. . . .'

8

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted).  As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion."  <u>Duchon v. Cajon Company</u>, 791 F.2d. 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial.  This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers.  Designate means simply "to point out the location of."  Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires.  This notice can be adequately accomplished through a local court rule or a pretrial order.

<u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989) <u>cert.</u> <u>denied</u> 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990).  Here, the parties have given some references to the proof upon which they rely.  Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.      Complex cases are not necessarily inappropriate for summary judgment.

2.      Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

9

3.      The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.      This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.      A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.      As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to

10

establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

As to Plaintiff's Fourth Amendment claim, the threshold question of reasonableness of a search and/or seizure is to be resolved by the Court.  Hunter v. Bryant, 502 U.S. 224 (1991).  The Fourth Amendment standard of objective reasonableness applies to all types of Fourth Amendment claims.  Graham v. Connor, 490 U.S. 386 (1989). In Jeffers v. Heavrin, 10 F.3d 380, 381 (6th Cir. 1993), concerning an immunity contention regarding a Fourth Amendment claim, the Court of Appeals stated that, "[o]ur starting point is that probable cause determinations, even if wrong, are not actionable as long as such determinations pass the test of reasonableness. Reasonableness is a question of law to be decided by the trial judge."

As to the defendant's qualified immunity defense, qualified immunity grants immunity from damages for government officials performing discretionary functions.  Blake v. Wright, 179 F.3d 1003, 1007 (6th Cir. 1999).  Government officials acting in their official capacities are not liable for civil damages, if their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Anderson v. Creighton, 483 U.S. 635, 639 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.").

"The statutory or constitutional rights in question must have been 'so clearly established when the acts were committed that any officer in the defendant's position, measured objectively,

11

would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'" Cullinan v. Abramson, 128 F.3d 301, 309 (6th Cir. 1997) (citations omitted).

While Defendants bear the burden of pleading qualified immunity as an affirmative defense, Plaintiff must show that Defendants are not entitled to qualified immunity. Blake, 179 F.3d at 1007. To overcome the qualified immunity defense, a Section 1983 plaintiff must show that the right was clearly established at the time of the violation, Harlow, 457 U.S. at 818, and that "the contours of [the clearly established] right...[were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. Yet, precedent is not required for all § 1983 claims to conclude that the right is clearly established. In a word, immunity from damages does not attach simply because the particular legal requirement "has never explicitly held to apply...in identical circumstances." Mitchell v. Forsyth, 472 U.S. 511, 535 n.12 (1985).

As to whether the individual defendants are immune from damages on Plaintiff's Fourth Amendment claim, the Court must first determine whether a constitutional violation is presented. In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth its two step approach: first, whether a constitutional violation presented and second, if so, was that right clearly established at the time of the constitutional violation. In Saucier, the Supreme Court stated:

> We have on several occasions addressed the proper analytical framework for determining whether a plaintiff's allegations are sufficient to overcome a defendant's defense of qualified immunity asserted in a motion for summary judgment. Qualified immunity is a defense that must be pleaded by a defendant official. Gomez v. Toledo, 446 U.S. 635 (1980); Harlow, 457 U.S. at 815. Once a defendant pleads a defense of qualified immunity, "[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. . . . Until this threshold immunity question is resolved, discovery should not be allowed." Id. at 818.

12

In <u>Harlow</u> we said that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." <u>Harlow</u>, <u>supra</u>, at 818 (emphasis added). <u>A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.</u>

<u>Id.</u> at 231-32 (emphasis added).

In <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S.Ct. 808 (2009), the Supreme Court modified <u>Saucier</u> to allow the district court to answer either or both of these two inquiries.

Where a decision has "been questioned by Members of the Court in later decisions and [has] defied consistent application by the lower courts," these factors weigh in favor of reconsideration. <u>Payne</u>, 501 U.S. at 829-830, 111 S.Ct. 2597; <u>see</u> also <u>Crawford v. Washington</u>, 541 U.S. 36, 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Collectively, the factors we have noted make our present reevaluation of <u>Saucier</u> two-step protocol appropriate.

On reconsidering the procedure required in <u>Saucier</u>, we conclude that, while the sequence set forth there is ofter appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

129 S. Ct. at 818. Given the circumstances here, the Court deems the appropriate inquiry here is to determine whether the Defendant violated Plaintiff's rights under the Second and Fourth Amendments.

Here, prior to Ward's seizure of Plaintiff, Plaintiff had an altered AK-47 strapped across his chest and fully loaded with a bullet in the weapon's chamber. Plaintiff's AK-47 type weapon had been modified with an orange barrel tip to resemble a toy. Several park visitors expressed concern about Plaintiff being armed. Ward used his weapon to order Plaintiff to the ground to allow Ward to search Plaintiff for any other weapons. After doing so, Ward allowed Plaintiff to

stand up and to use his cell phone until Metro Officers arrived at the scene. Ward never placed

Plaintiff in the ranger's vehicle or handcuffed him. Plaintiff concedes Defendant and the officers

were calm, courteous, and respectful to him.

State law authorized Ward to seize Plaintiff and his weapon. Tenn. Code Ann. § 39-17-

1351(t) provides:

> **Any law enforcement officer in this state or of any county or municipality may, within the realm of the officer's lawful jurisdiction** and when the officer is acting in the lawful discharge of the officer's duties, **disarm a permit holder at any time when the officer reasonably believes it is necessary for the protection of the permit holder, officer or other individual or individuals. The officer shall return the handgun to the permit holder before discharging the permit holder from the scene when the officer has determined that the permit holder is not a threat to the officer, to the permit holder, or other individual or individuals provided that the permit holder has not violated any provision of this section** and provided the permit holder has not committed any other violation that results in the arrest of the permit holder.

(emphasis added).

Here, Plaintiff's AK-47 type weapon had been modified with an orange barrel tip to

resemble a toy. Several park visitors expressed concerns about Plaintiff, given his camouflage

dress and the type of weapon he was carrying. Thus, under Tenn. Code Ann. § 39-17-1351(t),

the Court concludes that Ward had a reasonable belief to disarm Plaintiff as "necessary for the

protection of the permit holder, officer or other individuals or individuals" in the park area until

such time as Plaintiff's weapon was determined to be lawful. Further, Embody's weapon was

returned to him when the Metro Police investigation concluded that Embody's weapon was a

legal handgun.

Thus, the Court concludes that the temporary seizure of Plaintiff and his weapon was

objectively reasonable under the Fourth Amendment.

As to his Second Amendment claim, Plaintiff contends that on December 20, 2009, Plaintiff had a legal right to carry his weapon, a Draco AK-47 pistol in a State park because Plaintiff had a valid permit to carry the weapon that is legal under federal law.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. 2. In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held unconstitutional several District of Columbia statutes prohibiting the possession of handguns and requiring lawfully owned firearms to be kept inoperable. The Supreme Court concluded the Second Amendment "confer[s] an individual right to keep and bear arms." Id. at 595. The Supreme Court's express holding was as follows:

> In sum**, we hold that the District's ban on handgun possession in the home violates the Second Amendment**, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense. Assuming that Heller is not disqualified from the exercise of Second Amendment rights**, the District must permit him to register his handgun and must issue him a license to carry it in the home.**

Id. at 635 (emphasis added). The Supreme Court later extended Heller's holding to the States. McDonald v. City of Chicago, ---U.S. ----, 130 S.Ct. 3020, 3047 (2010) ("We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller.") (plurality opinion of Alito, J.).

In United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011), the Fourth Circuit explained these two holdings on the Second Amendment:

> The upshot of these landmark decisions is that **there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home. But a considerable degree of uncertainty remains as to the scope of that right beyond the home** and the standards for determining whether and how the right can be burdened by governmental regulation.

Id. at 467.

Although <u>Heller</u> recognized a citizen's personal right under the Second Amendment to possess a firearm in his name, the Court declined to define the scope of this right, but stated that: "Like most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th century cases that right was not a right to keep and carry a weapon whatsoever in any manner whatever and for whatever purpose.... [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms...."  534 U.S. at 626.  For example, "[t]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," <u>id.</u> at 625, that is based upon a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  <u>Id.</u> at 627. In addition, the Second Amendment does not preclude laws "on the possession of firearms by felons and the mentally ill, **or laws forbidding the carrying of firearms in sensitive places** such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  <u>Id.</u> at 627 (emphasis added).

Here, Tenn. Code Ann. § 39-17-1351(t) governs authorizes temporary seizure of weapons that raises a threat to public safety Tennessee:[4] Plaintiff does not challenge the constitutionality of Tenn. Code Ann. § 39-17-1351 on his Second Amendment claim.  Yet, the site of this seizure of Plaintiff's weapon occurred in a state park and this presents a significant fact for Plaintiff's Second Amendment claim.

In <u>Nordyke v. King</u>, 563 F.3d 439 (9th Cir. 2009), the Ninth Circuit addressed a challenge to a gun ban that extended to "open space venues, such as County-owned parks, recreational areas, historic sites, parking lots of public buildings ... and the County fairgrounds."

---

[4] "The citizens of this state have a legal right to keep and bear arms for their common defense; but the general assembly has the power, by law, to regulate the wearing of arms with a view to prevent crime."

The Ninth Circuit explained that rationale to these restrictions was that such sites are "gathering places where high numbers of people might congregate." The Ninth Circuit concluded that" [a]lthough Heller does not provide much guidance, the open, public spaces the County's Ordinance covers fit comfortably within the same category as schools and government buildings." Id. at 459-460. Similarly, in Masciandaro, the Fourth Circuit concluded that federal regulations barring a citizen's possession of a loaded weapon on his person or in his vehicle in a federal park did not violate the Second Amendment because "large numbers of people, including children congregate for recreation." 638 F.3d at 472. The Fourth Circuit also concluded that § 2.4(b)'s narrow prohibition was reasonably adapted to a substantial interest.

> Under § 2.4(b), national parks patrons are prohibited from possessing *loaded* firearms, and only then within their motor vehicles. 36 C.F.R. § 2.4(b) ("Carrying or possessing a loaded weapon in a motor vehicle, vessel, or other mode of transportation is prohibited").

Id. See also United States v. Dorosan, 2009 WL 3294733 (5th Cir. 2009) ("bringing a handgun onto property belonging to the United States Postal Service," a parking lot, was not protected by the Second Amendment).

Given that Plaintiff was in personal possession of a loaded weapon[5] in a public park, the Court concludes that the temporary seizure of Plaintiff's weapon did not violate the Second Amendment

For these reasons, the Defendant's motion for summary judgment (Docket Entry No. 21) should be granted.

An appropriate Order is filed herewith.

---

[5] Whether Plaintiff's AK-47, Draco pistol model, although legal, is a weapon "typically possessed by law-abiding citizens for lawful purposes," Heller, 554 U.S. at 625, poses a significant issue, but the parties did not submit proof on that issue. With the Court's conclusion about Plaintiff's possession of his loaded weapon in a public park, the Court deems resolution of this issue unnecessary.

**ENTERED** this the _____ day of July, 2011.

                                          _____

                                          WILLIAM J. HAYNES, JR.
                                          United States District Judge